1  **THE LAW OFFICE OF MYCHAL WILSON**

2  Mychal Wilson SBN #236189
   The Law Office of Mychal Wilson

3  2425 W. Olympic Blvd., Suite 4000-W
   Santa Monica, CA 90404

4  Telephone: (424) 252-4232

5  Facsimile: (310) 424-7116
   E-mail: mw@mychalwilsonesq.com

6

7  LA CV16 06997-RGK-RAOx

8  **IN THE UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

10

11  [UNDER SEAL]                          Case No. _____

12                  Relators,

13        v.                              **COMPLAINT FOR DAMAGES UNDER THE
                                          FEDERAL FALSE CLAIMS ACT AND**
14  [UNDER SEAL],                         **VARIOUS STATE FALSE CLAIMS ACTS
                                          AND DEMAND FOR JURY TRIAL**
15

16                  Defendant.           **TO BE FILED IN CAMERA
                                         AND UNDER SEAL PURSUANT TO**
17                                        **31 U.S.C. § 3730**

18

19                                        **DO NOT ENTER INTO PACER**

20                                        **DO NOT PLACE IN PRESS BOX**

21

22

23

24

25

26

27

28

FILED
CLERK U.S. DISTRICT COURT

SEP 16 2016

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

FILED

**THE LAW OFFICE OF MYCHAL WILSON**
Mychal Wilson SBN #236189
The Law Office of Mychal Wilson
2425 W. Olympic Blvd., Suite 4000-W
Santa Monica, CA 90404
Telephone: (424) 252-4232
Facsimile: (310) 424-7116
E-mail: mw@mychalwilsonesq.com

2016 SEP 16 PM 4:25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

LA CV16 06997-RGK-RAOx

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| and | **UNDER SEAL** |
| THE STATES OF ARKANSAS, | CIVIL ACTION No. |
| CALIFORNIA, COLORADO, | _____ |
| CONNECTICUT, DELAWARE, | |
| FLORIDA, GEORGIA, HAWAII, | **COMPLAINT FOR DAMAGES** |
| ILLINOIS, INDIANA, IOWA, | **AND DEMAND FOR JURY TRIAL** |
| LOUISIANA, MARYLAND, | |
| MASSACHUSETTS, MICHIGAN, | **TO BE FILED IN CAMERA AND** |
| MINNESOTA, MISSOURI, | **UNDER SEAL PURSUANT TO 31** |
| MONTANA, NEVADA, NEW | **U.S.C. § 3730 (b) (2)** |

PAID

16 2009

Clerk, US District Court
COURT 4612

1

HAMPSHIRE, NEW JERSEY, NEW
MEXICO, NEW YORK, NORTH
CAROLINA, OKLAHOMA, RHODE
ISLAND, TENNESSEE, TEXAS,
VERMONT, VIRGINIA,
WASHINGTON, AND THE DISTRICT
OF COLUMBIA

ex rel.

ALEXANDER VOLKHOFF, LLC,

                    Relator,

vs.


JANSSEN PHARMACEUTICA N.V.,
JANSSEN PHARMACEUTICALS,
INC., and JANSSEN RESEARCH &
DEVELOPMENT, LLC, JOHNSON &
JOHNSON, and ORTHO-MCNEIL


Defendants.

**DO NOT ENTER INTO PACER**

**DO NOT PLACE IN PRESS BOX**

2

Contents

INTRODUCTION ................................................................................10

PARTIES.............................................................................................23

JURISDICTION AND VENUE ........................................................27

FACTS ................................................................................................28

DEFAMATION AND BLACKLISTING .........................................88

CONCLUSION ..................................................................................90

Count I; FALSE CLAIMS ACT

    CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS......91

Count II; FALSE CLAIMS ACT

    CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT.......................................................................92

Count III; FALSE CLAIMS ACT

    CAUSING FALSE RECORDS OR STATEMENT TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT ................................................................................93

3

Count IV; FALSE CLAIMS ACT

   CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS;

   ILLEGAL RENUMERATION ........................................................................94

Count V; FALSE CLAIMS ACT

   CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED

   TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY

   THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND

   COMPENSATION ARRANGEMENTS ........................................................96

Count VI; FALSE CLAIMS ACT

   CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A

   FALSE OR FRAUDULENT CLAIM ALLOWD OR PAID............................98

Count VII; FALSE CLAIMS ACT

   RETALIATION/WRONGFUL TERMINATION ...........................................99

   VIOLATION OF THE RETALIATION STATUTE, 42 U.S.C. § 3730(h) ......99

Count VIII

   (Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 *et seq*.) ....101

Count XIX

   (California False Claims Act, Cal. Gov't Code § 12650 *et seq*.) .....................104

Count X

 (California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 *et seq.*)

 ..................................................................................................108

Count XI

 (Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 *et seq.*)

 ..................................................................................................111

Count XII

 (Connecticut False Claims Act for Medical Assistance Programs, Connecticut

 General Statutes § 17b-301b. *et seq.*) ...............................................115

Count XIII

 (Delaware Medicaid False Claims Act, 6 Del. C. § 1201 *et seq.*)....................118

Count XIV

 (District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 *et*

 *seq.*).........................................................................................122

Count XV

 (Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*)....................................126

Count XVI

(Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*) ....................................................................................129

Count XVII

(Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 *et seq.*)..........................133

Count XVIII

(Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*) ...136

Count XIX

(Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*).......140

Count XX

(Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*) ....................................................................................142

Count XXI

(Iowa False Claims Act, Iowa Code § 685.1 *et seq.*) .......................................146

Count XXII

(Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 *et seq.*)..........................................................................150

Count XXIII

(Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 *et seq.*) .........................154

Count XXIV

(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) *et seq.*) .................................................................................................158

Count XXV

(Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq.*) ..................161

Count XXVI

(Minnesota False Claims Act, (Minnesota Statutes § 15C.01 *et seq.*) .............165

Count XXVI

(Missouri Health Care Payment Fraud and Abuse Act, Missouri Revised Statutes § 191.900 *et seq.*) ..................................................................169

Count XXVII

(Montana False Claims Act, MT ST 17-8-401 *et seq.*) .....................................173

Count XXVIII

(Nevada False Claims Act, N.R.S. § 357.010 *et seq.*).......................................177

Count XXIX

(New Hampshire False Claims Act, N.H. Rev. Stat. § 167:61-b *et seq.*).........180

Count XXX

(New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.*)..............................183

Count XXXI

(New Mexico Medicaid False Claims Act, and New Mexico Fraud Against

Taxpayers Act, N. M. S. A. 1978, § 27-14-1 *et seq.*, and N. M. S. A. 1978, § 44-

9-1 *et seq.*)........................................................................................187

Count XXXII

(New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*)...................191

Count XXXIII

(North Carolina False Claims Act, North Carolina General Statutes § 51-1-605

*et seq.*)...............................................................................................195

Count XXXIV

(Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 *et seq.*).......198

Count XXXV

(Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1 *et seq.*).............201

Count XXXVI

(Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)

..........................................................................................................205

Count XXXVII

    (Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq*.)...........208

Count XXXVIII

    (Vermont False Claims Act, 32 V.S.A. 630 *et seq*.)........................................213

Count XXXIX

    (Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1*et seq*.) 216

Count XL

    (Washington False Claims Act, Washington Revised Code § 74 66-005 *et seq*.)

    .................................................................................................................220

REQUESTS FOR RELIEF .................................................................................223

DEMAND FOR JURY TRIAL ..........................................................................226

CERTIFICATION THAT VENUE IS PROPER .................................................227

# **INTRODUCTION**

1.      Relator Alexander Volkhoff, LLC is informed and believes, and thereon alleges the following Complaint against Janssen Phamaceutica N.V., Janssen Phamaceuticals, Inc., and Janssen Research & Develepment, LLC, Johnson & Johnson, and Ortho-McNeil, (hereinafter collectively referred to as "Defendants").

2.      Defendant Janssen ("Janssen") is a pharmaceutical company that produces, markets, sells, and distributes pharmaceutical and biological products in the areas of area of immunology, pain management, and infectious diseases among others. Janssen and Defendant Johnson & Johnson ("JNJ") and Defendant Ortho-McNeil ("Ortho-McNeil") co-promote the prescription drug Olysio, or simeprevir, in the United States. Janssen markets, sells, and distributes the opioid drug Nucynta and Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica.

3.      The Food and Drug Administration ("FDA") has approved Olysio for the treatment of patients with hepatitis C. The FDA has approved Nucynta for the treatment of moderate to severe pain acute pain under three (3) months in duration. Other indications for other Defendants' drugs include Levaquin for infections caused by designated, susceptible bacteria; Xarelto for a variety of specific blood thinning purposes; Aciphex for heartburn and reflux; Ultram ER for chronic pain; and Remicade for rheumatoid arthritis, psoriatic arthritis, ulcerative colitis, Crohn's

disease, and ankylosing spondylitis. Remicade is also used to treat severe or disabling plaque psoriasis. Also, Elmiron for the relief of bladder pain or discomfort associated with interstitial cystitis; Invokana as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus; Simponi for the treatment of rheumatoid arthritis, psoriatic arthritis, ankylosing spondylitis, and ulcerative colitis; and Imbruvica for the treatment of mantle cell lymphoma.

4.      Olysio is an expensive drug, costing as much as $25,000 per dose. In addition, its market share is inherently limited, since it is approved for use only in patients with Hepatitis C. According to the Centers for Disease Control, there are approximately 17,000 patients newly diagnosed annually with hepatitis C. To overcome these problems and gain a larger market for this drug, Defendants created a plan to illegally market Olysio off-label to treat HIV and renal failure patients, and other uses that are not approved by the FDA.

5.      Defendants funneled millions of dollars in unrestricted grant money to physicians in order to encourage them to speak and publish articles supporting the use of Olysio in patients whose cardiovascular event symptoms did not meet FDA criteria for Olysio. Specifically, Defendants targeted, developed, and trained physician "Key Opinion Leaders" ("KOLs"), influential doctors whom Defendants supported monetarily. Defendants, in turn, expected these KOLs to support

Defendants' prescription drug use among off-label patient populations. Defendants then pointed to the KOLs' use of Olysio when promoting the drug widely to other physicians throughout the country.

6.     Consistent with their scheme to provide illegal incentives to doctors who prescribed Olysio, Defendants also gave kickbacks to physicians for off-label use of the drug, providing the physicians with speaking opportunities, unrestricted educational grants, lavish meals, and honoraria to promote and prescribe Olysio off-label, including paid travel included trips to Las Vegas, Hawaii, Chicago, Dallas, and other locations [doctors flew their families to these paid speaking events, and paid for the additional days that they and their families were there. Sometimes speakers would say "I want to take the family to Hawaii, or to Whistler to ski – knowing that the company would pay for their own ticket and an overnight hotel day]. At these "fly-to" activities doctors would sometimes receive paid travel and also be paid as speakers, or would be given speaker training so they could receive additional speaker payments from Defendants in the future. Defendants encouraged the physicians' acceptance of the paid travel and speaking fees as a form of quid pro quo for increased sales of Olysio.

7.     Additionally, Olysio is not superior to competing, similar prescription drugs on the market, and Defendants' scheme to promote broad off-label use of Olysio among off-label patient populations and to influence studies promoting Olysio for

use in such patients is very costly. A 2015 study published in the journal BMC Gastroenterology reveals that Olysio is not a cost-effective treatment compared to older treatments, and that a reduction of thirty percent (30%) or more in cost would be necessary to achieve a cost-effective result (See Exhibit 1).

8.      Many of Defendant's drugs market share are inherently limited, because they are approved for use only in patients with very narrow indications. To overcome these problems and gain a larger market for these drugs, Defendants created a plan to illegally market Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug products to gain market share and formulary status in different territories.

9.      In order to increase sales of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug products, Defendants have illegally provided monetary and other incentives for physicians who were willing to prescribe the drugs. Defendants trained and instructed sales representatives, business and marketing managers, and other executives to offer physicians cash payments, expensive trips and meals, expensive gifts, and entertainment as kickbacks in exchange for the physicians' agreement to prescribe Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron,

13

Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug products.

10.     The pharmaceutical industry is highly regulated by the FDA. Pursuant to the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*, the FDA strictly regulates the content of consumer and physician based advertising, direct to physician product promotion, and drug labeling information used by pharmaceutical companies in promoting and selling-FDA approved prescription drugs.

11.     Under 21 C.F.R. § 202.l(k)(2), any brochures, handouts, slide shows or other such promotional materials aimed at physicians are deemed to be "product labeling" and is regulated as such.

12.     Under relevant FDA regulations, product labeling must be pre-approved by the FDA and conform to very exacting requirements concerning, inter alia, drug interactions, indicated uses and claims concerning competing products. See 21 C.F.R § 201.57.

13.     All claims made in any labeling material must be truthful, not misleading and represent a fair balance of the information presented. Any presentations, promotions, or marketing to physicians for products for use other than that approved for labeling purposes by the FDA is considered "off label" marketing and is thus prohibited by FDA regulation.

14.     Any failure to fairly and accurately represent the required information about a prescription drug is considered misbranding and is a false and fraudulent statement as a matter of law. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f) and (n); 21 C.F.R. § 201.57.

15.     Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading violate the Food Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*, and regulations promulgated hereunder. Such violations exist where promotional and marketing materials and presentations for an FDA approved drug:

a.     Minimize, understate or misrepresent the risks, contra-indications and complications associated with that drug;

b.     Overstate or misrepresent the risks, contra-indications and complications associated with any competing drugs;

c.     Reference "off label" uses of the drug for which it was not an approved indication by the FDA, or expressly or implicitly promote unapproved uses and dosing regimens for which the drug is not indicated;

d.     Make comparative claims about the drug that have not been demonstrated by substantial evidence, such as comparisons with competing drugs and/or drug indications of patient usage, warnings and safety claims including side effects, physician preference, or

15

e.     Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

16.     When Defendants present physicians with false information about off-label use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug products, and encourage physicians to prescribe and procure those drugs for off-label use uses which are not approved by the FDA or substantiated by any relevant drug compendium, Defendants cause physicians and facilities to submit bills for off-label use of these Defendants' drugs that are based upon fraudulent and misleading statements and are thus ineligible for reimbursement under federal Medicaid, Medicare, and TRICARE programs, and under state health care systems.

17.     Had the United States and the several States known that the Defendants caused procurement of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug products for off-label uses and also caused those drugs to be prescribed for off-label uses, they would not have provided reimbursement for such prescriptions. This course of conduct violates the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and equivalent state statutes.

16

18.     Federal laws and regulations governing Medicaid and Medicare and similar state statutes prohibit pharmaceutical manufacturers from providing kickbacks to physicians and medical care providers. Specifically, the federal healthcare program anti-kickback provision, 42 U.S.C. § 1320a-7b(b) (2)(B), provides:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

19.     The Medicare and Medicaid anti-kickback laws, 42 U.S.C. 1320a-7b(b), *et seq.*, regulate drug and device marketing in order to prevent over-utilization of medical care, medication, and medical drugs. Under the anti-kickback laws, companies may not offer or pay any remuneration, in cash or kind, to induce physicians or others to order or recommend drugs or devices which may be paid for by a federal healthcare program such as Medicare or Medicaid. These regulations not only prohibit outright bribes and rebate schemes, but prohibit any payment, remuneration, gratuities, and other benefits paid by a company to a

physician which has as one of its purposes inducing the physician to use the company's products.

20.     In addition to the anti-kickback laws, §1877 of the Social Security Act, often referred to as the "Stark law," provides that a physician cannot (1) refer patients to an entity (2) for the furnishing of DHS (designated health services) (3) if there is a direct or indirect financial relationship between the referring physician (or an immediate family member of the referring physician) and the entity, (4) unless the financial relationship fits within one of the specific exceptions in the statute or regulations. *See* 42 U.S.C. §1395nn. Unlike the Medicare Anti-Kickback Statute, which is a criminal statute requiring at least some measure of criminal intent, the Stark Statute is a civil statute requiring strict compliance. Intent to violate or substantial compliance has no bearing on whether an activity is or is not legal. Violation, no matter how unintentional or technical, is sufficient to invoke the Stark Statute. Lastly, if a prohibited referral occurs under Stark, the DHS entity may not file or cause to be filed a claim under Medicare or Medicaid or a bill to any individual, third party payer, or other entity for the designated health services provided.

21.     Had the United States and the several States known that Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug

products were being used by facilities because physicians in those facilities had accepted kickbacks from Defendants, the United States and the several States would not have funded these illegal kickbacks after the fact by providing reimbursement for Defendants' drugs.

22.     Defendants are also under concurrent Corporate Integrity Agreements for two separate FDA off-label promotion schemes. The extent of these infractions only indicates that the defendant has no respect for the law and is willing to push legal boundaries in pursuit of corporate profits despite what this may entail for the US government or patients' lives.

23.     Moreover, the kickbacks described in this Complaint are strictly illegal and have had the direct effect of greatly increasing the amount of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs that have been paid for and reimbursed by state and federal governments. Accordingly, the kickbacks have had the indirect effect of increasing the amount of money spent by the federal government and the States for payments and reimbursements covered by Medicaid, Medicare, and the TRICARE health care system for members of the military and their families. Defendants' kickbacks to physicians represent the inducement of payment from the government through a pattern of fraudulent conduct, constituting false claims within the meaning of 31

U.S.C. § 3729 and the relevant provisions of the state false claims and Medicaid fraud statutes. When Relator Alexander Volkhoff, LLC complained and reported these practices and other illegal and fraudulent practices to Defendants, Janssen retaliated against Relator and then eventually fired Relator.

24.     Relator Alexander Volkhoff, LLC also alleges violations by Defendants of the California Insurance Frauds Prevention Act ("CIFPA"), Cal. Ins. Code § 1871, *et seq.*; and the Illinois Insurance Claims Fraud Prevention Act ("ILCFPA"), 740 Ill. Comp. Stat. § 92/1, *et seq.*

25.     Both California and Illinois have *qui tam* statutes that permit relators to raise allegations of fraud by individuals or entities against private insurance companies. The statutes operate similarly to the federal and state FCAs, and are written to prevent fraud occurring in the private health care insurance market.

26.     Upon information and belief, Defendants receives significant revenues from private insurers in California and Illinois.

27.     Upon information and belief, Defendants are paid by private insurers that cover California- and Illinois-based patients who have been referred for treatment as a result of Defendants' scheme.

28.     Upon information and belief, private healthcare insurance companies in California and Illinois require the same conditions of payment and prohibitions kickbacks and off-label marketing found in the Medicare and Medicaid programs.

29.    The CIFPA prohibits as unlawful the following:

...It is unlawful to knowingly employ runners, cappers, steerers, or other persons...to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer.

30.    The Defendants' kickback scheme also violates Section 1871.7(a) of the CIFPA, Cal. Ins. Code 1871.7(a), and Section 92/5(a) of the ILCFPA 740 Ill. Comp. Stat. § 92/5(a). Defendants have entered into illegal arrangements with physicians that provide financial incentives for the use of their drug prescribing services, resulting in inappropriate claims submitted to private insurers.

31.    Ca. Ins. Code § 1871.7(a). Any person or entity found in violation of this section or specifically identified corollary criminal code sections is subject to civil penalties ranging from $5,000.00 to $10,000.00 per false claim plus three times the amount of each false claim for compensation from an insurer. Cal. Ins. Code § 1871.7(b).

32.    Under the CIFPA, any interested person may bring a sealed civil action for a violation of Section 187.7 on behalf of the State of California, Ca, Ins. Code § 1871.7(e)(1), (2). If the relator is ultimately successful and the District Attorney intervenes in the lawsuit, the relator is entitled to the recovery of fees, expenses, and a relator's share of between 30% and 40% according to the priority specified in

21

the statute. Cal. Ins. Code § 1871.7(g)(1)(A)(iii)(I), (IV). If neither the District

Attorney nor the Insurance Commissioner intervene and the relator is successful in

settling his/her lawsuit or attaining final judgment, the relator may receive between

40% and 50% of the proceeds plus costs and expenses. Cal. Ins. Code §

1871.7(g)(2)(A).

33.    The Illinois Insurance Claims Fraud Prevention Act ("ILCFPA") is similar

to the CIFPA. In Section 92/5(a), the ILCFPA prohibits kickbacks and states:

> ... [I]t is unlawful to knowingly offer or pay any remuneration directly or
>
> indirectly, in case or in kind, to induce any person to procure clients or
>
> patients to obtain services or benefits under a contract of insurance or that
>
> will be the basis for a claim against an insured person or the person's insurer.

34.    740 Ill. Comp. Stat. § 92/5(a). If a defendant is in violation of Section

92/5(a) or specifically identified corollary criminal code sections, he/she must

reimburse three times the amount of money defrauded as well as civil penalties

ranging from $5,000.00 to $10,000,00 per fraudulent claim. 740 Ill, Comp. Stat. §

92/5(b).

35.    Pursuant to Section 15 of the ILCFPA Section 15, an interested person may

bring a sealed civil action for a violation of the ILCFPA on behalf of him/herself

and the State of Illinois. 740 Ill. Comp, Stat. § 92/15(a), (b). If the State's Attorney

and/or the Attorney General intervene in the *qui tam* action, and it is ultimately

22

successful, the relator is entitled to at least 30% of the recovery. 740 Ill, Comp. State § 92/25(a). If neither government entity intervenes and the relator successfully pursues the lawsuit on his/her own, the relator is entitled to recover not less than 40% of the proceeds. 740 Ill. Comp. Stat. § 92/25(b).

36.    Relators here are the original sources of the allegations under the CIFPA and ILCFPA.

**PARTIES**

37.    Relator Alexander Volkhoff, LLC is a former pharmaceutical sales representative has worked in pharmaceutical sales since 2005, when Relator began working as a sales representative in Los Angeles for Janssen, promoting the multiple prescription drugs, including those contained in this complaint.

38.    Relator Alexander Volkhoff, LLC is a citizen of the United States. The principal of Alexander Volkhoff, LLC has been employed by Defendants and has inside knowledge that is independent of and materially adds to publicly disclosed information regarding Defendants' business related to pharmaceutical products.

39.    The Relator became aware of Defendants' false claim scheme alleged herein due to Relator's positions as original source. The Relator commenced this *qui tam* action against Defendants for the pharmaceutical products at issue based upon Relator's personal experiences and industry insider information. Relator, as an

employee of Defendants, had access to pricing, marketing and reimbursement information such as proprietary Defendant computer files revealing the marketing schemes, prices, and volume of sales by Defendants. Relator, as an industry insider, discovered huge profit spreads on the drugs at issue and that the drugs at issue were reimbursed by Medicare and Medicaid for illegal marketing schemes. Relator directly witnessed and observed the Defendants' sale and introduction into the stream of commerce the drugs. Relator was aware that Medicare and Medicaid intended to reimburse Defendants for drugs based on a belief that the drugs were legitimately marketed and that the drugs were not encumbered by illegal Defendant kickback and off-label marketing schemes at the Government's expense.

40.     The facts averred in this Complaint are based entirely upon the personal observations of Relator and documents in Relator's possession.

41.     Relator has provided or is providing to the United States Attorney and the Attorneys General of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of Columbia a full disclosure of substantially all material facts supporting this

Complaint, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2), and relevant state statutes.

42.      Janssen N.V. is a corporation organized and existing under the laws of Belgium with its principal place of business at Turnhoutseweg 30, B-2340, Beerse, Belgium.

43.      Janssen Pharm. is a corporation organized and existing under the laws of Pennsylvania with its principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

44.      Janssen R&D is a corporation organized and existing under the laws of New Jersey with its principal place of business at 920 Route 202, Raritan, New Jersey 08869.

45.      Janssen is a biopharmaceutical company engaged in the manufacture, promotion and sale of pharmaceutical products in interstate commerce regulated by the FDA, which activities are subject to the Food, Drug, and Cosmetic Act ("FDCA"), the Food and Drug Administration Modernization Act ("FDAMA") and regulations promulgated pursuant thereto. Janssen markets, sells, and distributes the prescription drug Olysio, which is indicated in the treatment of certain patients with hepatitis C, and the prescription drug Nucynta, which is indicated in the treatment of chronic pain, Nucynta ER, Xarelto, Ultram ER,

Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, among other drugs.

46.    JNJ is a fictitious name adopted by Defendant JOHNSON & JOHNSON COMPANY, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

47.    Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. ("JANSSEN PHARM") is a Pennsylvania Corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

48.    Defendant JANSSEN ORTHO LLC ("JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 01, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland, and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

26

49.     Since 2005, Defendants have been co-conspirators and co-partners in the production, promotion, marketing, sales, and distribution of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug products and are thus jointly and severally liable for the acts described herein related to the production, promotion, marketing, sales, and distribution of these drugs.

## JURISDICTION AND VENUE

50.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331. This court has jurisdiction over the state law counts asserted in this Complaint under both 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367, because the state claims arise from the same transaction or occurrence as the federal claims and because these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

51.     At all times material to this Complaint, Defendants regularly conducted substantial business within the State of California, maintained permanent employees and offices in California, and made and are making significant sales

within California. Defendants are thus subject to personal jurisdiction in California.

52.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this district, selling and promoting their drugs to multiple doctors in this district.

## FACTS

### Defendants Illegally Engaged in the Promotion of Drugs for Off-Label Uses.

53.     New pharmaceutical drugs may not be marketed in the United States until the sponsor of the drug has proven to the Food and Drug Administration (FDA) that the drug is safe and effective for specific indications at specified dosages (if applicable). The indications and dosages (if applicable) approved by the FDA are set forth in the product's labeling, the content of which is also approved by the FDA. Although it is not unlawful for physicians to use drugs for indications or at dosages different than those set forth in a product's labeling, the Food Drug and Cosmetic Act prohibits pharmaceutical companies from marketing or promoting approved drugs for uses other than those set forth in the drug's approved labeling. This regulatory structure protects patients and consumers by ensuring that medical companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body.

54.     The Medicaid and Medicare programs also rely on the FDA's findings regarding safe and effective uses for approved drugs. The Omnibus Budget Reconciliation Act of 1990 limited Medicare reimbursement for drugs or devices to "covered outpatient drugs" 42 U.S.C.§ 1396r-8(k)(2)(A). Covered outpatient drugs only include drugs used for "medically accepted indications". A medically accepted indication is a use which has been approved by the FDA or one which is supported by specific compendia set forth in the Medicare statutes. Until August, 1997, none of the compendia referenced in the statutes supported off-label usage of any approved drugs or devices. Even after August 1997, off-label usage was significantly restricted.

55.     Off-label use of a medical product refers to the prescription or use of a product in a manner not approved by the FDA. Since Congress passed the Food and Drug Administration Modernization Act ("FDAMA") in November 1997, manufacturers may provide off-label studies to the medical community only if certain conditions are met. Moreover, federal law prohibits manufacturers from promoting off-label uses through physician studies when the investigating physician is not truly independent or impartial, as well as when the physician is in fact an agent of the manufacturer based upon significant financial relationships. See 21 U.S.C. §§ 360aaa *et seq.*

29

56.     Whether a drug is FDA-approved for a particular use will largely determine whether payment for that drug will be reimbursed under the federal and state Medicaid and Medicare programs. Thus, the off-label use of such drugs is not eligible for reimbursement under Medicaid. Likewise, many state health care agencies intend not to reimburse for drugs for off-label purposes because the agencies do not want to spend money on drugs not recognized as medically necessary in sources specified by federal law. Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica were not eligible for reimbursement from federal or state Medicaid or Medicare programs when prescribed for use in off-label patients.

57.     Olysio's FDA New Drug Application ("NDA") number is NDA 205123. The FDA's approved use of Olysio is limited to the treatment of patients with hepatitis C, in combination with Peginterferon alfa and Ribavirin (not alone), not in patients with moderate or severe hepatic impairment or who have previously failed on Olysio or other HCV protease inhibitors.

58.     Defendants created a plan to illegally market Olysio off-label to treat HIV and renal failure patients, and other uses that are not approved by the FDA. Defendants additionally created schemes to illegally market Nucynta, Xarelto, Levaquin, and other drugs in off-label manners.

59.     Defendants' conduct caused physicians to submit bills for their drugs that were ineligible for reimbursement under Medicaid and Medicare because the drugs were used for off-label purposes. Defendants' actions caused physicians, hospitals, and clinics to prescribe, purchase and use Olysio. Such prescriptions, purchases and use were not eligible for reimbursement under Medicaid and Medicare because the drugs were for an off-label use. According to Alexander Volkhoff, LLC, up to ninety-eight (98%) of Olysio use in 2014 was for off-label purposes. Defendants thus caused the submission of false claims for payment of money under the federal Medicaid and Medicare programs and state health care programs.

60.     Additionally, the United States military's payments to cover the use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug products for off-label patient populations were not eligible for coverage under the TRICARE health care plan for members of the military and their families (formerly known as CHAMPUS), or through direct purchasing by the military. The Department of Defense will generally pay for the costs only of "proven" drugs, meaning drugs that have been found to be "safe and effective" by the FDA. 32 C.F.R. § 199.4(g)(15)(i)(A). TRICARE will pay for off-label use of a drug only if the use is determined to be a "medical necessity" and if the program can determine that the off-label use is "safe and effective and in accordance with nationally

accepted standards of practice in the medical community." *Id.* TRICARE will not pay for a drug unless "reliable evidence shows that the medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints". 32 C.F.R. § 199.4(g)(15)(i)(C). The studies Defendants supported to promote the use of Olysio off-label did not meet these standards. Had TRICARE known this, it would not have covered or reimbursed the off-label use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, or Defendant's other off-label drugs.

61.     In limited situations, investigational drugs may be used by the military. However, whenever a member of the armed forces receives a drug unapproved for its applied use, the member must be given notice and consent to such use. 10 U.S.C. § 1107. In order to waive consent for the purposes of using such an "investigational drug" in battle, the Secretary of Defense must request a waiver from the President. No such waiver was requested for Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, or Imbruvica.

62.     As described in this Complaint, Defendants have, since at least 2005 through the present, knowingly and intentionally violated the regulatory schemes described above in its marketing of Defendants' products. Defendants knew or

should have known that thousands of pharmacies would routinely and necessarily file false claims with the federal government when the pharmacies sought federal reimbursement for Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and Defendants' other drug products. But for Defendants' actions most, if not all, of the false claims for the purchase of Defendants' products would never have been submitted. Although in some cases the pharmacists did not directly contract with the federal government, Defendants were the indirect beneficiary of all of the false claims described in this Complaint.

63.     While all on-label and off-label sales made or effected by the health care providers receiving unlawful kickbacks or engaging in improper self-referral cause false claims to be filed, the unlawful promotion of off-label uses of Defendants' products provides an additional, independent, and, under the circumstances, far more urgent basis for the government to interdict this activity—the public health is at risk.

64.     Until January 2015, Janssen also developed, marketed, and sold Nucynta and Nucynta ER.

65.     Nucynta ER (tapentadol extended release) is a Schedule II opioid agonist tablet first approved in 2011 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for

which alternative treatment options are inadequate." Prior to April 2014, Nucynta

ER was indicated for the "management of moderate to severe chronic pain in

adults [and] neuropathic pain associated with diabetic peripheral neuropathy

(DPN) in adults." The DPN indication was added in August 2012.

66.    Nucynta (tapentadol) is a Schedule II opioid agonist tablet and oral solution

first approved in 2008 and indicated for the "relief of moderate to severe acute pain

in patients 18 years of age or older." Nucynta is indicated for the treatment of acute

pain under three (3) months of duration. In order to increase market capture of

product the company used multiple approaches. To both market it as a stand-alone

short acting medication, an addition to another long acting agent, and in

conjunction with Opioid rotation.

67.    Defendants promoted the idea that pain should be treated first by taking

long-acting opioids continuously and then by taking short-acting, rapid onset

opioids on top of that. Despite the short acting nature of the drug, the marketing

efforts for Nucynta were concentrated on high volume pain prescribers such as

pain management specialists and rheumatologist that primarily treat chronic pain

patients. The indication for short acting was for Nucynta (November 20, 2008),

which went on the market about three (3) years before the long-acting form,

Nucynta ER (August 25, 2011). The drug was marketed based on its so-called

ascending and descending pathways, part of a claim that the drug was non-addictive, and avoided withdrawal symptoms.

68.     While it was once thought that long-acting opioids would not be as susceptible to abuse and addiction as short-acting ones, this view has been discredited by innumerable adverse reaction reports. Since they claimed there was an ascending and descending pathway component to the opioid, the Defendants claimed the risk would be small. The FDA has enacted special risk evaluation mitigation requirements for extended release and long-acting opioids. The FDA has stated that these extended-release opioid drugs represent a significant overdose, addiction, and death problem for large numbers of patients.

69.     The emphasis on descending and ascending pathway served to ensure that the risk for addiction was minimal even with long term use, and thus ignoring the potential for addiction, tolerance, and the schedule II nature of the product.

70.     Janssen trained its representatives to expand the label by advising physicians to stack Nucynta in addition to other long acting opioids for additional pain relief. Physicians were encouraged to prescribe Nucynta as a part of an "opioid rotation regimen" whereby it is indicated that risk of tolerance would be decreased if the patient rotates through medications. This information is unsubstantiated in literature and there is no indication that adding additional Nucynta on a long acting opioid would be safe and effective for the patient.

71.     In 2013, in response to a petition to restrict the labels of long-acting opioid products, the FDA noted the significant risks of opioids, including overdose, death and addiction. The FDA recognized that opioids can cause death, coma, and life-threatening respiratory depression even when properly used under the supervision of a physician. The FDA required that—going forward—opioid makers of long-acting formulations clearly communicate these risks in their labels. The FDA also required the warnings to be placed on promotional and marketing materials for the drugs distributed by manufacturers.

72.     Thus, the FDA confirmed what had previously been accepted practice in the treatment of pain— that the adverse outcomes from opioid use include death, unintentional overdose, and addiction, and that long-acting or extended release opioids should only be used in cases where other treatments are not capable of achieving the needed effect.

73.     Notably, in reaching its conclusion, the FDA did not rely on new or otherwise previously unavailable scientific studies regarding the properties or effects of opioids.

74.     A 2008 Janssen marketing piece for detailing pharmacists emphasized neuroplasticity, that theoretically someone using Nucynta could change pain chemistry and prevent "neuronal remodeling" to prohibit the progression into chronic pain – (basically like a vitamin) (See Exhibit 2).

75.     Janssen denied that Nucynta ER wan an opioid, and said it had "weak" mu-opioid activity, and the majority of the pain relief was the result of adjuvant activity from serotonin and norepinephrine re-uptake, rather than any opioid effect.

76.     For example, one 2009 Nucynta promo piece profiles a 40-year-old African American male police officer who was hurt on the job. It recommends Nucynta for lower risk pain relief, due to its treatment of pain "by addressing both ascending and descending pathways" and its combination of "opioid and nonopioid activity in one centrally acting oral analgesic (See Exhibit 3).

77.     Janssen sales representatives were instructed to tell prescribers that Nucynta ER and Ultram ER "reach steady state, and essentially there's no dumping of the medication in the central nervous system." This was to indicate that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. Janssen trained and directed its sales representatives to use a similar statement for immediate release Nucynta – a marketing line that it had a "dual mode of action", and that it was safer due to the "neuroplasticity of the brain."

78.     Janssen sales representatives were instructed to emphasize to physicians that the majority of Nucynta's pain relief came from serotonin and norepinephrine, and that it has a weak affinity to mu-opioid receptors. They were told to claim that it was about "1/50th" of the effect of morphine on the mu-opioid receptors," and that "it tickles the mu-opioid receptors." This is not true, however, as Nucynta's label

37

notes that the drug contains tapentadol, an opioid agonist and Schedule II

substance with abuse liability similar to other opioid agonists, legal or illicit.

79.    Nucynta has weak activity on the mu-opioid receptor and achieves the

majority of its adjuvant pain relief properties from norepinephrine and serotonin

inhibition. This fact was repeated to tout the low potential for addiction to the

medication. This is a claim that is not supported by the label and again is used to

encourage broad adoption of the medication in patient populations where its use is

not warranted and is not deemed safe and effective by the label.

80.    Janssen's sales representatives told prescribers that Nucynta's unique

properties virtually eliminated the risk of addiction associated with the drug.

81.    This marketing exploitation is further supported by the compensation

structure of the sales representatives. The representatives were paid by baseline

growth of Nucynta prescriptions, not by the number of new prescriptions

indicating that the physicians are expected to have their patients on medication

above and beyond the on label ninety (90) day period. Since both compensation,

and retention of employment were based on the representatives' sales numbers,

this put additional pressure on representative to exploit these niches as their

employment and livelihood depended on it.

82.    In discussions with prescribers, Janssen sales representatives omitted

discussion of addiction risks related to many other of Janssen's drugs. Janssen's

38

sales representatives left REMS packages ["REMS" or Risk Management Protocol that is released for opiates] for the physicians without additional explanation of what that necessarily meant for the patient and the physician. In fact, in a Quality Assurance training session the company asserted that this is the package that is necessary for new compounds with no indication that there is an additional risk for addiction may be the actual reason for the REMS program. [Risk Management Protocol that is released for opiates].

83.     **OLYSIO**. In 2014, Olysio was widely prescribed off-label, nearly twenty percent (20%) of the treated genotype 1 patients were receiving a regimen containing Janssen's Olysio, with the majority of these patients being prescribed the off-label combination of Olysio plus Sovaldi with or without Ribavirin. Trending analysis from the previous sampling period shows that off-label prescribing of this combination had more than doubled, with thirty percent (30%) of specialists in one study reporting having patients currently prescribed the regimen (See Exhibit 4).

84.     According to marketing data presented at corporate training meetings between the months of November 2013 – November 2014, ninety-eight percent (98%) of Olysio prescriptions were written in an off label manner, for dual therapy based on the COSMOS trial which included only thirteen (13) patients per each arm of the treatment Q80K polymorphism. Those that were suffering from HIV

infection would need to take a drug holiday from their current HIV treatment in order to be treated. This was dual therapy instead of the proven and less expensive triple therapy regimen, and also included kidney compromised patients. At least one of these patients has reportedly died as a result of this experimentation (See Exhibit 5).

85.     However, the FDA's approved use of Olysio was limited to the treatment of patients with hepatitis C, in combination with Peginterferon alfa and Ribavirin (not alone), not in patients with moderate or severe hepatic impairment or who have previously failed on Olysio or other HCV protease inhibitors.

86.     Meanwhile, the company enjoyed a $2.3 billion windfall as a result of this strategic off label promotion. Defendant JNJ CEO Alex Gorsky addressed the investors that this surplus is a windfall and knowing that the drug simply didn't have the efficacy or the opportunity to compete in the market (See Exhibit 6).

87.     The Olysio niches that were to be exploited versus the competition by Janssen sales representatives included combination use with cholesterol lowering medication such as Lipitor (atorvastatin); and renally compromised patients as presented by sales marketing materials that consisted of speaker slide decks that the company prepared for their paid physician speakers, and district business plans from 2013 to 2015 (See Exhibits 7,8, and 9).

88.     Speakers were encouraged to talk about their success with pre and post liver transplant patients, again a population in which the medication has not been proven to be safe or effective. The FDA indicated that this usage with patients on concomitant cholesterol lowering medication is not deemed safe or effective and in fact seven (7) patients were reported injured as a result. Despite this, Defendants' sales representatives were pushed to actively promote this use (See Exhibit 10).

89.     These experimental regimens not only endangered the patient, they also caused an unhealthy cost burden to the healthcare system.

90.     For example, Defendants had Dr. Tram Tran moderate a Newport Liver society meeting (See Exhibit 11). Dr. Tran was overheard by Relator asserting that the cost of re-treating Hepatitis-C patient failures on this experimental system is nearly $1 million dollars.

91.     **XARELTO**. Xarelto (rivaroxaban) is advertised as a wonder drug — a "next generation" blood thinner to replace warfarin for prevention of blood clots and stroke. Unfortunately, Xarelto's makers chose not to warn that the drug also causes uncontrollable internal bleeding that may lead to death. That calculated decision has led to hundreds of deaths and many more injuries.

92.     Janssen minimized the need for an antidote indicating that Coumadin is an old paradigm that needed to be changed. True to its core business strategy, Janssen has positioned Xarelto as the #1 NOA [Novel Oral Anti-coagulent] in the market,

expanding the label and minimizing the potential side effects of this dangerous drug. Since the launch of Xarelto, hundreds of patients have died as a result of irreversible internal bleeds.

93.    The U.S. Food and Drug Administration (FDA) has approved Xarelto for a number of specified uses, including: For hip and knee replacement patients, to avoid and treat deep vein thrombosis (DVT) and pulmonary embolism (PE); and for nonvalvular atrial fibrillation (NVAF) patients, to minimize the risk for stroke.

94.    However, Defendants promoted Xarelto off-label in that it was not indicated for medically ill patients. Defendant had employees calling on hospitals and hematologists, whereas cardiologists and general practitioners and internists would have been the appropriate, on-label targets. Defendants minimized the bleeding deaths in the trials, and told doctors that there was no problem with reversal of the bleeding problem, "because we aren't seeing a bleeding problem."

95.    There were twenty-two (22) deaths at the end of one Xarelto trial that Defendants claimed were due to inaccuracy of the trial design. Additionally, Janssen chose to aggressively market to patients on dialysis and medically ill patients despite the fact that the FDA did not grant this label exception. Janssen extensively targets oncologists and nephrologists although the safety and efficacy has not borne out Xarelto's use in these patients.

96.     **LEVAQUIN**. Levaquin is a fluoroquinolone antibacterial indicated in adults (≥18 years of age) with infections caused by designated, susceptible bacteria. It is indicated for: Pneumonia: nosocomial and community acquired; Acute bacterial sinusitis; Acute bacterial exacerbation of chronic bronchitis; Skin and skin structure infections, both complicated and uncomplicated; Chronic bacterial prostatitis; Urinary tract infections, both complicated and uncomplicated; and for Acute pyelonephritis Inhalational anthrax, post-exposure. It is also indicated for Plagues.

97.     However, the FDA issued a drug safety alert that the agency is requiring the manufacturer of the antibiotic Levaquin (levofloxacin), Ortho-McNeil-Janssen Pharmaceuticals, and of other fluoroquinolone drugs revise the labeling to warn patients of the risk of serious side effects including nerve damage. Previously, these drugs were implicated in tendon tears and ruptures in the arms and legs, also serious injuries.

98.     Defendants misrepresented the risk of tendon tears to physicians, telling them only 1 in 10,000 patients had tendon ruptures (Achilles tendon tears were the more common). Sales representatives were told and directed to make it sound as safe as drinking coffee.

99.     Defendants required representatives to sell Levaquin for all anti-biotic purposes, as a much stronger anti-biotic than Cipro. At the Defendant's urging,

43

physicians were using to it off-label for all sorts of antibiotic purposes, and quite commonly for upper respiratory infections.

100.   Levaquin is used for mild upper respiratory infections such as acute bronchitis, which is usually a self-limiting disease. Defendants touted Levaquin as the work-horse quinolone antibiotic; safe and effective for use in both upper respiratory and genitourinary infections. While many doctors and thousands of patients have complained about the many adverse events associated with this strong medication, Janssen decided to push the envelope with this medication and encouraged doctors to use it as their go-to broad spectrum antibiotics from minor urinary tract infections to upper respiratory infections despite the danger of developing antibiotic resistance strains of bacteria, and despite the many reported side effects reported by the patients that the company has treated dismissively.

101.   Levaquin targets DNA gyrase and Topoisomerase 4 and as a very strong antibiotic, Janssen used this platform to indicate that the development of resistance to this antibiotic is extremely low. This has not borne out in any clinical study, local antibiograms nor has it been substantiated by the CDC as a means to lower the incidence of MRSA. The indiscriminate use of this strong antibiotic in fact may have contributed to the rise of MRSA in the local and national community.

102.   Additional, undisclosed adverse effects of Levaquin included patients who were "floxed" – since Levaquin is a chemotherapy agent, it deactivates two points

44

in cell replication, targeting the DNA. Physicians were told that it targets the bacterial DNA not the human DNA, and that widespread off-label use would therefore be safe.

103.   Patients who have been "floxed" have routinely reported suffering adverse effects such as widespread bodily pain, fatigue, muscle weakness, muscle twitching, muscle wasting, gait disturbances, severe balance issues, stiffness, spasms, joint pain, tendon issues, seizures, tremors, numbness, burning, tingling, fasciculation, spasticity, nerve damage, autonomic issues, voice issues, exercise intolerance, difficulty swallowing, slow digestive motility, abdominal pain, acid reflux, gastritis, nausea, constipation, diarrhea, colitis, cognitive impairment, memory impairment, cardiac issues, urinary issues, kidney damage, liver damage, pancreatic damage, thyroid abnormalities, hair loss, glucose issues, respiratory issues, emotional issues, depression, psychosis, depersonalization, dissociation, anxiety, insomnia, abnormal dreams, suicidal thoughts, thought alterations, agitation, fatigue, dizziness, inability to concentrate, panic attacks, difficulty communicating, forgetfulness, bruising, vision issues, hearing issues, tinnitus, dental issues, gum issues, skin issues, rashes, multiple chemical sensitivity, sexual dysfunction, reproductive issues, and DNA damage.

104.   Defendants warned the FDA that the drug's adverse reactions also included abnormal heart rhythms known as arrhythmias in addition to existing concerns

45

about heart problems and the potentially deadly Stevens Johnson Syndrome that has dogged Zithromax for some time. However, the Defendants have not adequately addressed the adverse events of the "floxed" patients in the drug's labeling, or adequately begun warning doctors against its continued off-label use.

105.   In fact, the Defendants minimized the potential for tendon rupture and did not disclose the thousands of permanent or otherwise persistent neurological side effects that have been reported by many patients since launch. The company marketing team asserted: that the risk for developing a tendon injury is less than one in 10,000 patients; that this is a class effect; and that in fact the large majority the cases are because of competing antibiotic drug Cipro. Thereby Defendants minimized the true side effects of this powerful agent that also has acted as a chemotherapy agent and a DNA disruptor.

106.   Defendants trained sales representatives on off-label and kickback-based sales in "best practices meetings" which occurred at every national sales meeting. Sales representatives were put through intensive training called "grinders," "round robin," and "role playing" at these sales meetings, and Defendants paid doctor customers to do the role playing during the sales training. Physicians were offered free travel and one day of pay to participate in the role playing.

107.   Defendants' sales representatives and Medical Science Liaisons ("MSL") were trained to use knowingly off-label information to persuade physicians to use

46

Defendants' drugs. Defendants trained and directed sales staff to tell doctors that Defendants' drugs are effective for a variety of off-label claims; none of which were indications which the FDA had approved for Defendants' drugs. These efforts were successful to promote the drug off-label. Collaboration with MSLs was utilized as a means to expand and extend the label and make the physicians comfortable with extensive off label use (98% in 2014 in combination with Sovaldi).

108.   Collaboration also occurred between Janssen sales representatives and pharmacists at various specialty pharmacies in order to pull-through off-label prescriptions. "Pull-through" is the process by which a drug company sales representative induces the physician, the physician's staff, the pharmacists, and the pharmacists staff to submit paperwork to overcome prior authorization or other roadblocks to getting a prescription filled.

109.   For example, in October, 2014 a presentation was given at a Janssen meeting for physicians at a Newport, California meeting by Rafael Marfil (See Exhibit 12). Mr. Marfil was the Sendera pharmacy founder, and he expressed the critical nature of the leverage between the representative and the pharmacy in order to pull through the medication. In this presentation, the representative demonstrated that when he has a difficult prescription (off-label prescription) to pull-through past the insurance company prior-authorization obstacles, he calls the pharmacy where the

prescription is supposed to be fulfilled. The pharmacy then reached out to the insurance company and had a variety of template studies that are attached to each in order to obtain the prior authorization for each off-label prescription. This relationship and collaboration is essential in procuring such a large percentage of medications that are cost prohibitive and not on the drug formularies. This scheme is similar to the off-label promotion scheme that was promoted for use by Defendants' Olysio sales representative in February, 2015 as a "Success Story" with Dr. Victor Machicao at the University of Texas for his liver transplant patients with acid reflux problems (See Exhibit 10).

110.    For example, in December, 2014, Janssen sales representatives were given information from Defendants to provide to doctors promoting the use of Olysio off-label for HIV, post-liver transplantation and renal failure patients. The information was included in a Janssen letter to physicians which was supposed to be used only for unsolicited requests for off-label information from physicians. However, Defendants' District Managers routinely ordered sales representatives to make available off-label information to hospitals and physicians in order to realize a boost in sales, and in order to get Defendants' MSLs invited to give additional off-label information to doctors promoting the use of Olysio for HIV and renal failure patients (See Exhibit 13).

111.   **NUCYNTA / NUCYNTA ER**. Defendants' sales representatives were also trained by Janssen to promote off-label uses of Nucynta and Nucynta ER.

112.   For example, a 2009 Nucynta promotional piece profiles a forty (40) year-old African American male police officer who was hurt on the job. Defendant's promotional piece recommends Nucynta for lower risk pain relief, due to its treatment of pain "by addressing both ascending and descending pathways" and its combination of "opioid and nonopioid activity in one centrally acting oral analgesic" (See Exhibit 14).

113.   Beginning in or about 2005, Janssen trained and instructed sales representatives to tell prescribers that Nucynta ER and Ultram ER "reach steady state, and essentially there's no dumping of the medication in the central nervous system." This was to indicate to physicians that the drugs did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused.

114.   Beginning in or about 2008, Janssen trained its sales representatives to market to prescribers that Nucynta's unique properties virtually eliminated the risk of addiction associated with the drug.

115.   Janssen told physicians that Nucynta's unique properties virtually eliminated the risk of addiction associated with the drug.

116.   In discussions with prescribers, Janssen sales representatives omitted discussion of addiction risks related to Janssen's drugs.

49

117.   Janssen sales representatives told prescribers that Nucynta and Nucynta ER were "weak opioids" in a class of their own, implying that the risks of addiction and other adverse outcomes associated with opioids were not applicable to Janssen's drugs. In truth, however, as set out in Nucynta's FDA-mandated label, Nucynta "contains Tapentadol, an opioid agonist and Schedule II substance with abuse liability similar to other opioid agonists, legal or illicit."

118.   A February, 2009 Janssen coaching sheet for training its sales representatives indicates that the low incidence of nausea and vomiting and the low the incidence of constipation, CNS, dizziness, somnolence and pruritus are important sales messages. Additionally, sales representatives were coached to push the "low discontinuation rates due to" adverse events, and a "low incidence of opiate withdrawal symptoms" (See Exhibit 15).

119.   A document called the "Nucynta Launch Vis Aid – An Annotated Guide" from 2009 was also used to coach sales representatives on their Nucynta messages. This document also promoted the "low composite incidence of nausea and vomiting," low discontinuation rates, and "low incidence of withdrawal symptoms." These statements did not accurately reflect the studies they referenced, which did not address patients on the drug for more than ninety (90) days or with chronic pain – a large target for the Nucynta sales team (See Exhibit 16).

120.   Another 2009 sales training booklet, called "Opioid Efficacy Meets Unexpected Tolerability" made the same claims of low rates of discontinuation, adverse events, and withdrawal symptoms in the same flawed manner based on the same studies (See Exhibit 17).

121.   Janssen sales representatives told prescribers that patients on Defendants' drugs were less susceptible to withdrawal than those on other opioids. Janssen sales representatives told prescribers that Nucynta was not an opioid, making it a good choice for chronic pain patients who previously were unable to continue opioid therapy due to excessive side effects. This statement was misleading because Nucynta is an opioid and has the same effects as other opioids.

122.   **XARELTO**. Xarelto® (rivaroxaban) is advertised as a wonder drug — a "next generation" blood thinner to replace Warfarin for prevention of blood clots and stroke. However, Janssen chose not to warn about the drug also causing sometimes fatal uncontrolled internal bleeding.

123.   The U.S. Food and Drug Administration (FDA) has approved Xarelto for a number of specified uses, including:

124.   For hip and knee replacement patients, to avoid and treat deep vein thrombosis (DVT) and pulmonary embolism (PE); and

125.   For nonvalvular atrial fibrillation (NVAF) patients, to minimize the risk for stroke.

51

126.   Before Xarelto and other blood thinners like it came on the market, doctors prescribed Warfarin (Coumadin) or heparin. The problem with Warfarin is that users must take the drug at mealtime, eat a limited diet and have their blood monitored frequently. These restrictions are unnecessary with Xarelto, as Janssen claims. But Xarelto can cause bleeding, and once bleeding starts, Xarelto does not have a simple method of stopping it. In this way, Xarelto is more dangerous than Warfarin, where internal bleeding can be quickly stopped with vitamin K or plasma.

127.   Janssen also directed that Xarelto be actively promoted to oncologists, nephrologists and hematologists, although there is no indication for medically ill patients (See Exhibit 18).

***Defendants Sponsored Seminars, Symposia, and Other Continuing Medical Education Programs that Promoted the Use of Olysio in HIV and renal failure patients, and Other Uses.***

128.   Specifically, as part of its scheme to promote Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs widely for use to treat off-label patient populations, Janssen sought out influential physicians and proffered kickbacks to them in return for conducting research and

implementing policies promoting the use of Defendants' drugs in those off-label cases. As set forth below, most of this "research" consisted of paying a physician to prescribe Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs and report some simple findings. The Janssen marketing department made the decisions on which doctors to pay to do case studies and be involved in research protocols based on their drug prescribe volume, showing that Janssen was not paying those doctors for a legitimate research purpose. In effect, Janssen paid these influential physicians to prescribe their patients with Janssen drugs in order to expand its market share. Janssen also paid these "Key Opinion Leaders" and "Champions" to promote the use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica at seminars and other events for referring cardiologists, clinic staff, and prescribing drugs in patients.

***Defendants Provided Financing and Other Support for Questionable Research to Support and Promote the Use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica in off-label patient populations.***

129.     Defendants engaged in a researching and publishing campaign under which it paid physicians to engage in off-label studies of Olysio in HIV and renal failure patients, and other uses, along with off-label uses of Levaquin, Xarelto, Nucynta, and other Defendants' drugs. These studies were heavily influenced by bias, since the physicians were paid by Defendants; the research was often coordinated by Defendants; and in many cases, Defendants' employees were included as researchers on the projects. In sum, Defendants deliberately pursued a scheme under which they paid for biased research and studies to support the use of Olysio off-label in HIV and renal failure patients, and other off-label uses for Levaquin, Xarelto, Nucynta, and other Defendants' drugs.

130.     Defendants also ran a number of nationwide studies which engaged a large number of investigators, each of whom enrolled a few patients each, and for which doctors were remunerated up to several thousand dollars per enrolled patient, in order to create brand loyalty with the physicians, often for off-label uses.

131.     Defendants' research and publication campaign had a clear purpose: to support and promote the off-label use of Olysio for HIV and renal failure patients, and other off-label uses for Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs.

**B.      Defendants Promoted Olysio, Xeralto and Levaquin for Use in Patients for Off-Label Purposes Even in the Face of Mounting Evidence of Harm.**

132.     Defendants continue to promote Olysio for use in off-label patient populations, even in the face of evidence that such use led to an increased risk of adverse events and even death. In fact, upon information and belief, Janssen continues to promote Olysio for off-label use in off-label patient populations in the same manner as set forth in this Complaint today.

133.   Given these risks, it is difficult to see how the benefits of using Olysio for patients with HIV and renal failure or other off-label indications for Defendants' drugs outweigh the risks.

**C.      Defendants Illegally Promoted Use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other drugs by Providing Kickbacks to Physicians and Researchers.**

134.     Defendants used illegal kickbacks and quid pro quo arrangements to ensure that physicians would continue to prescribe Defendants' drugs. None of these incentives have anything to do with true scientific or medical research or with the safety of patients. These incentives include cash payments to "consultants" and "preceptors," cash payments for a "speaker's bureau" and to national and regional

"advisory boards" and for participation in teleconferences, post-market research, "case studies," as well as the other activities described herein.

135.   Advisory boards were completely overseen by Defendants' marketing department. Marketing would invite the speakers and nominate the members of the advisory boards. With Olysio for example, they met at least three (3) times a year, normally in Chicago and Los Angeles. Physician's travel was paid, and they were paid for participating, at least $1500.

136.   Defendants rewarded doctors with many of these kickbacks for prescribing large quantities of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs. Some doctors, who prescribed a large number of Defendants' drugs, were given gifts including expensive meals. Defendants also expected sales representatives to supply some doctors with wine and alcohol at dinner. Relator Alexander Volkhoff, LLC has personal knowledge of alcohol provided at dinners.

137.   Defendants established formal internal guidelines for the award of these benefits to physicians, in effect pushing "prescribe to play," quid pro quo-focused sales strategies which are based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing Defendants' drugs. The recipients of these awards and benefits

were selected by Defendant marketers based on the recipients' ability to prescribe Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs, and to influence other doctors to do so.

138.   Some doctors demanded payment from Defendants as a speaker, a researcher in order to use Defendants' drugs, or demanded Defendants pay for lunch or dinner for the physicians' entire office or the physicians' friends. Defendants' managers would generally agree to pay, and would instruct sales representatives to arrange the paid activity for the doctor. Defendants' sales representatives were then responsible for following through to ensure that Defendants generated Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other defendant drug sales based on the provision of the quid pro quo payment.

139.   Paid speakers received increasing amounts of money over time with Janssen, starting from $1,000 per talk in relator's early years with the company to $3,000 per talk near the end. As long as the money was in the budget, Janssen pushed its sales representatives to pay for speakers in order to entice them to prescribe more drug.

140.   As a result of this pressure and despite continual objections by Janssen sales representatives that there are no additional educational needs in the market for

Olysio, the Janssen Regional Business Director and District Manager kept continual tabs of speaker programs and measured how many speaker programs each district or sales representative conducted. The sales representatives continually echoed that, since the medication is no longer in the launch mode and the majority of physicians are well trained, "there is no longer an educational need for the dinners." Due to increasing management pressure and the deleterious effects on employment, these dinners were conducted on nearly a weekly basis, in an expensive restaurant to allure and entertain physicians.

141. Often the physicians attending were friends, colleagues or referral partners and this was no more than a social event, an opportunity to have a referral dinner and enjoy some entertainment provided to them by the Defendant.

142. To make matters worse, the Janssen Regional Business Director requested a roster of favorability of speakers. This scoring system highlighted the physicians who wrote a higher volume of prescriptions, and who spoke favorably about various niches where they used the product. The sales representatives were expected to use these physicians as speakers most frequently, and this speaker program thereby provided a reward for their increased utilization. Those that were strictly using Janssen drugs on-label were considered "neutral" or "unfavorable" and the sales representatives were instructed to use them less often (See Exhibit 19, 20).

143.   Around December, 2014, Defendants' business conduct worsened when a Janssen District Manager wrote a scathing internal Janssen email about a speaker's presentation. The District Manager wrote about Dr. Saab, who was asked at one Janssen sponsored dinner what his "go-to prescription" was. Dr. Saab asserted that he uses competing drug Harvoni, and uses the combination as a secondary agent (See Exhibit 21). The Janssen Regional Business Director then requested that the Relator approach and shakedown the physician and confront him by saying, "for someone that we have spent so much marketing money, why is he writing so few scripts?" He further continued "if we are to continue using him he would need to use our product extensively."

144.   Dinners were about once per week; lunches were every day. Most of the time, the restaurant would bring in the food, but sometimes the reps had to bring in the food. A lot of the offices needed two different foods – kosher for the doctors, and non-kosher for the staff. Offices were also brought ice cream, pizza, breakfast, and other treats on a consistent basis (See Exhibit 22).

145.   For example, from May 19, 2005 through October 13, 2005, Janssen provided fifty-four (54) lunches and fifteen (15) dinners to doctors in the Cedars territory, and paid three doctors as speakers to promote Aciphex and Levaquin (See Exhibit 23).

146.   For example, on March 25, 2013, Janssen paid $134.82 for lunch for Dr. James Jung's office from Chosun Galbee Restaurant in Los Angeles (See Exhibit 24).

147.   For example, on April 2, 2013, Janssen paid $69.26 for lunch for Dr. Sharim's office from Shah Abbas Restaurant in Beverly Hills (See Exhibit 25).

148.   For example, on March 29, 2013, Janssen paid $79.97 for lunch for Dr. Sharim's office from Beach House Restaurant in Hermosa Beach (See Exhibit 26).

149.   For example, on March 26, 2013, Janssen paid $66.63 for lunch for Dr. Nassir's office from Real Food Daily Restaurant in Los Angeles (See Exhibit 27).

150.   For example, on March 20, 2013, Janssen paid $130.80 for lunch for Dr. Nusinovich's office from Fresh Corn Grill Restaurant in West Hollywood (See Exhibit 28).

151.   For example, on March 12, 2013, Janssen paid $260.38 for lunch for a doctor's office from a restaurant in Los Angeles (See Exhibit 29).

152.   For example, on November 2, 2011, Janssen paid $138.59 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 30).

153.   For example, on January 12, 2012, Janssen paid $210.00 for lunch for a doctor's office from Armai restaurant in Los Angeles (See Exhibit 30).

154.   For example, on January 12, 2012, Janssen paid $168.10 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 30).

155.   For example, on December 20, 2011, Janssen paid $229.00 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 30).

156.   For example, on January 25, 2012, Janssen paid $207.21 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 30).

157.   For example, on February 2, 2012, Janssen paid $194.00 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 30).

158.   For example, on February 7, 2012, Janssen paid $142.00 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 30).

159.   For example, on February 10, 2012, Janssen paid $114.90 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 30).

160.   For example, on April 6, 2012, Janssen paid $210.00 for lunch for a doctor's office from Armai restaurant in Los Angeles (See Exhibit 30).

161.   For example, on April 11, 2012, Janssen paid $170.89 for lunch for a doctor's office from Sharky's restaurant in Beverly Hills (See Exhibit 30).

162.   For example, on April 27, 2012, Janssen paid $150.95 for lunch for a doctor's office from California Pizza Kitchen in Los Angeles (See Exhibit 30).

163.   For example, on May 9, 2012, Janssen paid $1,866.40 for dinner for a doctor's office from Siene Bar and Grill restaurant in Beverly Hills (See Exhibit 30).

164.   For example, on December 8, 2011, Janssen paid $1,346.47 for dinner for a doctor's office from Wolfgang's Steakhouse restaurant in Beverly Hills (See Exhibit 30).

165.   For example, on April 18, 2012, Janssen paid $1,161.14 for dinner for a doctor's office from Il Covo restaurant in Los Angeles (See Exhibit 30).

166.   Defendants knew that its provision of kickbacks to these physicians and researchers was illegal and made efforts to conceal its illegal, fraudulent scheme by funneling some payments through third-party consulting organizations. Defendants also understood that its provision of these kickbacks actually caused Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica to be used for off-label purposes. Many of these drugs were paid for by Medicaid, Medicare, and the TRICARE health care system for military members and their families. Had the United States and the several States known that these drugs were used due to a fraudulent kickback scheme, they would not have provided reimbursement for these drugs.

**1.     *Defendants Paid Physicians Honoraria, and Lavish Meals to Attend or Speak at Events Promoting the Use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs.***

167.   In their efforts to promote the use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs in off-label patient populations, Defendants provided honoraria, and lavish meals to key opinion leaders and other physicians to attend or speak at dinners, lunches, conferences, symposia, and other events where Defendant's drugs were being promoted.

168.   The meals directly took into account the volume and value of the business generated, and were given to physicians who had used or would agree to use or promote the use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica.

169.   Many dinner meetings consisted of lavish dinners at local restaurants. The emphasis at some of these meetings was also on off-label uses of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs, and thousands of dollars' worth of honoraria were paid to physicians who spoke about off-label uses at these meetings. High volume prescribing doctors and local opinion leaders were targeted for invitation. High volume prescribing Medicaid and Medicare doctors were often specifically targeted for invitation. At all of the events physicians were encouraged to increase their use of Defendants' drugs.

170.    For example, a February 12, 2015 dinner was held at the expensive Cecconi's restaurant in West Hollywood, CA for high prescriber Dr. Edward Mena and for some other physicians who were targeted for sales (See Exhibit 31).

171.    Defendants ensured that cash and meals were often targeted specifically at high Medicare and Medicaid prescribing doctors, to increase market share within the Medicaid and Medicare programs, and to influence the market share status of Defendants' drugs within the Medicaid and Medicare programs. In addition, cash and meals were often targeted at high Medicaid and Medicare volume facilities in order to increase Defendants' reimbursements through State and Federal health care systems. Also, formulary committee members at high volume Medicaid facilities were specifically targeted for cash and meals to place Defendants' drugs on their approved drug formularies and hospital protocols, and to purchase Defendants' drugs for their inventories and increase Janssen's reimbursements.

172.    Sales representatives were encouraged to be involved with prior authorization process with Ultram ER, Nucynta, Nucynta ER, Aciphex and Simponi in order to pass insurance, hospital and Medicare drug formularies, and prior authorization manipulation was part of their business plans (See Exhibit 32). Not only does this violate HIPPA, it also violates prohibitions on illegal kickbacks. The District Managers touted that the number one representative in the country in 2012 got prescriptions by going to physician offices and simply flagging the charts

with Ultram ER stickers and doing prior authorizations for each patients. This practice was encouraged by the Regional Business Director and other District Managers. Examples of prior authorization pull through effort requirements for sales staff by District Manager Mo Issa are added as an Exhibit. (See Exhibit 33).

173.   Representative involvement in the prior authorization process endangered the patients' HIPPA rights and was designed to bypass the existing formulary process to gain the prescription.

174.   Janssen's territory business plans often included tracking of doctors by their volume of Medicare and Medicaid patients, average duration of treatment, and the average revenue from Janssen drugs. Janssen management utilized this Medicaid and Medicare volume information in order to determine which doctors to target for expensive meals and cash payments.

175.   For example, a February 27, 2015 Janssen business email updated Olysio sales representatives about various State Medicaid agreements to pay for the drug. Medicaid programs in California and a large number of other states were covering Olysio as of Feb. 25, 2015, and Janssen tracked twenty-three (23) states where Medicaid payment was possible. Janssen sales representatives were sent the information by email, and were told to report on their experience in "pulling through" any of the California Medicaid prescriptions through the California prior authorization process (See Exhibit 34).

176.   For example, a 2009 sales planning spreadsheet called for offering paid speaker programs and paid lunches as part of the "Plan of Action" to get Medicare and private insurance reimbursed physicians to write more prescriptions for Nucynta (See Exhibit 35).

177.   For example, an August 3, 2014 Janssen business plan document called for offering paid speaker programs and paid lunches as part of a campaign to promote Olysio to Medicare physicians (See Exhibit 32).

178.   Defendants' sales representatives were instructed to coordinate checks for payment for up to $3,000 to speakers for each dinner speaking program, and invitations to lavish meals exclusively to targeted high volume prescribers or referral sources in order to meet the representatives' required sales levels for bonus payouts each quarter. Defendants' sales representatives were instructed to target cardiologists, catheterization lab physicians, and internal medicine physicians for prescriptions, and buy them expensive meals, and sign them up for paid speaking engagements.

179.   For example, on January 27, 2012, Dr. Gerald Sacks was paid $1,500 to speak at Boa Steakhouse in West Hollywood on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 36).

180.   For example, on February 6, 2012, Dr. Lawrence Miller was paid $1,000 to speak at Sotto Restaurant in Los Angeles on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 37).

181.   For example, on March 18, 2008, Dr. Ellie Goldstein was paid $1,500 to speak at Valentino's Restaurant in Los Angeles on the topic of community-acquired pneumonia to promote the Janssen antibiotic Levaquin (See Exhibit 38).

182.   For example, on May 9, 2012, Dr. Jonathan Nissanoff was paid $2,500 to speak at La Seine Restaurant in Beverly Hills on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 39).

183.   For example, on March 7, 2012, Dr. William French was paid $2,000 to speak at Fig and Olive Restaurant in Los Angeles on the topic of stroke and systemic embolism to promote the Janssen blood thinner Xarelto (See Exhibit 40).

184.   For example, on June 27, 2012, Dr. Matthew Budoff was paid $2,000 to speak at Tanino Restaurant in Los Angeles on the topic of stroke and systemic embolism to promote the Janssen blood thinner Xarelto (See Exhibit 41).

185.   For example, on December 8, 2011, Dr. Lawrence Miller was paid $1,000 to speak at Boa Steakhouse in West Hollywood on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 42).

186. For example, on September 18, 2008, Dr. Allan Metzger was paid $1,000 to speak at Geisha House in Los Angeles on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 43).

187. For example, on October 21, 2008, Dr. Gerald Sacks was paid $1,500 to speak at Katana Restaurant in West Hollywood on the topic of "New Directions in Pain" to promote the Janssen opioid Nucynta (See Exhibit 44).

188. For example, on April 18, 2012, Dr. Lawrence Miller was paid $1,000 to speak at IL Covo Restaurant in Los Angeles on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 45).

189. For example, on December 8, 2011, Dr. Lawrence Miller was paid $1,000 to speak at Wolfgang's Steakhouse in Beverly Hills on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 46).

190. Payment for dinner and other incentives to increase referrals to a physician for the use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs is inappropriate and illegal. According to the federal Health and Human Services Office of the Inspector General (HHS OIG), paid meals would be inappropriate if they are tied directly or indirectly to the generation of federal health care program business for the manufacturer, or for the purposeful inducement of business. See, e.g., 68 F.R. 23738. ("these arrangements

[entertainment, recreation, travel, meals, etc.] potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business.")

**2.** *Defendants Concealed Some Illegal and Fraudulent Payments to Physicians by Funneling Them through Third Party Consultant Companies.*

191.  In order to hide illegal payments to physicians, Defendants made many payments to doctors through the MedForce marketing company, among other similar vendors. MedForce arranged for expensive meals and sent payments to sales representatives to be given to speakers for promoting Defendants' drugs off-label.

192.  For example, Janssen contracted with MedForce to pay a speaker fee and set up invitations and dinner reservations for Dr. Edward Mena to speak at Cecconi's restaurant in West Hollywood, California on February 12, 2015 on Olysio. MedForce provided sign-in sheets for guests, reviewed unauthorized charges on the food and beverage bill, collected meeting evaluations, and provided a credit card authorization for expenses (See Exhibit 47).

**3.** *Defendants Knew Their Payments to Physicians Were Illegal Because They Were Intended for the Purposeful Inducement of Business.*

193.  Defendants knew their payments to physicians were illegal kickbacks. In fact, Defendants provided personnel with guidelines that indicated that field employees could occasionally provide modest meals or snacks to health care

professionals where the primary purpose is an informational presentation. In contrast, Defendants' dinner events with paid speakers were often a sham, with the speaker getting paid up to $3,000 per speaking event, but having no real responsibility. Doctors received prepared slides from Defendants to speak from, so that the doctors did not have to put forth any effort to prepare a presentation. Doctors sometimes simply opened a laptop on the table at dinner with some slides on it, and then only spoke for five to ten minutes, or did not speak at all and simply enjoyed the lavish dinner with the other attendees.

**4.**    ***Defendants' Payment of Illegal Kickbacks to Physicians Actually Affected the Use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs among Doctors***

194.   Defendants' scheme to pay physicians resulted in specific sales. Defendants, like most branded drug companies, monitor the relationship of its sales to its promotional efforts over a very short timeframe; Defendants would be concerned about a drop in sales within a certain therapeutic regime not after a year look-back, or even a quarterly look-back, but over a period of just weeks. Defendants' marketing and sales strategy documents show that at least on a weekly basis Defendants were tracking prescription volume by doctor, and tracking the percentage change in prescribing habits of physicians for Defendants' drugs. In

addition, Defendants tracked the return on investment ("ROI") of paid travel and expensive meals for physicians. Defendants' sales representatives were instructed to ask physicians for additional prescriptions when the physicians were paid to speak at a lavish meal event, and told to track follow-up prescriptions by the physician, and to hold the physicians accountable if the physicians did not increase prescriptions of Defendants' drugs. Physicians were made aware by sales representatives that the physicians would not continue to be invited to lavish meals if the physicians did not remain in the high volume prescriber range, and if the physicians did not prescribe Defendants' drugs. Physicians who did not continue to prescribe Defendants' drugs were tracked on a quarterly basis by Defendants' marketing and sales personnel, and were sometimes penalized by being taken off target lists for invitations to future lavish meals and offers of speaking engagements, paid research opportunities, and other perks. Defendants' pushed "prescribe to play," quid pro quo-focused sales strategies, which are based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing Defendants' drugs. The recipients of these awards and benefits were selected by Defendants' marketers based on the recipients' ability to prescribe Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex,

71

Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs and to influence other doctors to do so.

195.   Defendants' sales representatives provided meals and other favors for physician members of formulary committees and of hospital guideline committees and their staffs, including committees which affected large Medicaid and Medicare patient populations, such as doctors with large Medicaid and Medicare populations. Defendants' management directed sales staff to invite formulary committee members and guideline committee members to lavish meals and offer paid speaking opportunities, paid research, and other perks. Defendants' management arranged inducements for influential formulary and guideline committee members in order to put Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, or other Defendants' drugs on their formulary or guidelines or standing orders, or to purchase Janssen drugs into inventory.

196.   Defendants also instructed physicians' office staff and clinic personnel to maximize Medicaid and Medicare billing. Defendants' field representatives gave billing seminars, and paid billing maximization speakers to give presentations, in which the Defendants' representatives suggested how to bill Medicare in order to receive maximum revenues. The field representatives also reviewed prior billings

for some facilities, and suggested additional billings that Medicaid or Medicare were known to pay for without question (See Exhibit 48).

197.    Defendants also instructed its sales representatives to review patient records at doctor's offices and to help them select high risk patients to receive Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs instead of competitor drugs.

198.    Additionally, in or around 2012, on a field ride with the Nucynta Product Director, Haya Teitel, Dr. Avrom Gart asserted that he had a patient that had experienced temporary blindness while on Nucynta. The Marketing Director requested that the representative not report the incident as it would "jeopardize the launch" of the medication. Regardless the representative reported the incident under "visual disturbance." This is parallel to company's overall culture to further expand the indication of the medications while simultaneously reducing the perceived rate of occurrence of side effects to encourage physician's comfort in prescribing medications broadly despite the off-label use and the clinical appropriateness for the patients.

199.    For example, in 2014, the Janssen Specialty Hepatology and Immunology ("JSHI") organization was brought together by Defendants for one purpose and one purpose only: to exploit the short off-label niche in which the Olysio product

73

could be effectively marketed. To the tune of $2.5 billion dollars in revenue ($600 average price per pill) and the expense of Medicaid, Medicare, TriCare, and private insurance companies this strategy was extremely successful. Soon after this off-label opportunity closed, the company disbanded the JSHI franchise, as the commercial opportunity for on-label sales of Olysio was considered minimal.

200.   The evidence points to willful and premeditated schemes of off-label promotion, kickbacks, and violations of patients' HIPPA protections. The Relator, who was vocal about these tactics, was prevented from promotions and from applying to other sales opportunities within the company, and was many times verbally and publicly reprimanded for not towing the company line, and generally not being "positive."

201.   The company was so aggressive about exploiting this Olysio off-label opportunity that many times the reps were worked one hundred (100) hours per week just to meet the extensive demands. Often times sales representatives were required to work nights and weekends and to take very minimal vacations to meet the increased demand of this short window of Olysio's off-label sales "opportunity."

202.   For example, in December 2014, Janssen Regional Business Director requested sales representatives to participate in non-educational events such as a liver foundation "Healthy Flavors of Coronado Culinary Gala" in San Diego's

prestigious Coronado Hotel, where high prescribing physicians were presented with an honorary plaque and award and Janssen paid $4,000 to participate as a "Table Sponsor." The Coronado Hotel event violated company policy since it was only for the entertainment of Janssen's physician customers, and had no educational component. The decision to fund the event was based on Janssen RBD Mo Issa wanting to support a local San Diego customer, high-Olysio prescriber Dr. Tarek Hassanein, and the purpose was a quid pro quo arrangement with him for more prescribing (See Exhibits 49, 50).

**D.    Defendants Illegally Promoted Use of Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other drugs by Illegally Promoting a Spread between Published AWP and WAC Pricing and the Prices Offered to Customers.**

203.   Commencing sometime by at least 2005 and continuing through the present, Defendants defrauded States and the United States by knowingly causing the Medicaid Programs to pay false or fraudulent claims. Examples of The Defendants' specific drug products at issue include Olysio, Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and are identified by "NDC" numbers in Relator's

extensive documentary evidence. The drugs at issue are referred to jointly as the "Spread Drugs."

204.   The Defendants marketed and sold their Spread Drugs to their Customers. The Customers purchased the Spread Drug products either directly from Defendants, through a GPO contract, or through wholesalers or specialty distributors. When Defendants sold their Spread Drugs to wholesalers, they invoiced wholesalers at gross prices which Defendants referred to as wholesale acquisition cost prices, however Defendants reported misleading, inflated AWPs and, in some cases, WACs to the pricing compendia for the Spread Drugs which had no relation to the prices Defendants knew were generally and currently available in the marketplace.

205.   The amount paid by a Customer was typically based on a price negotiated with Defendants, a price negotiated with a GPO, or an often equally competitive price set by a specialty wholesaler or distributor. Defendants offered "contract pricing" to many of their Customers that was less than "Non-Contract" or "Regular Cost" prices generally offered by wholesalers and distributors to any customer. Defendants created inflated Spreads on the Spread Drugs for Customers that purchased the Spread Drugs at regular cost, available to virtually any industry customer, and an even greater Spread for those purchasing the Spread Drugs "under contract".

206.   Defendants defrauded the Medicaid program by reporting excessively high and false prices for some of their prescription Spread Drugs with knowledge that Medicaid used these reported prices for establishing reimbursement to its Medicaid providers for these Spread Drugs. As a result, Medicaid sustained significant losses to its program by making reimbursement payments to Defendants' Customers/Medicaid providers for the Spread Drugs at illegally excessive prices compared to the prices at which the Defendants' Customers/Medicaid providers actually acquired the same Spread Drugs. This is a practice known in the industry as "creating a Spread." The Spread is utilized by pharmaceutical companies to seize market share and thereby to fraudulently increase their profits.

207.   Regardless of the method of purchase, Defendants' Customers submitted claims for payment to Medicaid when a drug product was dispensed to a program beneficiary. The claims submitted by Defendants' Customers were paid at amounts directly influenced by Defendants' false and fraudulent prices. Defendants disseminated false pricing information for their drug products to the Pricing Publications. Defendants knew the prices they reported to the pricing compendia controlled the pricing compendia's published reports of AWP and WAC.

208.   The manufacturers control the prices that are reported by the compendia, including First DataBank (FDB) a Division of the Hearst Corporation. Some state Medicaid programs use FDB. For example, FDB asserts that all pricing

information is supplied and verified by the products' manufacturers, and that there is no independent review of those prices for accuracy.

209.   Accordingly, the manufacturers functionally control what price information that payors, including the Medicaid program, can obtain. Defendants have taken undue advantage of the resulting disparity in status, power and knowledge by knowingly reporting prices for Medicaid reimbursement purposes that bear no relationship whatsoever to prices generally or currently available in the marketplace. The Defendants knew that the state Medicaid programs, which employ small numbers of pharmacy staff, would not have the manufacturers' insider knowledge, resources, or opportunity necessary to discover and remedy the Defendants' drug pricing fraud.

210.   Defendants first reported false prices for the Spread Drugs sometime by at least 2005. The reported prices did not represent prices actually being charged in the marketplace. Thereafter, Defendants' employees typically reported and/or confirmed the false and fraudulent prices to the Pricing Publications periodically. During the relevant time period, Defendants generally reported falsely inflated AWPs and WACs on the Spread Drugs while simultaneously offering dramatically lower prices to their Customers in the marketplace. Defendants routinely failed to update, adjust, decrease or correct their initial price reports for the Spread Drugs to reflect prices being charged in the marketplace. Consequently, Defendants caused

the price reporting compendia to publish false inflated WACs and/or AWPs from sometime by at least 2005 and continuing through the present.

211.   Defendants knew that the prices they reported to the Price Publications directly affected reimbursement amounts paid by the Medicaid Programs. The false prices Defendants reported to the Pricing Publications caused inflated government reimbursement amounts to be paid on claims submitted by Defendants' payors for the drug products at issue. Additionally, Defendants knew that withholding reports of WAC to the pricing compendia during the relevant time period would ensure the pricing compendia's failure to report WAC. Relator's extensive documentary evidence includes a pricing chart illustrating multiple examples of the NDCs at issue showing: reported prices (AWP and, if applicable, WAC), the Relator's Cost and the corresponding Spreads (difference between the prices at which Defendants actually sold their Spread Drugs and the false prices reported by Defendants). The prices listed as those available to the Relator, as an independent pharmacy, are some of the highest prices offered by Defendants in the marketplace. Therefore, the inflated Spreads available to the Relator were some of the lowest Spreads in the marketplace.

212.   Defendants manipulated AWPs and WACs to induce their Customers to purchase Defendants' Spread Drugs by marketing to their Customers the huge profits that would result to them from excessive reimbursement payments.

Defendants actively used the inflated Spreads and huge profits as a marketing tool directed at providers to promote increased sales of the Spread Drugs. Moreover, the Spreads, in effect, marketed themselves. Any purchaser could easily calculate the potential profit by using the reported prices and the actual sales price. For example, the inflated Spreads were readily apparent from information on the drug purchasing software programs available to Customers from drug wholesalers.

213.   The Defendants reported or caused to be reported false or misleading prices to Medicaid by providing false or misleading price information including but not necessarily limited to AWP, Suggested Wholesale Price ("SWP"), CDP, WAC, DP, List Price and direct wholesale price to the compendia with knowledge that they in turn would utilize such false and misleading price information in determining the AWPs and DPs that were reported to Medicaid.

214.   Defendants were well aware of how Medicaid used Defendants' reported pricing information to set reimbursement levels to providers for the Spread Drugs. At all relevant times, Defendants were aware that Medicaid used published AWPs and/or WACs to estimate acquisition costs, defined as the best estimate of the price generally and currently paid by providers in the marketplace.

215.   Defendants were also aware that the extraordinarily high volume of prescriptions processed by Medicaid requires the type of electronic data interchange that the Defendants have taken advantage of in order to defraud the

Medicaid program. For example, from 2003 through 2011 Medicaid paid for an average of 35.8 million prescriptions per week nationwide. During this time, Medicaid processed prescriptions for over 35,000 NDC drug codes each year, reaching a peak of 39,212 NDC drug codes in 2011.

216.   Defendants pay the Medicaid rebates and have reports that indicate the amount of their Spread Drugs, and the number of prescriptions for their Spread Drugs paid for by State by quarter. Defendants know that the Medicaid States are processing so many claims that it cannot be handled manually. Defendants know that Medicaid used complicated electronic payment databanks, and Defendants provided the databanks with false information.

217.   After creating price Spreads for their Spread Drugs, Defendants enlarged those Spreads by reducing acquisition costs to providers without disclosing the reductions to compendia such as First DataBank or to the Medicaid Program. Defendants also gave Customers incentives that decreased the price of prescription drugs, such as discounts, rebates, off-invoice pricing, free goods, charge backs, volume discounts, credit memos, "consulting" fees, debt forgiveness, educational and promotional grants, and other financial incentives. Price reductions were granted to some retail pharmacy chains, wholesalers, buying groups, pharmacy benefit managers at the request of those chains, wholesalers, buying groups or pharmacy benefit managers. These price reductions financially benefitted

providers, but were not reflected in the AWPs and other price quotes the

Defendants reported to the compendia, which formed the basis for reimbursements

by Medicaid.

**E.     Retaliation/Wrongful Termination**

218.   In or about November, 2013, Relator became aware that there were

company-wide problems with off-label promotion and kickbacks.

219.   The manner in which Defendants market the use of their drugs is governed

by the Food, Drug and Cosmetic Act ("FDCA") (Title 21, U.S.C. § 355) and

inducements to physicians are covered by the Medicare and Medicaid anti-

kickback laws, 42 U.S.C. 1320a-7b(b), *et seq.*

220.   In order to comply with the relevant laws and regulations, pharmaceutical

companies like Janssen must be able to account for all off-label marketing

materials and inducements given to physicians. In or about November 2013,

Relator found out that there were company-wide irregularities with respect to

tracking these payments and marketing materials. In particular, Relator spoke up at

the Newport meeting in December, 2014 with other Janssen sales representatives,

saying that with respect to the specialist pharmacies, that there was a question of

how was it legal for the company to work with the specialist pharmacies at such an

intimate level on prior authorization pull-through in order to forward the off-label

Olysio marketing scheme. At that time the Regional Director Mohammed Issa said,

in front of the other sales representatives, that "this was the biggest bunch of BS that I've ever heard," and then castigated Relator on multiple occasions for "not being positive." and "not being a team player," and not "being flexible." Subsequently, the Regional Director warned Relator not to make the same statements again.

221.   Thereafter, Relator complained and reported to Janssen human resources and management, both orally and in writing, of these alleged illegal business practices, which violated the FDCA and Medicare and Medicaid anti-kickback laws and other relevant statutes and regulations.

222.   In retaliation for these actions, Relator's supervisor at Janssen and Janssen HR personnel began a campaign to harass and intimidate Relator. In particular, the Regional Director would tell Relator that "you are not a team player, and that you should not point this stuff out in front of the team." This in spite of the fact that in addition to driving five (5) to six (6) hours per day in Relator's own territory to manage the Los Angeles territory, which was the eleventh (11th) highest volume territory in the nation, and managing a district including five (5) Western States, Relator was accused of "not being flexible or a team player." During this time period, the relator worked in excess of one hundred (100) hours a week, and consequently started to suffer many job-related physical and health complications [with long-term consequences], and did not do so for other sales representatives in

Relator's region. Under company policy, and in Relator's experience, no other sales rep was terminated without a performance improvement plan ("PIP"), unlike the Relator.

223.   In or about November 2013, Janssen made it clear to its sales representatives that they were to begin to market Olysio for use off-label to treat HIV and renal failure patients, and other uses that are not approved by the FDA. In November 2013, the FDA sent Janssen an approval letter for Olysio's labeling. More specifically, this FDA letter did not allow the Defendants to market Olysio for use in HIV and renal failure patients. However, Janssen continued to market Olysio for use in HIV and renal failure patients, as set forth above.

224.   In or about November, 2013, Relator complained about Janssen's off-label marketing strategy to Relator's manager. Relator also voiced concern about Janssen's use of kickbacks. For example, when District Manager Alan Williams wrote about Dr. Saab getting paid for speaking on Olysio even though it wasn't his "go-to drug" and asked Regional Business Director ("RBD") Mo Issa to intervene on this issue. The RBD asked in turn for the representative to confront the physician and ask "why with so many resources [speaker programs and advisory board kickbacks] does Dr. Saab write such minimal number of patients on Olysio?" The RBD proceeded to state that the Defendants would not be using physicians that are not advocates of the products. And the RBD requested a

favorability matrix to be developed to measure ROI of retaining physicians as speakers for products and their perceived value to the company. In this way, the RBD was clearly requiring sales representatives to make certain that their speaker arrangements with physicians were quid pro quo arrangements (See Exhibit 51).

225.   Again, in retaliation for these complaints, Relator was subjected to further harassment and intimidation. Relator continued to be treated differently from other sales representatives in the region. Relator had long been a graduate of the management development program. Despite having elevated into the last stage of the program, the management had asked Relator to repeat a series of classes that were already completed. Despite the fact that Relator attempted to apply for another position as the most qualified candidate, citing that Relator had ethical issues selling the product, the management team intervened and reached the hiring manager and told the hiring manager that Relator was job hopping. Relator had been with the same company for nine (9) years at that point, and was not "job hopping." The same manager supported another member of the team that had none of the qualifications to be successful in the new role.

226.   For example, other sales representatives in Relator's region were allowed to take vacations or miss meetings in order to accommodate family obligations or to run businesses on the side. Relator was pressured not to take vacation, and to keep working over one hundred (100) hours a week, while noted previously, running the

eleventh (11th) highest volume territory in the country while managing five (5) other states. Shortly after complaining about Janssen's off-label promotions, Relator was routinely required to attend promotional dinners with doctors, while colleagues in the region were given the night off in order to plan activities with their families or their own side businesses. In fact, the Regional Director himself had a side business that he was spending time on while at the same time demanding a very high amount of work hours from Relator. Relator was asked to work all the local area drug expositions (over 14 additional days with no over time or respite). Despite the intense emotional and social pressure, Relator worked nights for dinners and for completing district management duties, and worked days for sales calls and territory management. Relator was never compensated for these additional hours despite CA regulations.

227.   In addition, Relator was subjected to racial and religious discrimination by Relator's manager. For example, on June 26, 2014 while in a meeting in Denver, Colorado, Relator's manager Tyana Grant had her birthday celebrated at a meeting. Ms. Grant had just come back from a church-related trip from Israel. Relator asked her how her trip was, and Ms. Grant said Israel was beautiful, but the Palestinians are like animals. Relator was shocked and asked her what she meant by that. Ms. Grant said that the Muslim kids surrounded her bus and were begging for money. Ms. Grant said that they weren't acting like humans, they were surrounding the bus

86

like animals, and shaking people down for money. Relator's own family's religious

background and ethnic heritage were viciously attacked in this manner, and as a

result Relator suffered extreme emotional and physical distress.

228.   In April, 2015, Relator won a sales award for being the District

Representative of the Year, because Relator not only ran a sales territory

successfully, but Relator also ran an entire five (5) state district and brought that

district to the number one position in sales. But even then, Relator was being

retaliated against by not being allowed by Defendant to be promoted to the next

level of employment as a permanent District Manager. Despite the success Relator

experienced in the field and in the district the RBD stated that Relator is not

flexible and does not appear to have a positive disposition and such a role would be

highly at risk.

229.   On or about August 10, 2015, Defendants' employee Carrie Palmer from

Janssen's HR Office illegally disclosed the details of Relator's disability and

medical treatment to an outside party in violation of Relator's rights under HIPAA.

230.   On August 11, 2015, an HR representative for Janssen terminated Relator by

mail, without paying Relator's accrued vacation time as per California law. Relator

was not given a severance package, as the other sales representatives who had been

laid off previously had been. There was no PIP (performance Improvement PLAN)

to warn Relator and ask for corrective action.

231.   Janssen's stated reason for terminating Relator was for Relator's making of additional ("side") income. However, most of the Defendants' sales representatives and managers followed the same customary practice as Relator in creating a side income. This conduct had occurred for many years in front of Defendant's managers without any other sales reps receiving any criticism or complaints. For example, the Regional Business Director Mo Issa was simultaneously the CEO of another company, Noor Vitamins. This was information that was highly public and understood as completely compliant as the RBD discussed going to Dubai for this business and talked about his multiple business successes.

## DEFAMATION AND BLACKLISTING

232.   After the relator reported the alleged fraud to Defendants management, and despite the long history of employment and the fact that the Relator was an exemplary employee having won multiple sales awards nationally and regionally, the Relator was discharged without notice. The discharge was marred by the fact that Defendants' employee Carrie Palmer from JNJ human resources contacted an outside organization and illegally violated Relator's HIPPA rights by revealing the details of Relator's personal and private medical history and temporary disability without Relator's knowledge and consent. Subsequently, the Relator was discharged from that outside organization without cause.

233.   Other infractions include interference with HIPPA and encroachment on Relator's privacy, Cobra violations and interference with the active medical treatment of an employee under distress and during a period of active disability. Defendants retaliated against Relator by terminating Relator's medical insurance, terminating Relator's disability insurance, interfering with Relator's rights to continue insurance under Cobra, and by refusing to pay for treatments for Relator's severe disabling condition which was brought about by the hostile work environment described herein.

234.   Despite multiple state and federal regulation violations in this termination, Defendants further blacklisted the employee from gainful employment. In conversations revealed to Relator from August 2015 through June, 2016, several managers from JNJ including Molly Laughlin, Helen Cutchins were overheard discussing the details of this with representatives such as Ron Lloyd, Julie Ewers and with outside the organization managers, effectively rendering Relator black-listed and unemployable. To further undermine Relator's credibility, Defendants' employees maliciously accused the relator of fraud. Defendants roguishly continued these malicious attacks and did not do anything to curtail these highly illegal interactions.

235.   Relator suffered a multitude of physical and debilitating illnesses and was still under treatment at the time of discharge as evidenced by a menagerie of

supporting documentation. Another tactic that Defendants conducted to further intimidate and harass Relator was the Interference with Relator's disability application that was well on its way for approval. On or about August 2015, the Prudential disability insurance representative explained that it is highly unlikely that a company would interfere with the application at this stage.

236.   Despite multiple counts of fraud and kickbacks, Defendants continued to intimidate Relator by interfering with Relator's right to privacy, ability to receive adequate medical care, resolve disability, and interfering with the Relator's ability to maintain gainful employment and preserve a (ten) 10-year career in pharmaceutical sales. The Defendant's actions are unabated and considering that the Defendant has been under a Corporate Integrity Agreement for two separate counts of fraud and off-label promotion, highly unethical and in brute defiance of the pharma code and the FDCA. Defendants have shown no remorse in protecting the public from harm and continue to disregard the welfare of the patients and its employees for the pursuit of illicit profits.

## **CONCLUSION**

237.   Defendants' fraudulent activities, as set forth in this Complaint have resulted in significant fraud on the government's health care systems. These concerted, national schemes for fraudulent promotion of Defendants' drugs have resulted in

90

billions of dollars in unnecessary and fraudulent claims for reimbursement increasing the cost of healthcare and wasting the American taxpayer dollar.

## COUNT I; FALSE CLAIMS ACT

## CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS

238.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, ALEXANDER VOLKHOFF, LLC, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

239.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

240.   The DEFENDANTS, from at least January 1, 2005 to the present date knowingly [as defined in 31 USC, §3729(b)] caused to be presented to officers or employees of the UNITED STATES GOVERNMENT and STATES GOVERNMENTS false or fraudulent claims for payment or approval, in that the DEFENDANTS, caused to be presented to officers or employees of the UNITED STATES GOVERNMENT AND STATES GOVERNMENTS false or fraudulent claims for the specified drugs (as the term "specified drugs" has been defined throughout this Complaint) and caused the UNITED STATES and STATE

GOVERNMENTS to pay out sums of money to the healthcare providers and suppliers of the DEFENDANTS' specified drugs, grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES and STATE GOVERNMENTS.

241.   Because of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in amount to be proven at trial, all in violation of 31 U.S.C. §3729(a)(1).


## COUNT II; FALSE CLAIMS ACT

**CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT**


242.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, ALEXANDER VOLKHOFF, LLC, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

92

243.   Relator realleges and incorporates the allegations above as if fully set for

herein and further alleges as follows:

244.   The DEFENDANTS, from At least January 1, 2005 to the present date

knowingly [as defined in 31 USC, §3729(b)] caused false records or statements to

be made or used to get false or fraudulent claims to be paid or approved by the

GOVERNMENT, in that the DEFENDANTS, caused false information about the

DEFENDANTS' drugs specified herein to be used by the GOVERNMENT to pay

or approve claims presented by healthcare providers and suppliers of the

DEFENDANTS' specified drugs, which claims were grossly in excess of the

amounts permitted by law, resulting in great financial loss to the UNITED

STATES and STATE GOVERNMENTS.

245.   Because of the DEFENDANTS' conduct as set forth in this Count, the

UNITED STATES suffered actual damages in excess of One Billion Dollars

($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).


## COUNT III; FALSE CLAIMS ACT

### CAUSING FALSE RECORDS OR STATEMENT TO BE USED TO

### CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT

246.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator,

ALEXANDER VOLKHOFF, LLC, on behalf of the UNITED STATES and on

behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

247.      Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

248.      The DEFENDANTS, from at least January 1, 2005 to the present date knowingly [as defined in 31 USC, §3729(b)] caused false records or statements to be made or used to conceal obligations to pay money to the GOVERNMENT, in that: the DEFENDANTS knowingly made, used or caused to be made or used false records or false statements, i.e., the false certifications made or caused to be made by Defendants material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

249.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).


## COUNT IV; FALSE CLAIMS ACT

## CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS;

## ILLEGAL RENUMERATION

250.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, ALEXANDER VOLKHOFF, LLC, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

251.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

252.   The DEFENDANTS, from at least 2010 to the present date knew that the prices charged to their customers for the specified drugs were significantly reduced in the amount from the prices and costs represented by the DEFENDANTS and upon which the DEFENDANTS knew the Medicaid claims would be approved and paid. Accordingly, the DEFENDANTS have each knowingly offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers on the form of price reductions and/or in the form of illegal remuneration from the States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the specified drugs for which the DEFENDANTS knew that payment would be made, in whole or in part, by the States' Medicaid Programs. Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b) and 18 U.S.C.§2

253.   / / /

95

254.   The DEFENDANTS' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b), in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately reflect the remuneration in the claims, caused the claims for the specified drugs to be false and fraudulent claims and caused the claims to be presented to the States' Medicaid Programs for payment and approval in violation of 31 U.S.C. §3729(a)(1).

255.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).

## COUNT V; FALSE CLAIMS ACT

**CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND COMPENSATION ARRANGEMENTS**

256.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, ALEXANDER VOLKHOFF, LLC, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

257.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

258.   The DEFENDANTS, from at least 2010 to the present date knowingly presented or caused to be presented, prohibited claims or bills to individuals and other entities for designated health services [outpatient prescription drugs] furnished pursuant to prohibited referrals from physicians, physician groups and/or outpatient clinics with which the DEFENDANTS has financial relationships, for which the DEFENDANTS knew that payment would be made, in whole or in part, by the States' Medicaid Programs. Such prohibited referrals, claims bills and compensation arrangements are specifically prohibited by 42 U.S.C. §1395nn(a)(1)(B) and 18 U.S.C. §2.

259.   The DEFENDANTS' knowingly made or used or caused referring physicians, physician groups or outpatient clinics to make or use records or statements to get false or fraudulent claims and bills for the DEFENDANTS' outpatient prescription drugs to be paid or approved by the States' Medicaid Programs.

260.   The DEFENDANTS' knowing presentment or causing others to present, claims or bills to the States' Medicaid programs in violation of 42 U.S.C. §1395nn(a)(1)(B) without disclosing facts revealing said violations constituted the making or using, or the causing others to make or use, false records or statements

97

to get a false or fraudulent claims paid or approved by the GOVERNMENT in violation of 31 U.S.C. §3729(a)(2).

261.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(2).

## COUNT VI; FALSE CLAIMS ACT

## CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A FALSE OR FRAUDULENT CLAIM ALLOWD OR PAID

262.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, ALEXANDER VOLKHOFF, LLC, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

263.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

264.   With respect to State Medicaid Programs, this Count also applies to all DEFENDANTS manufacturing specified drugs which: 1) were multiple-source drugs and/or single-source drugs, 2) were subject to State Medicaid reimbursement methodology similar to the Medicare "J Code" methodology, and 3) had a falsely inflated reported AWP and/or WAC or another falsely inflated reported price or

cost if such price or cost was utilized in creating an array or prices or costs from which one was selected or reimbursement of all versions of a given drug.

265.   Each DEFENDANTS' liability as to this Count extends from the time it first reported a falsely inflated AWP and/or WAC, or in the case of Medicaid, a falsely inflated AWP and/or WAC or such other price cost used to create the array of drug prices or costs, until such time, if any, each DEFENDANT stopped reporting said inflated AWP and/or WAC or, in the case of Medicaid, stopped reporting said inflated AWP and/or WAC or such other reported price or cost used to create the array of drug prices or costs from which one was selected for reimbursement purposes.

266.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(3).


**COUNT VII; FALSE CLAIMS ACT**

**RETALIATION/WRONGFUL TERMINATION**

**VIOLATION OF THE RETALIATION STATUTE, 42 U.S.C. § 3730(h)**

267.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, ALEXANDER VOLKHOFF, LLC, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA

PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

268.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

269.   Janssen retaliated by harassing Relator and taking actions to prevent Relator from properly carrying out job responsibilities as a result of lawful acts done in furtherance of this action, including reporting violations of the FDCA and anti-kickback statutes to the UNITED STATES and JANSSEN management and refusing to engage in Janssen's scheme to promote off-label prescriptions and provide kickbacks to physicians. On August 11, 2015, the Relator was discharged from Defendant's employment through a letter mailed by Carrie Palmer from JOHNSON & JOHNSON human resources, also as a result of Relator's lawful acts done in furtherance of this action, as set forth above. This discharge was in violation of 31 U.S.C. § 3730(h).

270.   As a direct and proximate result of this unlawful and discriminatory discharge, Relator has suffered emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator's efforts to obtain alternative employment, in an amount to be proven at trial.

100

## COUNT VIII

### (Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 *et seq.*)

271.   Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

272.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Arkansas. Upon information and belief, Defendants' actions described herein occurred in the State of Arkansas as well. This is a qui tam action brought by Relator and the State of Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.

273.   The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides liability for any person who-

274.   Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;

275.   At any time knowingly makes or causes to be made any false     statement or representation of a material fact for use in determining rights to a benefit or payment;

276.   In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the Arkansas Medicaid program.

277.   Defendants violated the Arkansas Medicaid Fraud False Claims Act §20-77-902(1) (2) & (7)(A) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

278.   Defendants furthermore violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and presented to the State of Arkansas from at least 2005 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti-Kickback Act and Stark Act Requirements, as described    herein.

279.   The State of Arkansas, by and through the Arkansas Medicaid program and other State health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

280.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Arkansas is connection with Defendants' fraudulent and illegal practices.