281.   Had the State of Arkansas known that Defendants was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

282.   As a result of Defendants' violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

283.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, and brought this action pursuant to A.C.A. § 20-77-911(a) on behalf of themselves and the State of Arkansas.

284.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid program.

285.   Pursuant to the Arkansas Medicaid Fraud False Claims Act, the State  of Arkansas and Relator are entitled to the following damages as against  Defendants:

286.   To the STATE OF ARKANSAS:

287.   Three times the amount of actual damages which the State of Arkansas has sustained as a result of Defendants' fraudulent and illegal practices;

103

288.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Arkansas;

289.   Prejudgment interest; and

290.   All costs incurred in bringing this action.

291.   To RELATOR:

292.   The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and /or any other applicable provision of law;

293.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

294.   An award of reasonable attorneys' fees and costs; and

295.   Such further relief as this court deems equitable and just.

## COUNT XIX

### (California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)

296.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

297.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of California. Upon information and belief, Defendants' actions described herein occurred in the State of California as well.

298.   This is a qui tam action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

299.   Cal. Gov't Code § 12651(a) provides liability for any person who—

300.   Knowingly presents, or causes to be presented, to an officer or employee of the state of any political division thereof, a false claim for payment or approval;

301.   Knowingly makes, uses, or causes to be made or used a false record of statement to get a false claim paid or approved by the state or by any political subdivision;

302.   Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state of by any political subdivision.

303.   Is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

304.   In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

305.   Defendants violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

306.   Defendants furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 2005 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act and Stark Act Requirements, as described herein.

307.   The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

308.   Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' fraudulent and illegal practices.

309.   Had the State of California known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health

106

care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

310. As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

311. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

312. This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

313. Pursuant to the California False Claims Act, the State of California and Relator are entitled to the following damages as against Defendants:

314. To the STATE OF CALIFORNIA:

315. Three times the amount of actual damages which the State of California has sustained as a result of Defendants' fraudulent and illegal practices;

316. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants presented or caused to be presented to the State of California;

317.  Prejudgment interest; and

318.  All costs incurred in bringing this action.

319.  To RELATOR:

320.  The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law;

321.  Reimbursement for reasonable expenses which Relator incurred in connection with this action;

322.  An award of reasonable attorneys' fees and costs; and

323.  Such further relief as this Court deems equitable and just.

## COUNT X

**(California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 *et seq.*)**

324.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

325.  This is a claim for treble damages and penalties under the California Insurance Fraud Prevention Act.

326.  By virtue of the acts described above, Defendants knowingly utilized a scheme by which they improperly procured "runners, cappers, steerers, and other persons" to procure patients who held private insurance contracts and against whom Defendants could cause the filing of claims for payment. *See* Cal. Ins. Code § I871.7(a).

108

327.   Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the private insurers in California, or for patients in California those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

328.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

329.   By virtue of the acts described above, the Defendants conspired to violate the California Insurance Fraud Prevention Act and each patient's private health insurance contract.

330.   The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

331.   Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

332.   By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

333.   Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

334.   The State of California is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

335.   WHEREFORE, Relators request the following relief:

336.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that the private insurance companies have sustained because of Defendants' actions, plus a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation of Cal. Ins. Code § 1871.7(a) and (b);

337.   At least thirty percent (30%) and up to forty percent (40%) of the proceeds of this action to the Relators if the State of California elects to intervene, and forty percent (40%) to fifty percent (50%) if it does not;

338.   Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

339.   Such other relief as the Court deems just and appropriate.

## COUNT XI

**(Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 *et seq.*)**

340.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

341.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Colorado. Upon information and belief, Defendants' actions described herein occurred in the State of Colorado as well.

342.   This is a qui tam action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colorado Revised Statutes § 25.5-4-303.5. *et seq.*

343.   Colorado Revised Statutes § 25.5-4-305 provides liability for any person who-

344.   Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

345.   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

346.   Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and

knowingly delivers, or causes to be delivered, less than all of the money or property;

347.   Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

348.   Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

349.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act;"

350.   Conspires to commit a violation of paragraphs (a) to (f) of this subsection.

351.   Defendants violated Colorado Revised Statutes § 25.5-4-305 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

352.   Defendants furthermore violated Colorado Revised Statutes § 25.5-4-305 and knowingly caused thousands of false claims to be made, used and presented to the State of Colorado from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

353.   The State of Colorado, by and through the State of Colorado Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

354.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' fraudulent and illegal practices.

355.   Had the State of Colorado known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

356.   As a result of Defendants' violations of Colorado Revised Statutes § 25.5-4-305 the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

357.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Colorado Revised Statutes § 25.5-4-306(2) on behalf of itself and the State of Colorado.

358.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

359.   Pursuant to the Colorado Medicaid False Claims Act, the State of Colorado and Relator are entitled to the following damages as against Defendants:

360.   To the STATE OF COLORADO:

361.   Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' fraudulent and illegal practices;

362.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Colorado;

363.   Prejudgment interest; and

364.   All costs incurred in bringing this action.

365.   To RELATOR:

366.   The maximum amount allowed pursuant to Colorado Revised Statutes § 25.5-4-306(4) and /or any other applicable provision of law;

114

367.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

368.   An award of reasonable attorneys' fees and costs; and

369.   Such further relief as this court deems equitable and just.

## COUNT XII

**(Connecticut False Claims Act for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. *et seq.*)**

370.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

371.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Connecticut. Upon information and belief, Defendants' actions described herein occurred in the State of Connecticut as well.

372.   This is a qui tam action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. *et seq.*

373.   Connecticut General Statutes § 17b-301b. provides liability for any person who-

115

374.   Knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

375.   Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

376.   Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

377.   Defendants violated Connecticut General Statutes § 17b-301b from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

378.   Defendants furthermore violated Connecticut General Statutes § 17b-301b and knowingly caused thousands of false claims to be made, used and presented to the State of Connecticut from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

379.   The State of Connecticut, by and through the State of Connecticut Medicaid program and other state health care programs, and unaware of Defendants'

fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

380.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' fraudulent and illegal practices.

381.   Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

382.   As a result of Defendants' violations of Connecticut General Statutes § 17b-301b the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

383.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Connecticut General Statutes § 17b-301d on behalf of itself and the State of Connecticut.

384.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

385.   Pursuant to the Connecticut False Claims Act for Medical Assistance Programs, the State of Connecticut and Relator are entitled to the following damages as against Defendants:

386.   To the STATE OF CONNECTICUT:

387.   Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' fraudulent and illegal practices;

388.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Connecticut;

389.   Prejudgment interest; and

390.   All costs incurred in bringing this action.

391.   To RELATOR:

392.   The maximum amount allowed pursuant to Connecticut General Statutes § 17b-301 and /or any other applicable provision of law;

393.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

394.   An award of reasonable attorneys' fees and costs; and

395.   Such further relief as this court deems equitable and just.

## COUNT XIII

**(Delaware Medicaid False Claims Act, 6 Del. C. § 1201 *et seq.*)**

118

396.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

397.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Delaware. Upon information and belief, Defendants' actions described herein occurred in Delaware as well.

398.    This is a qui tam action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. § 1201 *et seq.*

399.    6 Del. C. § 1201 *et seq.* provides liability for any person who—

400.    Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

401.    Knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

402.    Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

403.    Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit money or property to or from the Government.

119

404.   Further, 31 Del. C. § 1005 provides that— It shall be unlawful for any person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person . . . [t]o purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

405.   Defendants violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware from 2005 to the present by its violation of federal and state laws, including 31 Del. C. §1005, and Anti-Kickback Act and the Stark Act Requirements, as described herein.

406.   The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

407.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' fraudulent and illegal practices.

408.   Had the State of Delaware known that Defendants were violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

409.   As a result of Defendants' violations of 6 Del C. § 1201(a), the State of Delaware has been damage in an amount far in excess of millions of dollars exclusive of interest.

410.   Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

411.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

412.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

413.   Pursuant to the Delaware Medicaid False Claims Act, the State of Delaware and Relator are entitled to the following damages as against Defendants:

414.   To the STATE OF DELAWARE:

415.   Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' fraudulent and illegal practices;

416.   A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

417.   Prejudgment interest; and

418.   All costs incurred in bringing this action.

419.   To RELATOR:

420.   The maximum amount allowed pursuant to 6 Del C. § 1205, and /or any other applicable provision of law;

421.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

422.   An award of reasonable attorneys' fees and costs; and

423.   Such further relief as this court deems equitable and just.

## COUNT XIV

### (District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 *et seq.*)

122

424.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

425.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the District of Columbia. Upon information and belief, Defendants' actions described herein occurred in the District of Columbia as well.

426.    This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 *et seq.*

427.    D.C. Code § 2-30814(a) provides liability for any person who-

428.    Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

429.    Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

430.    Conspires to defraud the District by getting a false claim allowed or paid by the District;

431.    Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

123

432.   In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

433.   Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program; or

434.   Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

435.   Defendants violated D. C. Code § 4-802(c) from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

436.   Defendants furthermore violated D. C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia from at least 2005 to the present by its violation of federal and state laws, including D. C. Code § 4-802(c), the Anti-Kickback Act and the Stark Act, as described herein.

437.   The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

438.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and

124

belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendants' fraudulent and illegal practices.

439.   Had the District of Columbia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

440.   As a result of Defendants' violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

441.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

442.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

443.   Pursuant to the District of Columbia Procurement Reform Amendment Act, the District of Columbia and Relator are entitled to the following damages as against Defendants:

444.   To the DISTRICT OF COLUMBIA:

445.   Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' fraudulent and illegal practices;

446.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the District of Columbia;

447.   Prejudgment interest; and

448.   All costs incurred in bringing this action.

449.   To RELATOR:

450.   The maximum amount allowed pursuant to D. C. Code § 2-308.15(f) and /or any other applicable provision of law;

451.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

452.   An award of reasonable attorneys' fees and costs; and

453.   Such further relief as this court deems equitable and just.

## COUNT XV

### (Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*)

454.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

455.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business

126

in the State of Florida. Upon information and belief, Defendants' actions described herein occurred in the State of Florida as well.

456.   This is a qui tam action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. § 68.081 *et seq.*

457.   West's F.S.A. § 68.082 provides liability for any person who-

458.   Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval

459.   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency

460.   Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid

461.   Defendants violated West's F.S.A. § 68.082 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

462.   Defendants furthermore violated West's F.S.A. § 68.082 and knowingly caused thousands of false claims to be made, used and presented to the State of Florida from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

463.   The State of Florida, by and through the State of Florida Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and

illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

464.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendants' fraudulent and illegal practices.

465.   Had the State of Florida known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

466.   As a result of Defendants' violations of West's F.S.A. § 68.082 the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

467.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to West's F.S.A. § 68.083(2) on behalf of themselves and the State of Florida.

468.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

469.   Pursuant to the Florida False Claims Act, the State of Florida and Relator are entitled to the following damages as against Defendants:

470.   To the STATE OF FLORIDA:

471.   Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' fraudulent and illegal practices;

472.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Florida;

473.   Prejudgment interest; and

474.   All costs incurred in bringing this action.

475.   To RELATOR:

476.   The maximum amount allowed pursuant to West's F.S.A. § 68.085 and /or any other applicable provision of law;

477.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

478.   An award of reasonable attorneys' fees and costs; and

479.   Such further relief as this court deems equitable and just.

## COUNT XVI

**(Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*)**

480.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

129

481.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Georgia. Upon information and belief, Defendants' actions described herein occurred in Georgia as well.

482.   This is a qui tam action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*

483.   Ga. Code Ann. § 49-4-168.1 *et seq.* provides liability for any person who—

484.   Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

485.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

486.   Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

487.   Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

488.   Defendants violated Ga. Code Ann. § 49-4-168.1 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State

130

of Georgia from 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

489.   The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

490.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' fraudulent and illegal practices.

491.   Had the State of Georgia known that Defendants were violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

492.   As a result of Defendants' violations of Ga. Code Ann. § 49-4-168.1, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

493.   Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any

investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

494.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Ga. Code Ann., § 49-4-168.2(b) on behalf of themselves and the State of Georgia.

495.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

496.   Pursuant to the Georgia State False Medicaid Claims Act, the State of Georgia and Relator are entitled to the following damages as against Defendants:

497.   To the STATE OF GEORGIA:

498.   Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' fraudulent and illegal practices;

499.   A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

500.   Prejudgment interest; and

501.   All costs incurred in bringing this action.

502.   To RELATOR:

503.   The maximum amount allowed pursuant to Ga. Code Ann., § 49-4-168.2(i), and/ or any other applicable provision of law;

504.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

505.   An award of reasonable attorneys' fees and costs; and

506.   Such further relief as this Court deems equitable and just.

## COUNT XVII

### (Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 *et seq.*)

507.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

508.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Hawaii. Upon information and belief, Defendants' actions described herein occurred in Hawaii as well.

509.   This is a qui tam action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 *et seq.*

510.   Haw. Rev. Stat. § 661-21(a) provides liability for any person who—

511.   Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

133

512.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

513.   Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

514.   Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

515.   Defendants violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

516.   The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

517.   Compliance with applicable Medicare, Medicaid and the various other federal state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' fraudulent and illegal practices.

134

518.   Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

519.   As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

520.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

521.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

522.   Pursuant to the Hawaii False Claims Act, the State of Hawaii and Relator are entitled to the following damages as against Defendants:

523.   To the STATE OF HAWAII:

524.   Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' fraudulent and illegal practices;

135

525.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

526.   Prejudgment interest; and

527.   All costs incurred in bringing this action.

528.   To RELATOR:

529.   The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and /or any other applicable provision of law;

530.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

531.   Such further relief as this Court deems equitable and just.

## COUNT XVIII

**(Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*)**

532.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

533.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Illinois. Upon information and belief, Defendants' actions described herein occurred in Illinois as well.

534.   This is a qui tam action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq*.

535.   740 ILCS 175/3(a) provides liability for any person who—

536.   knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

537.   knowingly makes, uses, of causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

538.   Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

539.   In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item of service for which payment may be made in whole or in part under the Illinois Medicaid program.

540.   Defendants violated 305 ILCS 5/8A-3(b) from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

541.   Defendants furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State

137

of Illinois from at least 2005 to the present by its violation of federal and state laws, including 305 ILCS 5/8A-3(b), the Anti-Kickback Act and the Stark Act, as described herein.

542.   The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

543.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' fraudulent and illegal practices.

544.   Had the State of Illinois known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

545.   As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

546.   Relator are private persons with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

547.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

548.   Pursuant to the Illinois Whistleblower Reward and Protection Act, the State of Illinois and Relator are entitled to the following damages as against Defendants:

549.   To the STATE OF ILLINOIS:

550.   Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' fraudulent and illegal practices;

551.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Illinois;

552.   Prejudgment interest; and

553.   All costs incurred in bringing this action.

554.   To RELATOR:

555.   The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other applicable provision of law;

556.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

557.   An award of reasonable attorneys' fees and costs; and

558.   Such further relief as this Court deems equitable and just.

## COUNT XIX

**(Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*)**

559.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

560.   This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act.

561.   By virtue of the acts described above, Defendants knowingly offered and/or paid remuneration to physicians to induce the procurement of patients for Defendants' drugs for which Defendants could cause the filing of claims for payment from the patients' insurers. *See* 740 Ill. Comp. Stat. § 92/5(a).

562.   Defendants knowingly presented or caused to he presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

563.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts

to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

564.   By virtue of the acts described above, the Defendants conspired to violate the Illinois Insurance Claims Fraud Prevention Act and each patient's private health insurance contract.

565.   The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

566.   Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

567.   By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

568.   Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

569.   The State of Illinois is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, 'used, presented, or caused to be made, used, or presented by Defendants.

570.   WHEREFORE, Relators request the following relief:

571.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that the private insurance companies have sustained because of Defendants' actions, plus a civil penalty of not less tl1an $5,000,00 and not more than $10,000.00 for each violation of 740 Ill. Comp. Stat. §§ 92/5(a) and (b);

572.   No less than thirty percent (30%) of the proceeds of this action to the Relators if the State of Illinois elects to intervene, and no less than forty percent (40%) if it does not;

573.   Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

574.   Such other relief as the Court deems just and appropriate.

## COUNT XX

**(Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*)**

575.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

142

576.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Indiana. Upon information and belief, Defendants' actions described herein occurred in Indiana as well.

577.   This is a qui tam action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*

578.   IC 5-11-5.5-2 provides liability for any person who—

579.   presents a false claim to the state for payment or approval;

580.   makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

581.   with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

582.   with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

583.   receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

584.   makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

143

585.   conspires with another person to perform an act described in subdivisions (a) through (f); or

586.   causes or induces another person to perform an act described in subdivisions (a) through (f).

587.   In addition, IC 12-15-24-1 & IC 12-15-24-2 prohibits the provision of a kickback or bribe in connection with the furnishing of items or services or the making or receipt of the payment under the Indiana Medicaid program.

588.   Defendants violated IC 12-15-24-1 & IC 12-15-24-2 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

589.   Defendants furthermore violated IC 5-11-5.5-2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Indiana from at least 2005 to the present by its violation of federal and state laws, including IC 12-15-24-1 & IC 12-15-24-2, the Anti-Kickback Act and the Stark Act, as described herein.

590.   The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

591.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and

144

belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' fraudulent and illegal practices.

592.   Had the State of Indiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

593.   As a result of Defendants' violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

594.   Relator are private persons with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to IC 5-11-5.5-4 on behalf of themselves and the State of Indiana.

595.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

596.   Pursuant to the Indiana False Claims and Whistleblower Protection Act, the State of Indiana and Relator are entitled to the following damages as against Defendants:

597.   To the STATE OF INDIANA:

145

598. Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' fraudulent and illegal practices;

599. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

600. Prejudgment interest; and

601. All costs incurred in bringing this action.

602. To RELATOR:

603. The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other applicable provision of law;

604. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

605. An award of reasonable attorneys' fees and costs; and

606. Such further relief as this Court deems equitable and just.

## COUNT XXI

### (Iowa False Claims Act, Iowa Code § 685.1 *et seq.*)

607. Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

608. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business

146

in the State of Iowa. Upon information and belief, Defendants' actions described herein occurred in Iowa as well.

609.   This is a qui tam action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1 *et seq.*

610.   Iowa Code § 685.2 provides liability for any person who—

611.   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

612.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

613.   Conspires to commit a violation of paragraphs (a), (b), (d)-(g);

614.   Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less than all of that money or property;

615.   Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

147

616.   Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the Iowa national guard, who lawfully may not sell or pledge property;

617.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

618.   Defendants violated Iowa Code § 685.2 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

619.   Defendants furthermore violated Iowa Code § 685.2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Iowa from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

620.   The State of Iowa, by and through the Iowa Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

621.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and

belief, also an express condition of payment of claims submitted to the State of Iowa in connection with Defendants' fraudulent and illegal practices.

622.   Had the State of Iowa known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

623.   As a result of Defendants' violations of Iowa Code § 685.2, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

624.   Relator are private persons with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to Iowa Code § 685.3(2)(a) on behalf of themselves and the State of Iowa.

625.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

626.   Pursuant to the Iowa False Claims Act, the State of Iowa and Relator are entitled to the following damages as against Defendants:

627.   To the STATE OF IOWA:

628.   Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' fraudulent and illegal practices;

629.   A civil penalty for each false claim which Defendants caused to be presented to the State of Iowa;

630.   Prejudgment interest; and

631.   All costs incurred in bringing this action.

632.   To RELATOR:

633.   The maximum amount allowed pursuant to Iowa Code § 685.3(4)(a)(1) and/or any other applicable provision of law;

634.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

635.   An award of reasonable attorneys' fees and costs; and

636.   Such further relief as this Court deems equitable and just.

## COUNT XXII

### (Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 *et seq.*)

637.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

638.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business

150

in the State of Louisiana. Upon information and belief, Defendants' actions described herein occurred in Louisiana as well.

639.   This is a qui tam action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 *et seq*.

640.   La. Rev. Stat. Ann. § 438.3 provides –

641.   No person shall knowingly present or cause to be presented a false or fraudulent claim;

642.   No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds;

643.   No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

644.   In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebated, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

645.   Defendants violated La. Rev. Stat. Ann § 438.2(A) from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

151

646.   Defendants furthermore violated La. Rev. Stat. Ann. § 438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana from at least 2005 to the present by its violation of federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback Act and Stark Act, as described herein.

647.   The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

648.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' fraudulent and illegal practices.

649.   Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

650.   As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

152

651.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev. Stat. Ann. § 439.1(A) on behalf of themselves and the State of Louisiana.

652.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

653.   Pursuant to the Louisiana Medical Assistance Programs Integrity Law, the State of Louisiana and Relator are entitled to the following damages as against Defendants:

654.   To the STATE OF LOUISIANA:

655.   Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' fraudulent and illegal practices;

656.   A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

657.   Prejudgment interest; and

658.   All costs incurred in bringing this action.

659.   To RELATOR:

660.   The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

153

661. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

662. An award or reasonable attorneys' fees and costs; and

663. Such further relief as this Court deems equitable and just.

## COUNT XXIII

**(Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 *et seq.*)**

664. Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

665. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the Commonwealth of Maryland. Upon information and belief, Defendants' actions described herein occurred in Maryland as well.

666. This is a qui tam action brought by Relator and the State of Maryland to recover treble damages and civil penalties under the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 *et seq.*

667. Annotated Code of Maryland § 2-602 provides liability for any person who-

668. Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

154

669.   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

670.   Conspires to commit a violation under this subtitle;

671.   Has possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly delivers or causes to be delivered to the State less than all of that money or other property;

672.   Knowingly makes any other false or fraudulent claim against a State health plan or a State health program.

673.   Defendants violated the Annotated Code of Maryland § 2-602 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

674.   Defendants furthermore violated the Annotated Code of Maryland § 2-602 and knowingly caused thousands of false claims to be made, used and presented to the State of Maryland from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

675.   The State of Maryland, by and through the State of Maryland Medicaid program and other state health care programs, and unaware of Defendants'

fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

676.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' fraudulent and illegal practices.

677.   Had the State of Maryland known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

678.   As a result of Defendants' violations of the Annotated Code of Maryland § 2-602 the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

679.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Annotated Code of Maryland § 2-604 on behalf of themselves and the State of Maryland.

680.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

681.   Pursuant to the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, the State of Maryland and Relator are entitled to the following damages as against Defendants:

682.   To the STATE OF MARYLAND:

683.   Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' fraudulent and illegal practices;

684.   A civil penalty of not less than the amount of the actual damages the State health plan or State health program incurs as a result of the violation, and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;

685.   Prejudgment interest; and

686.   All costs incurred in bringing this action.

687.   To RELATOR:

688.   The maximum amount allowed pursuant to the Annotated Code of Maryland § 2-605 and /or any other applicable provision of law;

689.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

690.   An award of reasonable attorneys' fees and costs; and

691.   Such further relief as this court deems equitable and just.

## COUNT XXIV

**(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) *et seq.*)**

692. Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

693. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the Commonwealth of Massachusetts. Upon information and belief, Defendants' actions described herein occurred in Massachusetts as well.

694. This is a qui tam action brought by Relator and State of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) *et seq.*

695. Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person who—

696. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

697. Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

698. Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

158

699.   Is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reason able time after discovery of the false claim.

700.   In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe ore rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

701.   Defendants violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

702.   Defendants furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Massachusetts from at least 2005 to the present by its violation of federal and state laws, including Mass. Gen. Laws Ann. Chap. 118E § 41, the Anti-Kickback Act and the Stark Act, as described herein.

703.   The State of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of Defendants'

159

fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

704.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Massachusetts in connection with Defendants' fraudulent and illegal practices.

705.   Had the State of Massachusetts known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

706.   As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B the State of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

707.   Relator are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to Mass. Gen. Laws Ann Chap. 12 § 5(c)(2) on behalf of themselves and the State of Massachusetts.

708.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and

merely asserts separate damage to the State of Massachusetts in the operation of its Medicaid program.

709.   Pursuant to the Massachusetts False Claims Act, the State of Massachusetts and Relator are entitled to the following damages as against Defendants:

710.   To the STATE OF MASSACHUSETTS:

711.   Three times the amount of actual damages which that State of Massachusetts has sustained as a result of Defendants' fraudulent and illegal practices;

712.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Massachusetts;

713.   Prejudgment interest; and

714.   All costs incurred in bringing this action.

715.   To RELATOR:

716.   The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5F and/or any other applicable provision of law;

717.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

718.   An award of reasonable attorneys' fees and costs; and

719.   Such further relief as this court deems equitable and just.

## COUNT XXV

### (Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq.*)

161

720.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

721.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in Michigan. Upon information and belief, Defendants' actions described herein occurred in Michigan as well.

722.    This is a qui tam action brought by Relator and State of Michigan for treble damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq*.

723.    M.C.L.A. 400.607 provides liability for any person who, among other things—

724.    Causes to be made or presented to an employee or officer of this state a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the state, knowing the claim to be false.

725.    Presents or causes to be made or presented a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards.

162

726.   In addition, M.C.L.A. 400.604 prohibits the solicitation, receipt or offering of a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program.

727.   Defendants violated M.C.L.A. 400.604 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

728.   Defendants furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan from at least 2005 to the present by its violation of federal and state laws, including M.C.L.A. 400.604, the Anti-Kickback Act and the Stark Act, as described herein.

729.   The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

730.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' fraudulent and illegal practices.

731.   Had the State of Michigan known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

732.   As a result of Defendants' violations of M.C.L.A. 400.607 the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

733.   Relator are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to M.C.L.A. 400.610a on behalf of themselves and the State of Michigan.

734.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

735.   Pursuant to the Michigan Medicaid False Claim Act, the State of Michigan and Relator are entitled to the following damages as against Defendants:

736.   To the STATE OF MICHIGAN:

737.   Three times the amount of actual damages which that State of Michigan has sustained as a result of Defendants' fraudulent and illegal practices;

738.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

739.   Prejudgment interest; and

740.   All costs incurred in bringing this action.

741.   To RELATOR:

742.   The maximum amount allowed pursuant to M.C.L.A. 400.610a(9) and/or any other applicable provision of law;

743.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

744.   An award of reasonable attorneys' fees and costs; and

745.   Such further relief as this court deems equitable and just.

## COUNT XXVI

### (Minnesota False Claims Act, (Minnesota Statutes § 15C.01 *et seq.*)

746.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

747.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in Minnesota. Upon information and belief, Defendants' actions described herein occurred in Minnesota as well.

165

748.   This is a qui tam action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, Minnesota Statutes § 15C.01 *et seq.*

749.   Minnesota Statutes § 15C.02 provides liability for any person who-

750.   Knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

751.   Knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

752.   Knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

753.   Defendants violated Minnesota Statutes § 15C.02 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

754.   Defendants furthermore violated Minnesota Statutes § 15C.02 and knowingly caused thousands of false claims to be made, used and presented to the State of Minnesota from at least 2005 to the present by its violation of federal and

state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

755.   The State of Minnesota, by and through the State of Minnesota Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

756.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendants' fraudulent and illegal practices.

757.   Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

758.   As a result of Defendants' violations of Minnesota Statutes § 15C.02 the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

759.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Minnesota Statutes § 15C.05 on behalf of themselves and the State of Minnesota.

760.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

761.   Pursuant to the Minnesota False Claims Act, the State of Minnesota and Relator are entitled to the following damages as against Defendants:

762.   To the STATE OF MINNESOTA:

763.   Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' fraudulent and illegal practices;

764.   A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

765.   Prejudgment interest; and

766.   All costs incurred in bringing this action.

767.   To RELATOR:

768.   The maximum amount allowed pursuant to Minnesota Statutes § 15C.12 and § 15C.13 and /or any other applicable provision of law;

769.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

770.   An award of reasonable attorneys' fees and costs; and

771.   Such further relief as this court deems equitable and just.

168

## COUNT XXVI

### (Missouri Health Care Payment Fraud and Abuse Act, Missouri Revised Statutes § 191.900 *et seq.*)

772.    Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

773.    Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Missouri. Upon information and belief, Defendants' actions described herein occurred in the State of Missouri as well.

774.    This is a qui tam action brought by Relator and the State of Missouri to recover treble damages and civil penalties under the Missouri Health Care Payment Fraud And Abuse Act, Missouri Revised Statutes § 191.900 et seq.

775.    The Missouri Health Care Payment Fraud And Abuse Act § 191-905(1) provides liability for any person –

776.    Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not;

777.    Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment made by a health care payer for providing health care;

169

778.   Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled.

779.   Knowingly presenting a claim to a health care payer that falsely indicates that any particular health care was provided to a person or persons, if in fact health care of lesser value than that described in the claim was provided.

780.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(2) provides liability if any person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for -

781.   Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

782.   Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

783.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(3) provides liability if any person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a

170

health care provider for the furnishing or arranging for the furnishing of any health care.

784.   Defendants violated the Missouri Health Care Payment Fraud and Abuse Act § 191-905(1) & (2) & (3) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

785.   Defendants furthermore violated Missouri Health Care Payment Fraud And Abuse Act § 191-905(1) & (2) & (3) and knowingly caused thousands of false claims to be made, used and presented to Missouri from at least 2005 to the present by its violation of federal and state laws, including Missouri Revised Statutes §191-905(3), the Anti-Kickback Act and Stark Act Requirements, as described herein.

786.   Missouri, by and through the Missouri Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

787.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Missouri in connection with Defendants' fraudulent and illegal practices.

1085. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' fraudulent and illegal practices.

1086. Had the State of Texas known that Defendants were violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1087. As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1088. Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

1089. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

1090. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

1091. Pursuant to the Texas False Claims Act, the State of Texas and Relator are entitled to the following damages as against Defendants:

1092. To the STATE OF TEXAS:

1093. Damages at two times the value of any payment or monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts set forth above, as provided by the Texas Human Resources Code § 36.052(a)(3) & (4), and

1094. A civil penalty of: (1) Not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $15,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $15,000, for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a disabled person, as defined by Section 48.002(a)(8)(A), or a person younger than 18 years of age; or (2) Not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31

212

U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A)

1095. Pre- and post-judgment interest, Tex. Hum. Res. Code § 36.052(a)(2),

1096. To RELATOR:

1097. The maximum amount allowed pursuant to V.T.C.A. Hum Res. Code § 36.110(a), and/or any other applicable provision of law;

1098. Reimbursement for reasonable expenses and costs which Relator incurred in connection with this action, Tex Hum Res. Code §§ 36.007 & 36.110(c);

1099. Reasonable attorneys' fees which Relator necessarily incurred in bringing and pressing this case, Tex Hum Res. Code §§ 36.007 & 36.110(c); and

1100. Such further relief as this Court deems equitable and just.

## COUNT XXXVIII

### (Vermont False Claims Act, 32 V.S.A. 630 *et seq.*)

1101. Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1102. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Vermont. Upon information and belief, Defendants' actions described herein occurred in the State of Vermont as well.

213

1103. This is a qui tam action brought by Relator and the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, 32 V.S.A. 630 *et seq.*

1104. 32 V.S.A. 631 provides liability for any person who shall-

1105. Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.

1106. Knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

1107. Conspires to commit a violation of this subsection.

1108. Defendants violated 32 V.S.A. 630 *et seq.* from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

1109. Defendants furthermore violated 32 V.S.A. 630 *et seq.* and knowingly caused thousands of false claims to be made, used and presented to the State of Vermont from at least 2005 to the present by its violation of federal and state laws, including 32 V.S.A. 630 *et seq.*, the Anti-Kickback Act, and Stark Act, as described herein.

1110. The State of Vermont, by and through the State of Vermont Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

214

1111. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Vermont in connection with Defendants' fraudulent and illegal practices.

1112. Had the State of Vermont known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1113. As a result of Defendants' violations of 32 V.S.A. 630 *et seq.* the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1114. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 32 V.S.A. 632(b)(1) on behalf of themselves and the State of Vermont.

1115. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

1116. Pursuant to the Vermont False Claims Act, the State of Vermont and Relator are entitled to the following damages as against Defendants:

215

1117. To the STATE OF VERMONT:

1118. Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' fraudulent and illegal practices;

1119. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Vermont;

1120. Prejudgment interest; and

1121. All costs incurred in bringing this action.

1122. To RELATOR:

1123. The maximum amount allowed pursuant 32 V.S.A. 635(b) and /or any other applicable provision of law;

1124. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

1125. An award of reasonable attorneys' fees and costs; and

1126. Such further relief as this court deems equitable and just.

## COUNT XXXIX

**(Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1*et seq.*)**

1127.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1128. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business

216

in the Commonwealth of Virginia. Upon information and belief, Defendants' actions described herein occurred in the Commonwealth of Virginia as well.

1129. This is a qui tam action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*

1130. Va. Code Ann. § 8.01-216.3 provides liability for any person who-

1131. Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

1132. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth

1133. Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

1134. Defendants violated Va. Code Ann. § 8.01-216.3 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

1135. Defendants furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused thousands of false claims to be made, used and presented to the Commonwealth of Virginia from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act and Stark Act, as described herein.

217

1136. The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1137. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' fraudulent and illegal practices.

1138. Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1139. As a result of Defendants' violations of Va. Code Ann. § 8.01-216.3 the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1140. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of himself and the Commonwealth of Virginia

218

1141. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

1142. Pursuant to the Virginia Fraud Against Taxpayers Act, the Commonwealth of Virginia and Relator are entitled to the following damages as against Defendants:

1143. To the COMMONWEALTH OF VIRGINIA:

1144. Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' fraudulent and illegal practices;

1145. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

1146. Prejudgment interest; and

1147. All costs incurred in bringing this action.

1148. To RELATOR:

1149. The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and /or any other applicable provision of law;

1150. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

219

1151. An award of reasonable attorneys' fees and costs; and

1152. Such further relief as this court deems equitable and just.

## COUNT XL

**(Washington False Claims Act, Washington Revised Code § 74 66-005 *et seq.*)**

1153.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1154. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Washington. Upon information and belief, Defendants' actions described herein occurred in the State of Washington as well.

1155. This is a qui tam action brought by Relator and the State of Washington to recover treble damages and civil penalties under the Washington False Claims Act, Washington Revised Code § 74 66-005 *et seq.*

1156. Washington Revised Code § 74 66-020 provides liability for any person who-

1157. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

1158. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

1159. Conspires to commit one or more of the violations in this subsection.

220

1160. Defendants violated Washington Revised Code § 74 66-020 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

1161. Defendants furthermore violated Washington Revised Code § 74 66-020 and knowingly caused thousands of false claims to be made, used and presented to the State of Washington from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

1162. The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1163. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' fraudulent and illegal practices.

1164. Had the State of Washington known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1165. As a result of Defendants' violations of Washington Revised Code § 74 66-020 the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1166. Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Washington Revised Code § 74 66-050 on behalf of themselves and the State of Washington.

1167. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

1168. Pursuant to the Washington False Claims Act, the State of Washington and Relator are entitled to the following damages as against Defendants:

1169. To the STATE OF WASHINGTON:

1170. Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' fraudulent and illegal practices;

1171. A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

1172. Prejudgment interest; and

1173. All costs incurred in bringing this action.

1174. To RELATOR:

1175. The maximum amount allowed pursuant to Washington Revised Code § 74

66-070 and /or any other applicable provision of law;

1176. Reimbursement for reasonable expenses which Relator incurred in

connection with this action;

1177. An award of reasonable attorneys' fees and costs; and

1178. Such further relief as this court deems equitable and just.

## REQUESTS FOR RELIEF

WHEREFORE, the Relator, on behalf of the UNITED STATES, demands that

judgment be entered in its favor and against Defendants: JANSSEN

PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-

MCNEIL, with judgment to be entered against each DEFENDANT for the amount

of damages to the States' Medicaid Programs arising (a) from claims for each

DEFENDANTS' respective specified drugs and (b) jointly and severally with such

other Defendants for damages as set forth in each paragraph above and herein, as

follows:

1.      On Count I (False Claims Act; Causing Presentation of False Claims) for

triple the amount of the UNITED STATES' damages, plus civil penalties of the

maximum amount allowed by law be imposed for each and every false claim that

Defendants presented to the UNITED STATES;

2.      On Count II (False Claims Act; Causing False Statements to Be Used to Get False Claims Paid or Approved by The GOVERNMENT) for triple the amount of UNITED STATES' damages plus civil penalties of plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

3.      On Count III (False Claims Act; Causing False Statements to Be Used to Conceal an Obligation to Pay Money to The GOVERNMENT) for triple amount of the UNITES STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

4.      On Count IV (False Claims Act; Causing Presentation of False and Fraudulent Claims; Illegal Remuneration) for triple amount of the UNITES STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

5.      On Count V (False Claims Act; Causing A False Record or Statement to Be Made or Used to Get a False or Fraudulent Claim Paid or Approved by The Government; Prohibited Referrals, Claims, and Compensation Arrangements) for triple amount of the UNITES STATES' damages plus civil penalties of the

224

maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

6.    On Count VI (False Claims Act; Conspiring to Defraud the Government by Getting a False or Fraudulent Claim Allowed or Paid) for triple amount of the UNITES STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES.

Further, the Relator, on its behalf, requests that it receive the maximum amount as permitted by the law, of the proceeds of this action or settlement of this action collected by the UNITED STATES, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relator requests that its award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

Relator hereby demands a jury trial.


Dated:  September 16, 2016


Respectfully submitted,


**UNITED STATES OF AMERICA, ex rel.**

**Relator**




By: _____

Mychal Wilson SBN 236189
The Law Office of Mychal Wilson
2425 W. Olympic Blvd., Suite 4000-W
Santa Monica, CA  90404
Telephone:  (424) 252-4232
Facsimile:    (310) 424-7116

*Attorney for Relator Alexander Volkhoff, LLC*

226

## <u>CERTIFICATION THAT VENUE IS PROPER</u>

Below-signed counsel hereby endorses and certify that this case is properly assigned to the Central District of California.


Dated:  September 16, 2016


By: _____

Mychal Wilson SBN 236189
THE LAW OFFICE OF MYCHAL WILSON
Mychal Wilson SBN #236189
The Law Office of Mychal Wilson
2425 W. Olympic Blvd., Suite 4000-W
Santa Monica, CA  90404
Telephone:  (424) 252-4232
Facsimile:   (310) 424-7116
E-mail:  mw@mychalwilsonesq.com


*Attorney for Relator Alexander Volkhoff, LLC*

227

1
2
**THE LAW OFFICE OF MYCHAL WILSON**
Mychal Wilson SBN #236189
3
The Law Office of Mychal Wilson
2425 W. Olympic Blvd., Suite 4000-W
4
Santa Monica, CA  90404
Telephone:  (424) 252-4232
5
Facsimile:   (310) 424-7116
6
E-mail:  mw@mychalwilsonesq.com

7

8
### IN THE UNITED STATES DISTRICT COURT

9
### CENTRAL DISTRICT OF CALIFORNIA

10

11
[UNDER SEAL]

12

13
                    Relators,

14
          v.

15
[UNDER SEAL],

16

17
                    Defendant.

18

19

20

21

22

23

24

25

26

27

28

Case No. _____

**EXHIBITS 1-51 TO COMPLAINT**

**TO BE FILED IN CAMERA
AND UNDER SEAL PURSUANT TO
31 U.S.C. § 3730**

**DO NOT ENTER INTO PACER**

**DO NOT PLACE IN PRESS BOX**

Exhibit 1

Zhang et al. BMC Gastroenterology (2015) 15:98
DOI 10.1186/s12876-015-0320-4



**RESEARCH ARTICLE**                                    **Open Access**



# Cost-effectiveness of sofosbuvir-based treatments for chronic hepatitis C in the US

Sai Zhang[2], Nathaniel D. Bastian[2] and Paul M. Griffin[1*]

**Abstract**

**Background:** The standard care of treatment of interferon plus ribavirin (plus protease inhibitor for genotype 1) are effective in 50 % to 70 % of patients with CHC. Several new treatments including Harvoni, Olysio + Sovaldi, Viekira Pak, Sofosbuvir-based regimens characterized with potent inhibitors have been approved by the Food and Drug Administration (FDA) providing more options for CHC patients. Trials have shown that the new treatments increased the rate to 80 % to 95 %, though with a substantial increase in cost. In particular, current market pricing of a 12-week course of sofosbuvir is approximately US$84,000. We determine the cost-effectiveness of new treatments in comparison with the standard care of treatments.

**Methods:** A Markov simulation model of CHC disease progression is used to evaluate the cost-effectiveness of different treatment strategies based on genotype. The model calculates the expected lifetime medical costs and quality adjusted life years (QALYs) of hypothetical cohorts of identical patients receiving certain treatments. For genotype 1, we compare: (1) peginterferon + ribavirin + telaprevir for 12 weeks, followed by 12 or 24 weeks treatment of peginterferon + ribavirin dependent on HCV RNA level at week 12; (2) Harvoni treatment, 12 weeks; (3) Olysio + Sovaldi, 12 weeks for patients without cirrhosis, 24 weeks for patients with cirrhosis; (4) Viekira Pak + ribavirin, 12 weeks for patients without cirrhosis, 24 weeks for patients with cirrhosis; (5) sofosbuvir + peginterferon + ribavirin, 12 weeks for patients with or without cirrhosis. For genotypes 2 and 3, treatment strategies include: (1) peginterferon + ribavirin, 24 weeks for treatment-naïve patients; (2) sofosbuvir + ribavirin, 12 weeks for patients with genotype 2, 24 weeks for genotype 3; (3) peginterferon + ribavirin as initial treatment, 24 weeks for patients with genotype 2/3, follow-up treatment with sofosbuvir + ribavirin for 12/16 weeks are performed on non-responders and relapsers.

**Results:** Viekira Pak is cost-effective for genotype 1 patients without cirrhosis, whereas Harvoni is cost-effective for genotype 1 patients with cirrhosis. Sofosbuvir-based treatments for genotype 1 in general are not cost-effective due to its substantial high costs. Two-phase treatments with 12-week and 16-week follow-ups are cost-effective for genotype 3 patients and for genotype 2 patients with cirrhosis. The results were shown to be robust over a broad range of parameter values through sensitivity analysis.

**Conclusions:** For genotype 1, sofosbuvir-based treatments are not cost-effective compared to Viekira Pak and Harvoni, although a 30 % reduction in sofosbuvir price would change this result. Sofosbuvir + ribavirin are cost-effective as second-phase treatments following peginterferon + ribavirin initial treatment for genotypes 2 and 3. However, there is limited data on sofosbuvir-involved treatment, and the results obtained in this study must be interpreted within the model assumptions.

**Keywords:** Cost-effectiveness, Markov model, Sofosbuvir, Harvoni, Olysio, Viekira Pak, Chronic hepatitis C

* Correspondence: pgriffin@gatech.edu
[1]School of Industrial and Systems Engineering, Georgia Institute of Technology, 755 Ferst Dr, Atlanta, GA 30332-0205, USA
Full list of author information is available at the end of the article



© 2015 Zhang et al. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly credited. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

Zhang et al. BMC Gastroenterology (2015) 15:98

## Background

Chronic hepatitis C (CHC) is the leading cause of chronic liver disease and the primary reason for liver transplantation [1, 2]. Approximately 170 million people worldwide are infected with the hepatitis C virus (HCV), including 4 million people in the US [3, 4]. CHC can go undetected for years, and once the symptoms do appear, liver damage has begun [5]. Approximately 42 % of CHC patients will develop cirrhosis in their lifetime [6]. Further, 23 % of these patients, if untreated, will eventually develop hepatocellular carcinoma, the primary cause of liver disease induced mortality [7]. In advanced stages of cirrhosis, liver transplantation is typically the only treatment option [8].

In the last few years, the standard of care for untreated CHC patients has changed from dual therapy with peginterferon and ribavirin to triple treatment with peginterferon, ribavirin plus protease inhibitors (PI) such as telaprevir or boceprevir [9]. Although fairly effective compared to the older dual therapy, this triple therapy does not achieve more than a 75 % sustained virologic response (SVR) [10], which is defined as HCV RNA less than lower limit of quantification (LLOQ) at 12 weeks after the end of treatment. Once SVR is achieved, relapse is very unlikely. However, injected interferon can lead to severe side effects such as fatigue, depression, and emotional liability [2].

In December 2013, sofosbuvir (brand name Sovaldi) as a new component of interferon-free oral regimen was approved by the U.S. Food and Drug Administration (FDA) for treating CHC. The drug eliminates the need for some patients to take interferon, specifically patients with genotypes 2 and 3 [11]. These patients can use sofosbuvir alone with ribavirin, whereas patients with genotype 1 are recommended to take sofosbuvir in combination with peginterferon and ribavirin [11]. More recently, there have appeared a number of potent inhibitors that were approved as an all-oral regimen to treat genotype 1 (Table 1). In October 2014, the combination of ledipasvir-sofosbuvir (Harvoni) was approved by the FDA for the treatment of genotype 1 CHC patients with or without cirrhosis [12]. One month later, the use of

simeprevir (brand name Olysio) in combination with sofosbuvir was also approved for genotype 1 patients [13]. A month later, Viekira Pak comprised of four medications (ombitasvir, paritaprevir, ritonavir and dasabuvir) was approved for genotype 1 patients as well [14]. These new treatments are characterized by significant increases in SVR [15]. The traditional regimen of peginterferon plus ribavirin is effective in 50 % to 70 % of patients with CHC. These new regimens as combinations of inhibitors increased the effective rate to 80 % to 95 % [12–14, 16–18]. However, as a popular component of new treatments, current market pricing of a 12-week course of sofosbuvir alone costs roughly $84,000 [19, 20]. We determine the cost-effectiveness of sofosbuvir-involved treatments in comparison with interferon-based treatments. To date, such analysis has not been reported, except for a recent study that found sofosbuvir-based treatments to be cost-effective for incarcerated persons [21].

## Methods

We apply a Markov simulation model of CHC disease progression to evaluate the cost-effectiveness of different treatment strategies for CHC. The model calculates the expected lifetime medical costs and quality adjusted life years (QALYs) of hypothetical cohorts of identical patients receiving certain treatments. Treatments are compared based on the ratio of the additional cost of the more costly treatment divided by the additional effectiveness of the treatment. Reference patient cohorts are defined according to the average patient characteristics, gender and age, obtained from the trials used in this study (52-years old, 64 % male, treatment-naïve who have CHC with or without cirrhosis).

At the beginning of a period, each hypothetical patient receives a designated treatment. If the patient shows detectable HCV RNA by a PCR test throughout the therapy, the patient is classified as a non-responder. If a patient is HCV negative during therapy and also negative in the test 12 weeks after treatment, we assume SVR is achieved. Otherwise, a relapse occurs. Whether a non-responder or relapser will receive follow-up treatment depends on the specific treatment plan. After receiving treatment, each patient enters a Markov process based on the viral response result. Subsequent long-term prognosis of each treatment group is then estimated using simulation, and the cohort is tracked as a patient moves through different health states until death. Transitions are made annually based on natural disease progression and each year patients may remain in the same state or transit to another state. In accordance with the literature, [6, 22–25] the costs and benefits are discounted at an annual rate of 3 %. All costs are adjusted to 2014 U.S. dollars.

**Table 1** FDA recommendations [19]

| Genotype | Treatment | Duration (weeks) |
|---|---|---|
| 1 | Harvoni | 12 |
| | Olysio + Sovaldi with or without Ribavirin | 12 (no cirrhosis), 24 (cirrhosis) |
| | Viekira Pak + Ribavirin | 12 (no cirrhosis), 24 (cirrhosis) |
| | Sovaldi + Peginterferon + Ribavirin | 12 |
| 2 | Sovaldi + Ribavirin | 12 |
| 3 | Sovaldi + Ribavirin | 24 |

Zhang et al. BMC Gastroenterology (2015) 15:98

## Efficacy rates of treatments

Efficacy data associated with sofosbuvir-based new treatments are extracted from five clinical studies [16–18]. These studies include a total of 1724 HCV mono-infected patients with genotypes 1 to 6 CHC. It should be noted that these five trials targeted different patient cohorts. The primary ending point was SVR at 12 weeks after the end of treatment. In the NEUTRINO study, [17] a 12-week treatment was evaluated with Sovaldi + peginterferon-alpha + ribavirin in treatment-naïve subjects with genotype 1,4,5,6. In the study, 90 % of patients had a SVR with 89 % for patients with genotype 1. The SVR rate was 92 % among patients without cirrhosis and 80 % among those with cirrhosis. Aiming at treatment-naïve subjects with genotypes 2 and 3, the FISSON study compared 12-week treatment with Sovaldi and ribavirin to a 24-week treatment with peginterferon-alpha plus ribavirin [17]. SVR categorized by genotype and cirrhosis is shown in Tables 2 and 3. The FUSION study conducted experiments on patients previously treated with interferon with genotypes 2 or 3 who either relapsed or failed to respond, and a 12- or 16-week treatment with Sovaldi and ribavirin was performed [16]. The VALENCE trial showed that for treatment-naïve genotype 3 patients, Sovaldi plus ribavirin for 24-week treatment obtained a 93 % SVR with no cirrhosis and a 92 % SVR with cirrhosis [18]. For Harvoni treatment, phase 3 studies (ION-1,ION-2,ION-3) have consistently shown SVR rates greater than 90 % with a 12-week course in patients of genotype 1 CHC with or without cirrhosis [12]. According to the COSMOS study, SVR rates were 95 % for non-cirrhotic patients with 12-week treatment of Olysio + Sovaldi and 100 % for cirrhotic patients with 24-week treatment [13]. Viekira Pak + ribavirin regimens was characterized with 95 % SVR for non-cirrhotic patients with 12-week treatment (SAPPHIRE-I study) and 95 % for cirrhotic patients with 24-week treatment (TURQOUISE study) [14]. In all of these trials, treatments were not guided by subjects' HCV RNA levels, implying that a no response-guided algorithm was used.

As benchmarks, we consider pegylated interferon, ribavirin plus telaprevir therapy as the standard care for genotype 1 and pegylated interferon plus ribavirin as the standard care for genotypes 2 and 3. They are commonly accepted treatments and acknowledged to be cost-effective in previous literature. Telaprevir is given with peginterferon and ribavirin for the first 12 weeks of therapy, followed by an additional 12 or 36 weeks of peginterferon and ribavirin depending on the response during therapy. If HCV RNA levels are undetectable at week 12 of treatment, an additional 12 weeks of peginterferon and ribavirin should be received, otherwise an additional 24 weeks of peginterferon and ribavirin are expected. As sofosbuvir also works for relapsers and non-responders with genotypes 2 and 3, we design a follow-up treatment of sofosbuvir plus ribavirin for patients who experience prior interferon treatment failure. We assume that all patients who participate in sofosbuvir-involved therapy either as initial or follow-up treatment complete the whole course of treatment. Subsequent prognosis of patients who relapse after the whole treatment is assumed to be identical to those who never have treatment.

In this study, we discuss treatment strategies based on genotypes. For genotype 1, the following treatment strategies are compared: (1) peginterferon + ribavirin + telaprevir for 12 weeks, followed by an additional 12 or 24 weeks treatment of peginterferon + ribavirin dependent on HCV RNA level at week 12; (2) Harvoni treatment, 12 weeks; (3) Olysio + Sovaldi, 12 weeks for patients without cirrhosis, 24 weeks for patients with cirrhosis; (4) Viekira Pak + ribavirin, 12 weeks for patients without cirrhosis, 24 weeks

**Table 2** Response rates for patients without cirrhosis

| Genotype | Treatment | Duration (weeks) | SVR (%) | Trials |
|---|---|---|---|---|
| 1 | Telaprevir + Peginterferon-alpha + Ribavirin | 12 + 12 or 12 + 36 | 75 | ADVANCE |
| | Harvoni | 12 | 98 | ION |
| | Olysio + Sovaldi | 12 | 95 | COSMOS |
| | Viekira Pak + Ribavirin | 12 | 96 | SAPPHIRE |
| | Sofosbuvir + Peginterferon + Ribavirin | 12 | 92 | NEUTRINO |
| 2 | Peginterferon + Ribavirin (Treatment-naïve) | 24 | 81 | FISSION |
| | Sofosbuvir + Ribavirin (Treatment-naïve) | 12 | 97 | FISSION |
| | Sofosbuvir + Ribavirin (Non-responders & Relapsers) | 12 | 90 | FUSION |
| | | 16 | 92 | FUSION |
| 3 | Peginterferon + Ribavirin (Treatment-naïve) | 24 | 81 | FISSION |
| | Sofosbuvir + Ribavirin (Treatment-naïve) | 24 | 93 | VALENCE |
| | Sofosbuvir + Ribavirin (Non-responders & Relapsers) | 12 | 37 | FUSION |
| | | 16 | 63 | FUSION |

Zhang *et al. BMC Gastroenterology* (2015) 15:98

**Table 3** Response rates for patients with cirrhosis

| Genotype | Treatment | Duration (weeks) | SVR (%) | Trials |
|---|---|---|---|---|
| 1 | Telaprevir + Peginterferon-alpha + Ribavirin | 12 + 12 or 12 + 36 | 75 | ADVANCE |
| | Harvoni | 12 | 98 | ION |
| | Olysio + Sovaldi | 24 | 100 | COSMOS |
| | Viekira Pak + Ribavirin | 24 | 95 | TURQUOISE |
| | Sofosbuvir + Peginterferon + Ribavirin (Treatment-naïve) | 12 | 80 | NEUTRINO |
| 2 | Peginterferon + Ribavirin (Treatment-naïve) | 24 | 62 | FISSION |
| | Sofosbuvir + Ribavirin (Treatment-naïve) | 12 | 83 | FISSION |
| | Sofosbuvir + Ribavirin (Non-responders & Relapsers) | 12 | 60 | FUSION |
| | | 16 | 78 | FUSION |
| 3 | Peginterferon + Ribavirin (Treatment-naïve) | 24 | 30 | FISSION |
| | Sofosbuvir + Ribavirin (Treatment-naïve) | 24 | 92 | FISSION |
| | Sofosbuvir + Ribavirin (Non-responders & Relapsers) | 12 | 19 | FUSION |
| | | 16 | 61 | FUSION |

for patients with cirrhosis; (5) sofosbuvir + peginterferon + ribavirin, 12 weeks for patients with or without cirrhosis. For genotypes 2 and 3, treatment strategies include: (1) peginterferon + ribavirin, 24 weeks for treatment-naïve patients; (2) sofosbuvir + ribavirin, 12 weeks for patients with genotype 2, 24 weeks for genotype 3; (3) peginterferon + ribavirin as initial treatment, 24 weeks for patients with genotype 2/3, follow-up treatment with sofosbuvir + ribavirin for 12/16 weeks are performed on non-responders and relapsers. We do not explicitly consider the case of patients where interferon containing therapy is not an option because of contraindications or because interferon based therapy has failed.

The Markov simulation model includes the following CHC associated health states: CHC, treatment induced cure, and liver disease induced death [5, 6]. In addition, patients at each health state are subject to the same age-dependent other cause induced death rate. Transition occurs annually and depends on health state-specific transition probabilities. Due to a lack of well-designed studies of patients with CHC, transition probabilities are estimated from the most widely quoted published data. Age-dependent death rates are obtained from the 2008 United States life table [26].

#### Health-state related quality adjusted life years
Quality of life specific to different health states are adjusted on an annual scale from 1 (perfect health) to 0 (death). Estimates of utilities were based on actual patients' utilities using the health utility index [27]. To estimate treatment-specific QALYs, the time spent in each health state was multiplied by each utility value and then summed over the life expectancy. As interferon based therapy has significant side effects, a 9 % reduction in utility is assumed for interferon-based therapy [22, 25].

Since most side effects are significantly more common in interferon containing regimens as compared to interferon-free ones, we assume that adding sofosbuvir in a regimen does not change the QALY values.

#### Medical costs
Medical costs are summarized in Tables 4 and 5. Drug costs are estimated using approximate 2014 average wholesale acquisition prices [12–14, 20]. Other therapy related costs including screening, diagnostic and laboratory testing, drugs, monitoring costs during therapy and follow-up periods are estimated from the literature. Annual costs associated with each health state have been previously discussed and are inflated to 2014 US dollars using the medical care component of the Consumer Price Index [28].

#### Sensitivity analysis
In order to evaluate the robustness of the model, sensitivity analysis is performed for all parameters. Specifically, a 95 % confidence interval is used for each entry of utility weights and natural history transition probabilities. Costs are halved and doubled. In terms of response rate, the model is reanalyzed for ±10 % change of the value for each efficacy. A variable is considered to be potentially influential if it leads to the change of effectiveness for a treatment. In addition to one-way sensitivity analyses for all variables, we conduct probabilistic sensitivity analyses. It is based on Monte Carlo simulation with 1000 runs, where parameters are varied according to associated distributions. This approach examines the effect of joint uncertainty in the model's variables. We assume that transition probabilities and utilities follow a uniform distribution with ranges specified in Tables 6 and 7. Treatment efficacies follow a Beta

Zhang et al. BMC Gastroenterology  (2015) 15:98

**Table 4** Annual costs of care

|  | Annual costs of care (2014 US$) | Reference |
|---|---|---|
| Chronic Hepatitis C | $572.69 | [25] |
| Compensated Cirrhosis | $762.99 | [25] |
| Decompensated Cirrhosis | $39,675.48 | [25] |
| HCC | $25,862.67 | [25] |
| Liver Transplant (1st year) | $483,057.01 | [25] |
| Liver Transplant (successive year) | $46,515.46 | [25] |

distribution and costs follow a Gamma distribution, all with a standard deviation equal to 10 % of the baseline value.

## Results

### Base case analysis

Treatments aimed at the same group of patients (genotype, existence of cirrhosis) are compared. We consider results categorized by whether cirrhosis exists. The results for patients without cirrhosis are shown in Table 8, and the results for patients with cirrhosis are shown in Table 9. Note that the treatments are sorted according to cost in ascending order. In both tables, the incremental cost-effectiveness ratio (ICER) is calculated as the additional cost divided by additional effectiveness between each treatment and the benchmark treatment. Specifically, all treatments are first compared to the standard of care treatment (e.g., standard of care treatment for genotype 1 is Telaprevir + Peginterferon + Ribavirin), and then compared to the adjacent efficient treatment. For example, in Table 8 for genotype 2, the Adjacent ICER between two-phase treatment with 24 + 12 versus Peginterferon + Riavirin is 4233. The Adjacent ICER between two-phase treatment with 24 + 16 versus two-phase treatment with 24 + 12 is 44,458. The Adjacent ICER between Sofosbuvir + Ribavirin versus two-phase treatment with 24 + 16 is 1,805,952.

For genotype 1 patients without cirrhosis, compared to the acknowledged efficient benchmark treatment (peginterferon + ribavirin + telaprevir), all new treatments are cost-effective with ICER less than the threshold of $50,000/QALY. In particular, treatments

**Table 5** Weekly cost of treatments

| Treatment | Cost per week (2014 US$) |
|---|---|
| Harvoni | $7,875.00 |
| Olysio + Sovaldi | $12,500.00 |
| Viekira Pak + Ribavirin | $7,000.00 |
| Ribavirin | $250 |
| Peginterferon + Ribavirin | $750 |
| Sofosbuvir | $7,000 |

Harvoni and Viekira Pak both achieve higher QALYs with reduced costs, which makes the benchmark treatment no longer efficient, whereas treatments olysio + sovaldi and sofosbuvir + peginterferon + ribavirin both achieve higher QALYs but with increased costs compared to benchmark treatment. However, if compared to Viekira + Pak, Harvoni, olysio + sovaldi and sofosbuvir + peginterferon + ribavirin are no longer efficient characterized with higher costs and lower QALYs. Thus, we conclude that all four new regimens are alternatives of the current standard care of treatment (peginterferon + ribavirin + telaprevir), but Viekira Pak is the most cost-effective for genotype 1 patients without cirrhosis, whereas the other three sofosbuvir-based treatments are featured with higher costs and lower QALYs. For genotype 2 treatments, compared to standard care of treatment (peginterferon + ribavirin), all three sofosbuvir-based treatments are cost-effective. However, the comparative ICER of two-phase treatment with a 16-week follow-up versus 12-week single treatment of sofosbuvir + ribavirin is $1,805,952/QALY, which is far beyond the threshold. Thus, for genotype 2 the two-phase treatments with peginterferon + ribavirin as initial and 12 and 16 weeks of sofosbuvir as follow-up are cost-effective, whereas single treatment with sofosbuvir + ribavirin is not. For genotype 3, similarly, the two-phase sofosbuvir-based treatments are cost-effective compared to the standard care of treatment; note that ICERs between adjacent treatments are also below the threshold. The 24-week single treatment with sofosbuvir + ribavirin is not cost-effective compared to standard care of treatment with an ICER of $88,833/QALY. Further, it is not cost-effective compared to two-phase treatment with a 16-week follow-up with an ICER of $374,594/QALY. Overall, single-phase treatment with sofosbuvir for both genotype 2 and 3 patients dominates two-phase treatments using peginterferon + ribavirin regimen as initial and sofosbuvir-based new treatment as follow-up. The reason is attributable to the fact that the traditional regimen (peginterferon + ribavirin) has a relatively high SVR for genotypes 2 and 3, and the new treatment's additional SVR increase does not justify its much higher cost.

When patients with cirrhosis are considered, for genotype 1 all new treatments are efficient compared to the standard care of treatment, whereas adjacent ICERs show that sofosbuvir + peginterferon + ribavirin and Viekira Pak are both inefficient compared to Harvoni with higher costs and lower QALYs. Although olysio + sovaldi has higher cost as well as higher QALYs compared to Harvoni, the ICER is $1,305,213/QALY, which is far beyond the threshold and hence not efficient. Therefore, for genotype 2 patients with cirrhosis, Harvoni

Case 2:16-cv-06997-RGK-RAO   Document 1-1   Filed 09/16/16   Page 94 of 100   Page ID #:197

Zhang *et al. BMC Gastroenterology* (2015) 15:98

Page 6 of 9

**Table 6** Annual transitions (stated as percentages)

| Transition | Baseline | Range | Reference |
|---|---|---|---|
| Chronic Hepatitis C | | | |
| to Compensated Cirrhosis | 7.30 % | 1.0 %-23.2 % | [6, 25] |
| Compensated Cirrhosis | | | |
| to Decompensated Cirrhosis | 3.90 % | 2.0 %-8.3 % | [22, 25, 29] |
| to HCC | 3.70 % | 1.0 %-4.4 % | [25, 30, 31] |
| Decompensated Cirrhosis | | | |
| to HCC | 3.70 % | 1.0 %-4.4 % | [25, 29, 30] |
| to Liver Transplant | 3 % | 1.0 %-6.2 % | [22, 25] |
| to Liver-induced Death | 12.90 % | 6.5 %-19.3 % | [15, 22, 24, 29] |
| HCC | | | |
| to Liver Transplant | 3 % | 1.0-6.2 % | [22, 25] |
| to Liver-induced Death | 42.70 % | 33 %-86 % | [25, 29] |
| Liver Transplant | | | |
| to Liver-Induced Death, first year | 13.70 % | 6 %-42 % | [25, 32] |
| to Liver-Induced Death, successive year | 5.20 % | 2.4 %-11 % | [25, 32] |

is the most cost-effective treatment. For genotype 2, both two-phase treatments with 12-week and 16-week follow-ups are cost-effective, whereas 12-week single treatment with sofosbuvir + ribavirin is not cost-effective. For genotype 3 treatments, a 24-week single treatment with sofosbuvir + ribavirin is cost-effective, as well as the two-phase treatment with a 16-week follow-up.

**Sensitivity analysis**
One-way sensitivity analyses are performed on prices, transition probabilities, SVR rates, utility weights and costs of care. Only when the sofosbuvir price is reduced by at least 30 %, olysio + sovaldi and sofosbuvir + peginterferon + ribavirin can achieve cost-effectiveness compared to Harvoni or Viekira Pak for genotype 1 patients. However, even when the sofosbuvir price is halved, using sofosbuvir as initial treatment is still not cost-effective compared to two-phase treatments that use sofosbuvir as a follow-up treatment for genotypes 2 and 3. Further, increasing SVR for sofosbuvir-based treatments by 10 % does make them cost-effective compared to Harvoni and

**Table 7** Health-state specific QALYs

| QALYs | Baseline | Range | Reference |
|---|---|---|---|
| Uninfected | 1 | 1 | [27] |
| Chronic Hepatitis C | 0.82 | 0.6-0.9 | [27] |
| Compensated Cirrhosis | 0.78 | 0.5-0.9 | [27] |
| Decompensated Cirrhosis | 0.65 | 0.3-0.88 | [27] |
| HCC | 0.25 | 0.1-0.5 | [27] |
| Liver Transplant (1st year) | 0.5 | 0.11-0.7 | [27] |
| Liver Transplant (successive year) | 0.7 | 0.24-0.87 | [27] |

Viekira Pak for genotype 1 patients, and reducing SVR for Harvoni and Viekira Pak by 10 % also makes sofosbuvir-based treatments cost-effective.

Changing SVR rates of sofosbuvir-based treatments for genotypes 2 and 3 does not change the effectiveness of the treatments. Two-phase treatments of 24 + 12 weeks are always cost-effective for both genotypes 2 and 3, compared to which, a change in the values of cost of care or utility weights can push 24 + 16 weeks treatments' ICER beyond or below $50,000/QALY when benchmarked with the base case. However, it does not change the conclusion that single phase treatment of sofosbuvir + ribavirin is not cost-effective for both genotypes 2 and 3. Thus, for genotype 1 patients, a reduction in sofosbuvir price can improve the cost-effectiveness of sofosbuvir-based treatments compared to the alternatives of Harvoni and Viekira Pak. For genotypes 2 and 3, however, sofosbuvir-based new treatments serve better as follow-up treatments rather than initial treatments.

Probabilistic analysis results are shown via the cost-effectiveness acceptability curves (Fig. 1), which are interpreted as the probability that the data are consistent within a true cost-effectiveness ratio falling below that value between two treatments. The figure that the ICER of olysio + sovaldi versus Harvoni falls either below 0 or above $50,000/QALY with approximate probability 0.95, implying that compared to Harvoni, olysio + sovaldi either achieves lower QALYs with higher costs or achieves higher QALYs with higher cost but with ICER exceeding the threshold $50,000/QALY. Thus, with 95 % confidence we conclude that olysio + sovaldi is not cost-effective. For Viekira Pak and sofosbuvir + peginterferon + ribavirin,

Zhang *et al. BMC Gastroenterology* (2015) 15:98

**Table 8** Base case results for patients without cirrhosis

| Genotype | Treatment | Duration (weeks) | Cost ($) | Effectiveness (QALYs) | ICER compared to benchmark ($/QALY) | Adjacent ICER ($/QALY) |
|---|---|---|---|---|---|---|
| 1 | Viekira Pak + Ribavirin | 12 | 97,380 | 19.9659 | dominant | |
| | Harvoni | 12 | 106,830 | 19.9618 | dominant | dominated |
| | Telaprevir + Peginterferon + Ribavirin for first 12 weeks, followed by additional 12 or 36 weeks of Peginterferon + Ribavirin | 12 + 12 or 36 | 108,820 | 18.3364 | benchmark | dominated |
| | Sofosbuvir + Peginterferon + Ribavirin (Treatment-naïve) | 12 | 111,790 | 19.568 | 2,412 | dominated |
| | Olysio + Sovaldi | 12 | 165,220 | 19.9356 | 35,268 | dominated |
| 2 | Peginterferon + Ribavirin (Treatment-naïve) | 24 | 45,560 | 18.7853 | benchmark | |
| | Initial: Peginterferon + Ribavirin; Follow-up: Sofosbuvir + Ribavirin for non-responders and relapsers. | 24 + 12 | 50,340 | 19.9145 | 4,233 | 4,233 |
| | | 24 + 16 | 54,030 | 19.9975 | 6,987 | 44,457 |
| | Sofosbuvir + Ribavirin (Treatment-naïve) | 12 | 99,540 | 20.0227 | 43,624 | 1,805,952 |
| 3 | Peginterferon + Ribavirin (Treatment-naïve) | 24 | 52,810 | 18.2828 | benchmark | |
| | Initial: Peginterferon + Ribavirin; Follow-up: Sofosbuvir + Ribavirin for non-responders and relapsers. | 24 + 12 | 69,390 | 18.9351 | 25,418 | 25,418 |
| | | 24 + 16 | 70,220 | 19.4892 | 14,431 | 1,498 |
| | Sofosbuvir + Ribavirin (Treatment-naïve) | 24 | 187,880 | 19.8033 | 88,833 | 374,594 |

compared to Harvoni, they both have roughly a 0.50 probability of being effective according to figure. For both genotypes 2 and 3, the ICER of two-phase treatment with peginterferon + ribavirin as initial and 12-week sofosbuvir as follow-up versus the standard of treatment is below $10,000/QALY with 0.95 probability according to the figure, whereas two-phase treatment with peginterferon + ribavirin as initial, a 16-week sofosbuvir as follow-up and single treatment with sofosbuvir + ribavirin both have equal probability of being effective and not effective for genotypes 2 and 3.

## Discussion

Our analyses show that Viekira Pak is cost-effective for genotype 1 patients without cirrhosis, while Harvoni is cost-effective for genotype 1 patients with cirrhosis. Sofosbuvir-based treatments for genotype 1, in general, are not cost-effective due to its substantial high costs. The price of Sofosbuvir would need to be reduced by at least 30 % in order for olysio + sovaldi and sofosbuvir + peginterferon + ribavirin to achieve cost-effectiveness. For genotypes 2 and 3, sofosbuvir + ribavirin as initial treatment comes with a large increase in cost and a small increase in effectiveness. It is not recommended as an initial

**Table 9** Base case results for patients with cirrhosis

| Genotype | Treatment | Duration (weeks) | Cost ($) | Effectiveness (QALYs) | ICER compared to benchmark ($/QALY) | Adjacent ICER ($/QALY) |
|---|---|---|---|---|---|---|
| 1 | Harvoni | 12 | 108,000 | 19.9787 | dominant | |
| | Telaprevir + Peginterferon + Ribavirin for first 12 weeks, followed by additional 12 or 36 weeks of Peginterferon + Ribavirin | 12 + 12 or 36 | 122,420 | 17.2075 | benchmark | dominated |
| | Sofosbuvir + Peginterferon + Ribavirin (Treatment-naïve) | 12 | 130,750 | 17.8475 | 13,016 | dominated |
| | Viekira Pak + Ribavirin | 24 | 186,820 | 19.7603 | 25,227 | dominated |
| | Olysio + Sovaldi | 24 | 313,310 | 20.136 | 65,184 | 1,305,213 |
| 2 | Peginterferon + Ribavirin (Treatment-naïve) | 24 | 81,070 | 15.874 | benchmark | |
| | Initial: Peginterferon + Ribavirin; Follow-up: Sofosbuvir + Ribavirin for non-responders and relapsers. | 24 + 12 | 81,920 | 18.4461 | 330 | 330 |
| | | 24 + 16 | 82,240 | 19.3293 | 339 | 362 |
| | Sofosbuvir + Ribavirin (Treatment-naïve) | 12 | 119,940 | 18.4217 | 15,257 | dominated |
| 3 | Peginterferon + Ribavirin (Treatment-naïve) | 24 | 121,170 | 12.2543 | benchmark | |
| | Initial: Peginterferon + Ribavirin; Follow-up: Sofosbuvir + Ribavirin for non-responders and relapsers. | 24 + 16 | 147,520 | 17.1869 | 5,342 | 5,342 |
| | | 24 + 12 | 162,490 | 13.8563 | 25,793 | dominated |
| | Sofosbuvir + Ribavirin (Treatment-naïve) | 24 | 191,280 | 19.3615 | 9,865 | 20,123 |

Zhang *et al. BMC Gastroenterology* (2015) 15:98



**Fig. 1** Cost-effectiveness Acceptability Curves between Treatments. Olysio + Sovaldi versus Harvoni for Genotype 1 (*Subfigure 1*); Viekira Pak versus Harvoni for Genotype 1 (*Subfigure 2*); Sofosbuvir + Peginterferon + Ribavirin versus Harvoni for Genotype 1 (*Subfigure 3*); Two-phase of 24 + 12 versus Peginterferon + Ribavirin for Genotype 2 (*Subfigure 4*); Two-phase of 24 + 16 versus Two-phase of 24 + 12 for Genotype 2 (*Subfigure 5*); Sofosbuvir + Ribavirin versus Two-phase of 24 + 16 for Genotype 2 (*Subfigure 6*); Two-phase of 24 + 12 versus Peginterferon + Ribavirin for Genotype 3 (*Subfigure 7*); Two-phase of 24 + 16 versus Two-phase of 24 + 12 for Genotype 3 (*Subfigure 8*); Sofosbuvir + Ribavirin versus Two-phase of 24 + 16 for Genotype 3 (*Subfigure 9*)

treatment for patients with genotypes 2 and 3, with the exception of genotype 3 with cirrhosis, in which case, a 24-week sofosbuvir + ribavirin treatment is cost-effective as it leads to much higher SVR compared to alternative treatments. As a second-phase treatment for genotypes 2 and 3, sofosbuvir + ribavirin is cost-effective following peginterferon + ribavirin as initial treatment.

To assure the robustness of our results, we performed sensitivity analyses over wide ranges for all model parameters, and the results did not significantly impact our final conclusions. However, it is important to note that the results obtained in this study should be interpreted within the model assumptions, and there are several limitations. First, model parameters were obtained from the literature and there is limited data on sofosbuvir-involved treatment. Further, the SVR rates used from the five trials targeted different patient cohorts. Bias in these past studies could impact the results presented here. In addition, the Markov model used in the analysis is a simplified representation of disease progression based on aggregate population transitions. Although we believe that we have captured the primary stages, a higher fidelity model could lead to different conclusions. Finally, the population data is specific to the United States, and

so the results might not be directly applicable to other countries.

## Conclusions

We analyzed the cost-effectiveness of sofosbuvir-based new treatments for genotypes 1, 2 and 3 in the US. Data regarding the natural history of hepatitis C, utility weights, and various costs and transition probabilities were obtained from the literature, and sustained virologic response data associated with new treatments were extracted from clinical studies. Treatment strategies compared in this study were designed based on the data available while complying with drug dosage and administrative recommendations.

We found that for genotype 1 patients, sofosbuvir-based treatments are not cost-effective compared to Viekira Pak and Harvoni. If the price of sofosbuvir were reduced by at least 30 %, then this would change this result. In addition, Sofosbuvir + ribavirin is cost-effective as second-phase treatments following peginterferon + ribavirin initial treatment for genotypes 2 and 3. However, the data for sofosbuvir-involved treatment is limited. Therefore, the results obtained in this study must be interpreted within the model assumptions.

Zhang et al. BMC Gastroenterology (2015) 15:98

## Abbreviations
CHC: Chronic Hepatitis C; EVR: Earlier virologic response; FDA: US Food and Drug Administration; HCC: Hepatocellular carcinoma; LLOQ: Lower limit of quantification; QALY: Quality adjusted life year; SVR: Sustained virologic response.

## Competing interests
The authors declare that they have no competing interests.

## Authors' contributions
SZ helped in formulating and developing the mathematical models, data collection, running the models, and writing the manuscript. NB helped in interpreting the results, finalizing the analysis and in writing the manuscript. PG helped in defining the initial problem and scope, developing the mathematical modeling, data collection, interpreting the results, and writing the manuscript. Contributing authors have read and approved the final version of this manuscript.

## Acknowledgements
One of the authors was funded by the National Science Foundation under Grant No. IIP-1361509 and under Grant No. DGE1255832.

## Author details
[1]School of Industrial and Systems Engineering, Georgia Institute of Technology, 755 Ferst Dr, Atlanta, GA 30332-0205, USA. [2]Department of Industrial Engineering, Penn State University, University Park, PA 16803, USA.

Received: 12 January 2015 Accepted: 16 July 2015
Published online: 05 August 2015

## References
1. Verna EC, Brown Jr RS. Hepatitis C virus and liver transplantation. Clin Liver Dis. 2006;10:919–40.
2. Strader DB, Wright T, Thomas DL, Seeff LB. Diagnosis, management, and treatment of hepatitis C. Hepatology, 2004;39(4):1147–71.
3. Awad T, Thorlund K, Hauser G, Stimac D, Mabrouk M, Gluud C. Peginterferon alpha-2a is associated with higher sustained virological response than peginterferon alfa-2b for treatment of chronic hepatitis C: systematic review of randomized trials. Hepatology. 2010;51:1176–84.
4. Averhoff FM, Glass N, Holtzman D. Global burden of hepatitis C: considerations for healthcare providers in the United States. Clin Infect Dis. 2012;55 Suppl 1:S10–5.
5. Chen SL, Morgan TR. The natural history of hepatitis C virus (HCV) infection. Int J Med Sci. 2006;3:47–52.
6. Sullivan SD, Jensen M, Bernstein DE, Hassanein TI, Foster GR, Lee SS, et al. Cost-effectiveness of combination peginterferon alpha-2a and ribavirin compared with interferon alpha-2b and ribavirin in patients with chronic hepatitis C. Am J Gastroenterol. 2004;99:1490–96.
7. Sangiovanni A, Prati GM, Fasani P, Ronchi G, Romeo R, Manini M, et al. The natural history of compensated cirrhosis due to hepatitis C virus: a 17-year cohort study of 214 patients. Hepatology. 2006;43(6):1303–10.
8. Ghany MG, Strader DB, Thomas DL, Seeff LB. Diagnosis, management, and treatment of hepatitis C: an update. Hepatology. 2009;49(4):1335–74.
9. Petta S, Cabibbo G, Enea M, Macaluso FS, Plaia A, Bruno R, et al. Cost-Effectiveness of Sofosbuvir-Based Triple Therapy for Untreated Patients with Genotype 1 Chronic Hepatitis C. Hepatology. 2014;59(5):1692–705.
10. Jacobson IM, McHutchison JG, Dusheiko G, Di Bisceglie AM, Reddy KR, Bzowej HN, et al. Telaprevir for previously untreated chronic hepatitis C virus infection. N Engl J Med. 2011;364(25):2405–16.
11. Tucker ME. FDA approves 'game changer' hepatitis C drug Sofosbuvir". Medscape. December 6, 2013. http://www.medscape.com/viewarticle/817371 (accessed 1 March 2015).
12. Ledipasvir-Sofosbuvir (Harvoni). Hepatitis C Online. http://www.hepatitisc.uw.edu/page/ledipasvir-sofosbuvir (accessed 1 Mar 2015).
13. Simeprevir (Olysio). Hepatitis C Online. http://www.hepatitisc.uw.edu/page/treatment/drugs/simeprevir-drug (accessed 1 Mar 2015).
14. Ombitasvir-Paritaprevir-Ritonavir and Dasabuvir (Viekira Pak). Hepatitis C Online. http://www.hepatitisc.uw.edu/page/treatment/drugs/3d (accessed 1 Mar 2015).
15. Salomon JA, Weinstein MC, Hammitt JK. Cost-effectiveness of treatment for chronic hepatitis C infection in an evolving patient population. JAMA. 2003;290:228–37.
16. Jacobson IM, Gordon SC, Kowdley KV, Yoshida EM, Rodriguez-Torres M, Sulkowski MS, et al. Sofosbuvir for hepatitis C genotype 2 or 3 in patients without treatment options. N Engl J Med. 2013;368:1867–77.
17. Lawitz E, Mangia A, Wyles D, Rodriguez-Torres M, Hassanein T, Gordon SC, et al. Sofosbuvir for previously untreated chronic hepatitis C infection. N Engl J Med. 2013;368:1878–87.
18. Sovaldi drug description. www.rxlist.com/sovaldi-drug.htm. (accessed 1 Mar 2015).
19. 7U.S. Food and Drug Administration Approves Gilead's Sovaldi™ (Sofosbuvir) for the Treatment of Chronic Hepatitis C. Gilead [eLetter] 6 December 2013. www.gilead.com/news/press-releases/2013/12/us-food-and-drug-administration-approves-gileads-sovaldi-sofosbuvir-for-the-treatment-of-chronic-hepatitis-c#sthash.T9uTbSWK.dpuf". (accessed 1 March 2015).
20. Peginterferon alfa-2a (Pegasys). Hepatitis C Online. www.hepatitisc.uw.edu/page/treatment/drugs/peginterferon-alfa-drug. (accessed 1 March 2015).
21. Liu S, Watcha D, Holodniy M, Goldhaber-Fiebert J. Sofosbuvir-based treatment regimens for chronic, genotype 1 hepatitis C virus infection in U.S. incarcerated populations. Ann Intern Med. 2014;161:546–53.
22. Bennett WG, Inoue Y, Beck JR, Wong JB, Pauker SG, Davis GL. Estimates of the cost-effective of a single course of interferon-alpha2b in patients with histologically mild chronic hepatitis C. Ann Intern Med. 1997;127:855–65.
23. Davis GL, Alter MJ, El-Serag H, Poynard R, Jennings LW. Aging of the hepatitis C virus infected persons in the United States: a multiple cohort model of HCV prevalence and disease progression. Gastroenterology. 2010;138:513–21.
24. Kim WR, Poterucha JJ, Hermans JE, Therneau TM, Dickson ER, Evans RW, et al. Cost-effectiveness of 6 and 48 weeks of interferon-alpha therapy for chronic hepatitis C. Ann Intern Med. 1997;127:866–74.
25. Younossi Z, Singer M, Mchutchison J, Shermock K. Cost effectiveness of interferon alpha2b combined with ribavirin for the treatment of chronic hepatitis C. Hepatology. 1999;30:1318–24.
26. E Arias. United States Life Tables, 2008. National Vital Statistics Reports. 2012;61. www.cdc.gov/nchs/data/nvsr/nvsr59/nvsr59_10.pdf. (accesses 1 March 2015).
27. Younossi Z, McCormick M, Boparai N, Price L, Fqrquhar L, Guyatt G. Assessment of utilities and health-related quality of life in patients with chronic liver disease. Gatroenterology. 1999;116:A1292.
28. Bureau of Labor Statistics. http://data.bls.gov/timeseries/CUUR0000SA0?output_view=pct_12mths (accessed 1 Mar 2015).
29. Fattovich G, Guistina G, Degas E. Morbidity and mortality in compensated cirrhosis type C: a retrospective follow up study of 384 patients. Gastroenterology. 1997;112:463–72.
30. Degos F, Christidis C, Ganne-Carrie N, Farmachidi JP, Degott C, Guettier C, et al. Hepatitis C virus related cirrhosis: time to occurrence of hepatocellular carcinoma and death. Gut. 2000;47:131–36.
31. Fattovich G, Stroffolini T, Zagni I, Donato F. Hepatocellular carcinoma in cirrhosis: incidence and risk factors. Gastroenterology. 2004;127:S35–50.
32. Forman LM, Lewis JD, Berlin JA, Feldman HI, Lucey MR. The association between hepatitis C infection and survival after orthotopic liver transplantation. Gastroenterology. 2002;122:889–96.

**Submit your next manuscript to BioMed Central and take full advantage of:**

- Convenient online submission
- Thorough peer review
- No space constraints or color figure charges
- Immediate publication on acceptance
- Inclusion in PubMed, CAS, Scopus and Google Scholar
- Research which is freely available for redistribution

Submit your manuscript at
www.biomedcentral.com/submit

 BioMed Central

Exhibit 2

These examples of acute pain leading to chronic pain should be very familiar to pharmacists

This message is both compelling and relevant—pharmacists may think of chronic pain only in terms of nerve injury, but it can also be a consequence of unresolved acute pain

Be aware that both peripheral nerves and the CNS can be sensitized

When pain continues after the injury has healed, the pain itself can be considered a disease. The pharmacist should be referred to www.neopathwaysinpain.com for more information on chronicity



*NEO Detail Aid—Consequences, Page 4*

## SAMPLE MESSAGE

*As a pharmacist, you are a key member of a patient's pain relief team. I'm sure you see a lot of patients who are looking for relief of pain that they've had for weeks, months, or even years. Wouldn't you agree that unresolved acute pain can have significant clinical consequences?*

*Did you know that unresolved acute pain may lead to the development of chronic pain? In fact, the severity of acute pain is often a risk factor for the development of chronic pain. This has been documented in patients with low back pain, suggesting that moderate to severe pain should be resolved as quickly as possible.*

*The cascade of events that leads from acute pain to chronic pain can begin in even less than an hour of injury. This schematic shows how an acute injury can lead to **sensitization** and **neuronal remodeling***\* that results in chronic pain. Yet, early intervention and effective management of acute pain may improve long-term outcomes in pain patients. For more information on the chronicity of pain, you can visit www.neopathwaysinpain.com.*

*Does this information provide evidence to you of the importance of early, effective treatment of acute pain?*

\***Sensitization** and **neuronal remodeling** are changes to the nervous system that cause increased pain intensity and pain persistence.

Exhibit 3