**THE LAW OFFICE OF MYCHAL WILSON**
Mychal Wilson SBN 236189
401 Wilshire Blvd., 12th Floor
Santa Monica, CA 90401
Telephone: (424) 252-4232
Facsimile: (310) 424-7116
E-mail:  mw@mychalwilsonesq.com

**CUTTER LAW PC**
C. Brooks Cutter, SBN 121407
John R. Parker, Jr., SBN 257761
401 Watt Avenue
Sacramento, CA 95864
Telephone:  (916) 290-9400
Facsimile:  (916) 588-9330
E-mails:      bcutter@kcrlegal.com / jparker@kcrlegal.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and | CIVIL ACTION No. 2:16-cv-06997-RGK-RAO |
| THE STATES OF ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MISSOURI, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE,VERMONT, VIRGINIA, WASHINGTON, AND THE DISTRICT OF COLUMBIA ex rel. | **FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

-1-

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1    JANE DOE, an individual,

2                                        Relator,

     vs.

3

4    JANSSEN PHARMACEUTICA N.V.,
     JANSSEN PHARMACEUTICALS,
5    INC., and JANSSEN RESEARCH &
     DEVELOPMENT, LLC, JOHNSON &
6    JOHNSON, and ORTHO-MCNEIL

7

8    Defendants.

9

10   / / /

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28

-2-

Contents

INTRODUCTION ...............................................................9

PARTIES......................................................................18

JURISDICTION AND VENUE ...............................................21

FACTS .......................................................................22

  A. Defendants Illegally Promoted Drugs for Dangerous Off-Label Uses. ..........22

    *i. Defendants' off-label promotion of opioid drugs* ..........................26

    *ii. Defendants' off-label marketing of Olysio* ...........................32

    *iii. Defendants' off-label marketing of Xarelto* ........................37

    *iv. Defendants' off-label promotion of Levaquin* .......................38

    *v. Defendants' off-label promotion of Invokana* ......................41

    *vi. Defendants' off-label promotion of Simponi* ......................42

    *vii. Defendants' scheme to get off-label drug uses covered by insurance.* ........42

    *viii. Defendants sponsored seminars, symposia, and other continuing medical education programs that promoted the off-label use of their drugs* ..................45

    *ix. Defendants provided financing and other support for questionable research to support and promote the use of their drugs in off-label patient populations.* 46

  B.  Defendants Illegally Promoted Use of Their Drugs by Providing Kickbacks to Physicians and Researchers. ...........................................47

    *i. Defendants Paid Physicians Honoraria, and Lavish Meals to Attend or Speak at Events Promoting the Use of Opioid Drugs Nucynta, Nucynta ER, and Ultram ER, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' Drugs.* ..................................................56

    *ii. Defendants Concealed Some Illegal and Fraudulent Payments to Physicians by Funneling Them through Third Party Consultant Companies.* ....................62

*iii. Defendants Knew Their Payments to Physicians Were Illegal Because They Were Intended for the Purposeful Inducement of Business.* ...............................62

*iv. Defendants' Payment of Illegal Kickbacks to Physicians Actually Affected the Use of Opioid Drugs Nucynta, Nucynta ER, and Ultram ER, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' Drugs among Doctors* ...............................................................................................63

C.   Defendants Illegally Promoted Use of Opioid Drugs Nucynta, Nucynta ER, and Ultram ER, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Drugs by Illegally Promoting a Spread between Published Pricing and the Prices Offered to Customers. ...............................................................66

DEFENDANTS' ACTS OF RETALIATION ......................................................75

DEFENDANTS' SCHEMES RESULTED IN FALSE CLAIMS TO MEDICAID AND MEDICARE ...............................................................................85

CONCLUSION ...............................................................................87

Count I; FALSE CLAIMS ACT ......................................................87

   CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS ......87

Count II; FALSE CLAIMS ACT ......................................................88

   CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT ...............................................................88

Count III; FALSE CLAIMS ACT ......................................................89

   CAUSING FALSE RECORDS OR STATEMENT TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT ...............................................................................89

Count IV; FALSE CLAIMS ACT ......................................................89

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS;

ILLEGAL RENUMERATION ..................................................................89

Count V; FALSE CLAIMS ACT ....................................................................91

CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED

TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY

THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND

COMPENSATION ARRANGEMENTS ..........................................................91

Count VI; FALSE CLAIMS ACT ..................................................................92

CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A

FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID ..........................92

Count VII; FALSE CLAIMS ACT .................................................................93

RETALIATION/WRONGFUL TERMINATION ............................................93

VIOLATION OF THE RETALIATION STATUTE, 42 U.S.C. § 3730(h) ......93

Count VIII ...................................................................................................94

(Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 *et seq.*) ......94

Count XIX ...................................................................................................97

(California False Claims Act, Cal. Gov't Code § 12650 *et seq.*) ......................97

Count X .......................................................................................................99

(California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 *et seq.*) 99

Count XI ....................................................................................................101

(Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 *et seq.*)

...................................................................................................................101

Count XII ...................................................................................................104

(Connecticut False Claims Act for Medical Assistance Programs, Connecticut

General Statutes § 17b-301b. *et seq.*) ..............................................................104

Count XIII ......................................................................................107

   (Delaware Medicaid False Claims Act, 6 Del. C. § 1201 *et seq*.)....................107

Count XIV ......................................................................................110

   (District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 *et seq*.) ...............................................................................110

Count XV ......................................................................................112

   (Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq*.)....................................112

Count XVI ......................................................................................115

   (Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.) ....................................................................................115

Count XVII ......................................................................................117

   (Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 *et seq*.)........................117

Count XVIII ......................................................................................120

   (Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq*.) ...120

Count XIX ......................................................................................122

   (Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq*.).......122

Count XX ......................................................................................124

   (Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq*.) ....................................................................................124

Count XXI ......................................................................................127

   (Iowa False Claims Act, Iowa Code § 685.1 *et seq*.) ........................................127

Count XXII ......................................................................................130

   (Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 *et seq*.)................................................................................130

Count XXIII ......................................................................................132

FIRST AMENDED COMPLAINT       2:16-cv-06997-RGK-RAO

(Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 *et seq.*) ........................132

Count XXIV ........................................................................................135

(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) *et seq.*) ..................................................................................................135

Count XXV ..........................................................................................138

(Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq.*) ..................138

Count XXVI .........................................................................................140

(Minnesota False Claims Act, (Minnesota Statutes § 15C.01 *et seq.*) ............140

Count XXVII ........................................................................................143

(Missouri Health Care Payment Fraud and Abuse Act, Missouri Revised Statutes § 191.900 *et seq.*) ....................................................................143

Count XXVIII ......................................................................................146

(Montana False Claims Act, MT ST 17-8-401 *et seq.*) ..................................146

Count XXIX .........................................................................................149

(Nevada False Claims Act, N.R.S. § 357.010 *et seq.*)....................................149

Count XXX ..........................................................................................151

(New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.*).............................151

Count XXXI .........................................................................................154

(New Mexico Medicaid False Claims Act, and New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 27-14-1 *et seq.*, and N. M. S. A. 1978, § 44-9-1 *et seq.*)..........................................................................................154

Count XXXII ........................................................................................157

(New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*)....................157

Count XXXIII .......................................................................................159

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

(North Carolina False Claims Act, North Carolina General Statutes § 51-1-605 *et seq.*) ..................................................................159

Count XXXIV ...................................................................162

    (Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 *et seq.*).......162

Count XXXV ...................................................................164

    (Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1 *et seq.*) ............164

Count XXXVI ...................................................................167

    (Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*) ..................................................................167

Count XXXVII ...................................................................169

    (Vermont False Claims Act, 32 V.S.A. 630 *et seq.*).........................................169

Count XXXVIII ...................................................................171

    (Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1*et seq.*) 171

Count XXXIX ...................................................................174

    (Washington False Claims Act, Washington Revised Code § 74 66-005 *et seq.*) ..................................................................174

REQUESTS FOR RELIEF ...................................................................176

DEMAND FOR JURY TRIAL ...................................................................178

CERTIFICATION THAT VENUE IS PROPER ..................................................179

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

## **INTRODUCTION**

Jane Doe ("Relator") is informed and believes, and thereon alleges the following Complaint against Janssen Phamaceutica N.V., Janssen Phamaceuticals, Inc., and Janssen Research & Development, LLC, Johnson & Johnson, and Ortho-McNeil, (hereinafter collectively referred to as "Defendants").

1.      Defendant Janssen ("Janssen") is a pharmaceutical company that produces, markets, sells, and distributes pharmaceutical and biological products in the areas of area of immunology, pain management, and infectious diseases among others. Janssen and Defendant Johnson & Johnson ("JNJ") and Defendant Ortho-McNeil ("Ortho-McNeil") co-promote the prescription drug Olysio, or simeprevir, in the United States. Janssen also markets, sells, and distributes the opioid drugs Nucynta, Nucynta ER, and Ultram ER. Additionally, Janssen markets, sells, and distributes drugs for a variety of other uses, such as its other drugs Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica.

2.      The Food and Drug Administration ("FDA") has approved Olysio for the treatment of patients with Hepatitis C. The FDA has approved Nucynta for the treatment of moderate to severe pain acute pain under three (3) months in duration. Other indications for other Defendants' drugs include Levaquin for infections caused by designated, susceptible bacteria; Xarelto for a variety of specific blood thinning purposes; Aciphex for heartburn and reflux; Ultram ER for chronic pain; and Remicade for rheumatoid arthritis, psoriatic arthritis, ulcerative colitis, Crohn's disease, and ankylosing spondylitis. Remicade is also used to treat severe or disabling plaque psoriasis. Also, Elmiron for the relief of bladder pain or discomfort associated with interstitial cystitis; Invokana as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus; Simponi for the treatment of rheumatoid arthritis, psoriatic arthritis, ankylosing

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

spondylitis, and ulcerative colitis; and Imbruvica for the treatment of mantle cell lymphoma.

3.    Olysio is an expensive drug, costing as much as $25,000 per dose. In addition, its market share is inherently limited, since it is approved for use only in patients with Hepatitis C. According to the Centers for Disease Control, there are approximately 17,000 patients newly diagnosed annually with hepatitis C. To overcome these problems and gain a larger market for this drug, Defendants created a plan to illegally market Olysio off-label to treat HIV and renal failure patients, and other uses that are not approved by the FDA.

4.    Defendants funneled millions of dollars in unrestricted grant money to physicians in order to encourage them to speak and publish articles supporting the use of Olysio in patients whose cardiovascular event symptoms did not meet FDA criteria for Olysio. Specifically, Defendants targeted, developed, and trained physician "Key Opinion Leaders" ("KOLs"), influential doctors whom Defendants supported monetarily. Defendants, in turn, expected these KOLs to support Defendants' prescription drug use among off-label patient populations. Defendants then pointed to the KOLs' use of Olysio when promoting the drug widely to other physicians throughout the country.

5.    Consistent with their scheme to provide illegal incentives to doctors who prescribed Olysio, Defendants also gave kickbacks to physicians for off-label use of the drug, providing the physicians with speaking opportunities, unrestricted educational grants, lavish meals, and honoraria to promote and prescribe Olysio off-label, including paid travel included trips to Las Vegas, Hawaii, Chicago, Dallas, and other locations. At these "fly-to" activities, doctors received paid travel and speaker fees, and/or received speaker training so they could receive additional speaker payments from Defendants in the future. Defendants encouraged the physicians' acceptance of the paid travel and speaking fees as a form of quid pro

FIRST AMENDED COMPLAINT                              2:16-cv-06997-RGK-RAO

quo for increased sales of Olysio.

6.      Additionally, Olysio is not superior to competing, similar prescription drugs on the market, and Defendants' scheme to promote broad off-label use of Olysio among off-label patient populations and to influence studies promoting Olysio for use in such patients is very costly. A 2015 study published in the journal BMC Gastroenterology reveals that Olysio is not a cost-effective treatment compared to older treatments, and that a reduction of thirty percent (30%) or more in cost would be necessary to achieve a cost-effective result (See Exhibit 1).

7.      Many of Defendant's drugs have an inherently limited market share, because they are approved for use only in patients with very narrow indications. To overcome these problems and gain a larger market for these drugs, Defendants created a plan to illegally sell and market its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products to gain market share and formulary status in different territories.

8.       In order to increase sales of its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products, Defendants have illegally provided monetary and other incentives for physicians who were willing to prescribe the drugs. Defendants trained, managed, and instructed its sales representatives, business and marketing managers, and other executives to offer physicians cash payments, expensive trips and meals, expensive gifts, and entertainment as kickbacks in exchange for the physicians' agreement to prescribe Defendants' opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

Defendants' other drug products.

9.      The pharmaceutical industry is highly regulated by the FDA. Pursuant to the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*, the FDA strictly regulates the content of consumer and physician based advertising, direct to physician product promotion, and drug labeling information used by pharmaceutical companies in promoting and selling-FDA approved prescription drugs.

10.     Under 21 C.F.R. § 202.l(k)(2), any brochures, handouts, slide shows or other such promotional materials aimed at physicians are deemed to be "product labeling" and is regulated as such.

11.     Under relevant FDA regulations, product labeling must be pre-approved by the FDA and conform to very exacting requirements concerning, inter alia, drug interactions, indicated uses and claims concerning competing products. See 21 C.F.R § 201.57.

12.     All claims made in any labeling material must be truthful, not misleading and represent a fair balance of the information presented. Any presentations, promotions, or marketing to physicians for products for use other than that approved for labeling purposes by the FDA is considered "off label" marketing and is thus prohibited by FDA regulation.

13.     Any failure to fairly and accurately represent the required information about a prescription drug is considered misbranding and is a false and fraudulent statement as a matter of law. See 21 U.S.C. §§ 331(a) and (b), 352(a), (f) and (n); 21 C.F.R. § 201.57.

14.     Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading violate the Food Drug and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.*, and regulations promulgated hereunder. Such violations exist where promotional and marketing materials and

FIRST AMENDED COMPLAINT                                    2:16-cv-06997-RGK-RAO

presentations for an FDA approved drug:

    a.    Minimize, understate or misrepresent the risks, contra-indications and complications associated with that drug;

    b.    Overstate or misrepresent the risks, contra-indications and complications associated with any competing drugs;

    c.    Reference "off label" uses of the drug for which it was not an approved indication by the FDA, or expressly or implicitly promote unapproved uses and dosing regimens for which the drug is not indicated;

    d.    Make comparative claims about the drug that have not been demonstrated by substantial evidence, such as comparisons with competing drugs and/or drug indications of patient usage, warnings and safety claims including side effects, physician preference, or

    e.    Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

15.    When Defendants present physicians with false information about off-label use of its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products, and encourage physicians to prescribe and procure those drugs for off-label use uses which are not approved by the FDA or substantiated by any relevant drug compendium, Defendants cause physicians and facilities to submit bills for off-label use of these Defendants' drugs that are based upon fraudulent and misleading statements and are thus ineligible for reimbursement under federal Medicaid, Medicare, and TRICARE programs, and under state health care systems.

16.    Had the United States and the several States known that the Defendants caused procurement of opioid drugs Nucynta, Nucynta ER, and Ultram ER, along

with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products for off-label uses and also caused those drugs to be prescribed for off-label uses, they would not have provided reimbursement for such prescriptions. This course of conduct violates the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. and equivalent state statutes.

17.     Federal laws and regulations governing Medicaid and Medicare and similar state statutes prohibit pharmaceutical manufacturers from providing kickbacks to physicians and medical care providers. Specifically, the federal healthcare anti-kickback provision, 42 U.S.C. § 1320a-7b(b) (2)(B), provides:

> [W]hoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

18.     The Medicare and Medicaid anti-kickback laws, 42 U.S.C. 1320a-7b(b), *et seq.*, regulate drug and device marketing in order to prevent over-utilization of medical care, medication, and medical drugs. Under the anti-kickback laws, companies may not offer or pay any remuneration, in cash or kind, to induce physicians or others to order or recommend drugs or devices which may be paid for by a federal healthcare program such as Medicare or Medicaid. These regulations not only prohibit outright bribes and rebate schemes, but prohibit any payment, remuneration, gratuities, and other benefits paid by a company to a physician which has as one of its purposes inducing the physician to use the

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1   company's products.

2   19.    In addition to the anti-kickback laws, §1877 of the Social Security Act,

3   often referred to as the "Stark law," provides that a physician cannot (1) refer

4   patients to an entity (2) for the furnishing of DHS (designated health services) (3)

5   if there is a direct or indirect financial relationship between the referring physician

6   (or an immediate family member of the referring physician) and the entity, (4)

7   unless the financial relationship fits within one of the specific exceptions in the

8   statute or regulations. *See* 42 U.S.C. §1395nn. Unlike the Medicare Anti-Kickback

9   Statute, which is a criminal statute requiring at least some measure of criminal

10  intent, the Stark Statute is a civil statute requiring strict compliance. Intent to

11  violate or substantial compliance has no bearing on whether an activity is or is not

12  legal. Violation, no matter how unintentional or technical, is sufficient to invoke

13  the Stark Statute. Lastly, if a prohibited referral occurs under Stark, the DHS entity

14  may not file or cause to be filed a claim under Medicare or Medicaid or a bill to

15  any individual, third party payer, or other entity for the designated health services

16  provided.

17  20.    Had the United States and the several States known that Defendants' opioid

18  drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto,

19  Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,

20  and Imbruvica, and Defendants' other drug products were being used by facilities

21  because physicians in those facilities had accepted kickbacks from Defendants, the

22  United States and the several States would not have funded these illegal kickbacks

23  after the fact by providing reimbursement for Defendants' drugs.

24  21.    Defendants' conduct occurred while under concurrent Corporate Integrity

25  Agreements (2010 and 2013) for two (2) separate FDA off-label promotion

26  schemes. The extent of these infractions only indicates that the defendant has no

27  respect for the law and is willing to push legal boundaries in pursuit of corporate

28

-15-

1   profits despite what this may entail for the US government or patients' lives.

2   22.     Moreover, the kickbacks described in this Complaint are strictly illegal and

3   have had the direct effect of greatly increasing the amount of Defendants' opioid

4   drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto,

5   Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,

6   and Imbruvica, and other Defendants' drugs that have been paid for and

7   reimbursed by state and federal governments. Accordingly, the kickbacks have had

8   the indirect effect of increasing the amount of money spent by the federal

9   government and the States for payments and reimbursements covered by Medicaid,

10  Medicare, and the TRICARE health care system for members of the military and

11  their families. Defendants' kickbacks to physicians represent the inducement of

12  payment from the government through a pattern of fraudulent conduct, constituting

13  false claims within the meaning of 31 U.S.C. § 3729 and the relevant provisions of

14  the state false claims and Medicaid fraud statutes. When Relator JANE DOE

15  complained and reported these practices and other illegal and fraudulent practices

16  to Defendants, Janssen retaliated against Relator and then eventually fired Relator.

17  23.     Relator also alleges violations by Defendants of the California Insurance

18  Frauds Prevention Act ("CIFPA"), Cal. Ins. Code § 1871, *et seq*.; and the Illinois

19  Insurance Claims Fraud Prevention Act ("ILCFPA"), 740 Ill. Comp. Stat. § 92/1,

20  *et seq*.

21  24.     Both California and Illinois have *qui tam* statutes that permit relators to raise

22  allegations of fraud by individuals or entities against private insurance companies.

23  The statutes operate similarly to the federal and state FCAs, and are written to

24  prevent fraud occurring in the private health care insurance market.

25  25.     Upon information and belief, Defendants receive significant revenues from

26  private insurers in California and Illinois.

27  26.     Upon information and belief, Defendants are paid by private insurers that

28

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

cover California- and Illinois-based patients who have been referred for treatment as a result of Defendants' scheme.

27.     Upon information and belief, private healthcare insurance companies in California and Illinois require the same conditions of payment and prohibitions kickbacks and off-label marketing found in the Medicare and Medicaid programs.

28.     The CIFPA prohibits as unlawful the following:

> …It is unlawful to knowingly employ runners, cappers, steerers, or other persons...to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer.

29.     The Defendants' kickback scheme also violates Section 1871.7(a) of the CIFPA, Cal. Ins. Code 1871.7(a), and Section 92/5(a) of the ILCFPA 740 Ill. Comp. Stat. § 92/5(a). Defendants have entered into illegal arrangements with physicians that provide financial incentives for the use of their drug prescribing services, resulting in inappropriate claims submitted to private insurers.

30.     Under the CIFPA, any interested person may bring a sealed civil action for a violation of Section 187.7 on behalf of the State of California, Ca, Ins. Code § 1871.7(e)(1), (2). If the relator is ultimately successful and the District Attorney intervenes in the lawsuit, the relator is entitled to the recovery of fees, expenses, and a relator's share of between 30% and 40% according to the priority specified in the statute. Cal. Ins. Code § 1871.7(g)(1)(A)(iii)(I), (IV). If neither the District Attorney nor the Insurance Commissioner intervene and the relator is successful in settling his/her lawsuit or attaining final judgment, the relator may receive between 40% and 50% of the proceeds plus costs and expenses. Cal. Ins. Code § 1871.7(g)(2)(A).

31.     The Illinois Insurance Claims Fraud Prevention Act ("ILCFPA") is similar to the CIFPA. In Section 92/5(a), the ILCFPA prohibits kickbacks and states:

... [I]t is unlawful to knowingly offer or pay any remuneration directly or indirectly, in case or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.

32.   740 Ill. Comp. Stat. § 92/5(a). If a defendant is in violation of Section 92/5(a) or specifically identified corollary criminal code sections, he/she must reimburse three times the amount of money defrauded as well as civil penalties ranging from $5,000.00 to $10,000,00 per fraudulent claim. 740 Ill, Comp. Stat. § 92/5(b).

33.   Pursuant to Section 15 of the ILCFPA Section 15, an interested person may bring a sealed civil action for a violation of the ILCFPA on behalf of him/herself and the State of Illinois. 740 Ill. Comp, Stat. § 92/15(a), (b). If the State's Attorney and/or the Attorney General intervene in the *qui tam* action, and it is ultimately successful, the relator is entitled to at least 30% of the recovery. 740 Ill, Comp. State § 92/25(a). If neither government entity intervenes and the relator successfully pursues the lawsuit on his/her own, the relator is entitled to recover not less than 40% of the proceeds. 740 Ill. Comp. Stat. § 92/25(b).

34.   Relators here are the original sources of the allegations under the CIFPA and ILCFPA.

## **PARTIES**

35.   Relator has worked in pharmaceutical sales since 2005, when Relator began working as a sales representative in Los Angeles, California for Janssen, promoting the multiple prescription drugs, including those contained in this complaint.

36.   Relator is a citizen of the United States. Relator has been employed by Defendants and has inside knowledge that is independent of and materially adds to publicly disclosed information regarding Defendants' business related to pharmaceutical products.

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

37.     The Relator became aware of Defendants' false claim scheme alleged herein due to Relator's position as an original source. The Relator commenced this *qui tam* action against Defendants for the pharmaceutical products at issue based upon Relator's personal experiences and industry insider information. Relator, as an employee of Defendants, had access to pricing, marketing and reimbursement information such as proprietary Defendant computer files revealing the marketing schemes, prices, and volume of sales by Defendants. Relator, as an industry insider, discovered huge profit spreads on the drugs at issue and that the drugs at issue were reimbursed by Medicare, Medicaid, and private insurers for illegal marketing schemes. Relator directly witnessed and observed the Defendants' sale and introduction of the drugs into the stream of commerce. Relator was aware that Medicare and Medicaid intended to reimburse Defendants for drugs based on a belief that the drugs were legitimately marketed and that the drugs were not encumbered by illegal kickback and off-label marketing schemes, when in fact the Defendants heavily influenced sales of the drugs with kickbacks and off-label promotion.

38.     The facts averred in this Complaint are based entirely upon the personal observations of Relator and documents in Relator's possession.

39.     Relator has provided or is providing to the United States Attorney and the Attorneys General of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Vermont, Virginia, Washington, and the District of Columbia a full disclosure of substantially all material facts supporting this Complaint, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2), and relevant state statutes.

/ / /

FIRST AMENDED COMPLAINT                                    2:16-cv-06997-RGK-RAO

40.     Janssen N.V. is a corporation organized and existing under the laws of Belgium with its principal place of business at Turnhoutseweg 30, B-2340, Beerse, Belgium.

41.     Janssen Pharm. is a corporation organized and existing under the laws of Pennsylvania with its principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

42.     Janssen R&D is a corporation organized and existing under the laws of New Jersey with its principal place of business at 920 Route 202, Raritan, New Jersey 08869.

43.     Janssen is a biopharmaceutical company engaged in the manufacture, promotion and sale of pharmaceutical products in interstate commerce regulated by the FDA, which activities are subject to the Food, Drug, and Cosmetic Act ("FDCA"), the Food and Drug Administration Modernization Act ("FDAMA") and regulations promulgated pursuant thereto. Janssen markets, sells, and distributes the prescription drug Olysio, which is indicated in the treatment of certain patients with hepatitis C, and the prescription drug Nucynta, which is indicated in the treatment of chronic pain, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, among other drugs.

44.     JNJ is a fictitious name adopted by Defendant JOHNSON & JOHNSON COMPANY, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

45.     Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. ("JANSSEN PHARM") is a Pennsylvania Corporation, having a principal place of business at 1125 Trenton-Harbourton

1  Road, Titusville, New Jersey 08560.

2  46.      Defendant JANSSEN ORTHO LLC ("JANSSEN ORTHO") is a limited

3  liability company organized under the laws of Delaware, having a principal place

4  of business at Stateroad 933 Km 01, Street Statero, Gurabo, Puerto Rico 00778.

5  Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only

6  member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated

7  in Ireland with a principal place of business in Puerto Rico. Accordingly,

8  JANSSEN ORTHO LLC is a citizen of Delaware, Ireland, and Puerto Rico for

9  purposes of determining diversity under 28 U.S.C. § 1332.

10  47.      Since 2005, Defendants have been co-conspirators and co-partners in the

11  production, promotion, marketing, sales, and distribution of its opioid drugs

12  Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto,

13  Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,

14  and Imbruvicaa, and Defendants' other drug products and are thus jointly and

15  severally liable for the acts described herein related to the production, promotion,

16  marketing, sales, and distribution of these drugs.

17  **JURISDICTION AND VENUE**

18  48.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

19  This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and

20  3730(b). This court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28

21  U.S.C. § 1331. This court has jurisdiction over the state law counts asserted in this

22  Complaint under both 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367, because the state

23  claims arise from the same transaction or occurrence as the federal claims and

24  because these claims are so related to the federal claims that they form part of the

25  same case or controversy under Article III of the U.S. Constitution.

26  49.      At all times material to this Complaint, Defendants regularly conducted

27  substantial business within the State of California, maintained permanent

28

FIRST AMENDED COMPLAINT                              2:16-cv-06997-RGK-RAO

employees and offices in California, and made and are making significant sales within California. Defendants are thus subject to personal jurisdiction in California.

50.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this district, selling and promoting their drugs to multiple doctors in this district.

## FACTS

### A. Defendants Illegally Promoted Drugs for Dangerous Off-Label Uses.

51.     Defendants created a plan to illegally market Olysio off-label to treat HIV and renal failure patients, and other uses that are not approved by the FDA. Defendants additionally created schemes to illegally market the opioid pain drugs Nucynta, Nucynta ER, and Ultram ER in ways that increased the risk of addiction. Defendants also illegally marketed Xarelto, Levaquin, Invokana, Simponi, and other drugs in dangerous off-label manners.

52.     New pharmaceutical drugs may not be marketed in the United States until the sponsor of the drug has proven to the Food and Drug Administration (FDA) that the drug is safe and effective for specific indications at specified dosages (if applicable). The indications and dosages (if applicable) approved by the FDA are set forth in the product's labeling, the content of which is also approved by the FDA. Although it is not unlawful for physicians to use drugs for indications or at dosages different than those set forth in a product's labeling, the Food Drug and Cosmetic Act prohibits pharmaceutical companies from marketing or promoting approved drugs for uses other than those set forth in the drug's approved labeling. This regulatory structure protects patients and consumers by ensuring that medical companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body.

53.     The Medicaid and Medicare programs also rely on the FDA's findings

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

regarding safe and effective uses for approved drugs. The Omnibus Budget Reconciliation Act of 1990 limited Medicare reimbursement for drugs or devices to "covered outpatient drugs" 42 U.S.C.§ 1396r-8(k)(2)(A). Covered outpatient drugs only include drugs used for "medically accepted indications". A medically accepted indication is a use which has been approved by the FDA or one which is supported by specific compendia set forth in the Medicare statutes. Until August, 1997, none of the compendia referenced in the statutes supported off-label usage of any approved drugs or devices. Even after August 1997, off-label usage was significantly restricted.

54.     Off-label use of a medical product refers to the prescription or use of a product in a manner not approved by the FDA. Since Congress passed the Food and Drug Administration Modernization Act ("FDAMA") in November 1997, manufacturers may provide off-label studies to the medical community only if certain conditions are met. Moreover, federal law prohibits manufacturers from promoting off-label uses through physician studies when the investigating physician is not truly independent or impartial, as well as when the physician is in fact an agent of the manufacturer based upon significant financial relationships. See 21 U.S.C. §§ 360aaa *et seq*.

55.     Whether a drug is FDA-approved for a particular use will largely determine whether payment for that drug will be reimbursed under the federal and state Medicaid and Medicare programs. Thus, the off-label use of such drugs is not eligible for reimbursement under Medicaid. Likewise, many state health care agencies intend not to reimburse for drugs for off-label purposes because the agencies do not want to spend money on drugs not recognized as medically necessary in sources specified by federal law. Defendants' opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

Imbruvica were not eligible for reimbursement from federal or state Medicaid or Medicare programs when prescribed for use in off-label patients.

56.     Defendants' conduct caused physicians to submit bills for their drugs that were ineligible for reimbursement under Medicaid and Medicare because the drugs were used for off-label purposes. Defendants' actions caused physicians, hospitals, and clinics to prescribe, purchase and use Olysio. Such prescriptions, purchases and use were not eligible for reimbursement under Medicaid and Medicare because the drugs were for an off-label use. According to Relator, up to ninety-eight (98%) of Olysio use in 2014 was for off-label purposes. Defendants thus caused the submission of false claims for payment of money under the federal Medicaid and Medicare programs and state health care programs.

57.     Additionally, the United States military's payments to cover the use of Defendants' opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products for off-label patient populations were not eligible for coverage under the TRICARE health care plan for members of the military and their families (formerly known as CHAMPUS), or through direct purchasing by the military. The Department of Defense will generally pay for the costs only of "proven" drugs, meaning drugs that have been found to be "safe and effective" by the FDA. 32 C.F.R. § 199.4(g)(15)(i)(A). TRICARE will pay for off-label use of a drug only if the use is determined to be a "medical necessity" and if the program can determine that the off-label use is "safe and effective and in accordance with nationally accepted standards of practice in the medical community." *Id.* TRICARE will not pay for a drug unless "reliable evidence shows that the medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints". 32 C.F.R. § 199.4(g)(15)(i)(C). The studies Defendants supported to

FIRST AMENDED COMPLAINT                           2:16-cv-06997-RGK-RAO

promote the use of Olysio off-label did not meet these standards. Had TRICARE

known this, it would not have covered or reimbursed the off-label use of

Defendants' opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other

drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex,

Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products.

58.     In limited situations, investigational drugs may be used by the military.

However, whenever a member of the armed forces receives a drug unapproved for

its applied use, the member must be given notice and consent to such use. 10

U.S.C. § 1107. In order to waive consent for the purposes of using such an

"investigational drug" in battle, the Secretary of Defense must request a waiver

from the President. No such waiver was requested for Defendants' opioid drugs

Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto,

Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,

and Imbruvica, and Defendants' other drug products.

59.     As described in this Complaint, Defendants have, since at least 2005

through the present, knowingly and intentionally violated the regulatory schemes

described above in its marketing of Defendants' products. Defendants knew or

should have known that thousands of pharmacies would routinely and necessarily

file false claims with the federal government when the pharmacies sought federal

reimbursement for its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its

other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex,

Invokana, Simponi, Elmiron, and Imbruvica, and Defendants' other drug products.

But for Defendants' actions most, if not all, of the false claims for the purchase of

Defendants' products would never have been submitted. Although in some cases

the pharmacists did not directly contract with the federal government, Defendants

were the indirect beneficiary of all of the false claims submissions described in this

Complaint.

60.     While all on-label and off-label sales made or effected by the health care providers receiving unlawful kickbacks or engaging in improper self-referral cause false claims to be filed, the unlawful promotion of off-label uses of Defendants' products provides an additional, independent, and, under the circumstances, far more urgent basis for the government to interdict this activity—the public health is at risk.

*i. Defendants' off-label promotion of opioid drugs*

61.     Opioid drugs have the potential for patient addiction, abuse, and misuse, resulting in life-threatening overdoses. Defendants downplayed this risk, and marketed the opioid drugs Nucynta, Nucynta ER, and Ultram ER as natural and less addictive than other drugs. Although evidence was building up that long-acting extended release ("ER") opioids should only be used as a last resort for pain management, Defendants ignored the signs and continued to push these highly addictive drugs using misleading terms.

62.     Nucynta (tapentadol) is a Schedule II opioid agonist tablet and oral solution first approved in 2008 and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older." Nucynta is indicated for the treatment of acute pain under three (3) months of duration. The company used multiple approaches to increase market capture of the product. To both market it as a stand-alone short acting medication, in addition to another long acting agent, and in conjunction with Opioid rotation. Until January 2015, Janssen developed, marketed, and sold Nucynta and Nucynta ER, the "extended release" formula.

63.     Nucynta ER (tapentadol extended release) is a Schedule II opioid agonist tablet first approved in 2011 and indicated for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Prior to April 2014, Nucynta ER was indicated for the "management of moderate to severe chronic pain in

adults [and] neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults." The DPN indication was added in August 2012.

64.     Ultram ER (tramadol hydrochloride extended release) is a Schedule IV opioid agonist tablet. It was first approved in the U.S. in 1995. Like Nucynta ER, Ultram ER is indicated for "the management of pain severe enough to require daily around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."

65.     Defendants promoted the dangerous and contraindicated idea that pain should be treated first by taking long-acting opioids like Nucynta ER and Ultram ER continuously and then by taking short-acting, rapid onset opioids on top of that. Extended release formulas are only indicated where shorter-acting formulas are inadequate. Meanwhile, despite the short acting nature of the drug, the marketing efforts for Nucynta were concentrated on high volume pain prescribers such as pain management specialists and rheumatologist that primarily treat chronic pain patients. Short-acting Nucynta (November 20, 2008) went on the market about three (3) years before the long-acting form, Nucynta ER (August 25, 2011). The drug was marketed based on its so-called ascending and descending pathways, part of a claim that the drug was non-addictive, and avoided withdrawal symptoms.

66.     While it was once thought that long-acting opioids would not be as susceptible to abuse and addiction as short-acting ones, this view has been discredited by innumerable adverse reaction reports. Since they claimed there was an ascending and descending pathway component to the opioid, the Defendants claimed the risk would be small. The FDA has enacted special risk evaluation mitigation requirements for extended release and long-acting opioids. The FDA has stated that these extended-release opioid drugs represent a significant overdose, addiction, and death problem for large numbers of patients.

67.     The emphasis on descending and ascending pathway served to ensure that

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

the risk for addiction was minimal even with long term use, and thus ignoring the potential for addiction, tolerance, and the schedule II nature of the product.

68.     Janssen trained, managed and instructed its sales representatives to expand the label by advising physicians to stack Nucynta in addition to other long acting opioids for additional pain relief. Physicians were encouraged to prescribe Nucynta as a part of an "opioid rotation regimen" whereby it is indicated that risk of tolerance would be decreased if the patient rotates through medications. This information is unsubstantiated in literature and there is no indication that adding additional Nucynta on a long acting opioid would be safe and effective for the patient.

69.     In 2013, in response to a petition to restrict the labels of long-acting opioid products, the FDA noted the significant risks of opioids, including overdose, death and addiction. The FDA recognized that opioids can cause death, coma, and life-threatening respiratory depression even when properly used under the supervision of a physician. The FDA required that—going forward—opioid makers of long-acting formulations clearly communicate these risks in their labels. The FDA also required the warnings to be placed on promotional and marketing materials for the drugs distributed by manufacturers.

70.     Thus, the FDA confirmed that the adverse outcomes from opioid use include death, unintentional overdose, and addiction, and that long-acting or extended release opioids should only be used in cases where other treatments are not capable of achieving the needed effect.

71.     Notably, in reaching its conclusion, the FDA did not rely on new or otherwise previously unavailable scientific studies regarding the properties or effects of opioids. The information had been available all along, and Defendants actively concealed it.

72.     For example, a 2008 Janssen marketing piece for detailing pharmacists

FIRST AMENDED COMPLAINT                              2:16-cv-06997-RGK-RAO

emphasized neuroplasticity, that theoretically someone using Nucynta could change pain chemistry and prevent "neuronal remodeling" to prohibit the progression into chronic pain (See Exhibit 2). Essentially, this is a claim that Nucynta would help patients actually get better, not just treat their pain.  Chronic pain develops when a patient is in pain so long that their brain undergoes "neuronal remodeling" which basically means that the brain resets to be in a pain state constantly. Thus, claiming that Nucynta would prevent this neuronal remodeling implies that Nucynta would somehow address the underlying cause of the pain, which is totally unsubstantiated.

73.    In fact, Janssen denied that Nucynta ER was an opioid, and said it had "weak" mμ-opioid activity, and the majority of the pain relief was the result of adjuvant activity from serotonin and norepinephrine re-uptake, rather than any opioid effect.

74.    For example, one 2009 Nucynta promo piece profiles a 40-year-old African American male police officer who was hurt on the job. It recommends Nucynta for lower risk pain relief, due to its treatment of pain "by addressing both ascending and descending pathways" and its combination of "opioid and nonopioid activity in one centrally acting oral analgesic (See Exhibit 3).

75.    Janssen sales representatives were instructed to tell prescribers that Nucynta ER and Ultram ER "reach steady state, and essentially there's no dumping of the medication in the central nervous system." This was to indicate that they did not produce a rush or euphoric effect, and therefore were less addictive and less likely to be abused. Janssen trained and directed its sales representatives to use a similar statement for immediate release Nucynta – a marketing line that it had a "dual mode of action", and that it was safer due to the "neuroplasticity of the brain."

76.    Janssen sales representatives were instructed to emphasize to physicians that the majority of Nucynta's pain relief came from serotonin and norepinephrine, and

FIRST AMENDED COMPLAINT                                    2:16-cv-06997-RGK-RAO

that it has a weak affinity to mu-opioid receptors. They were told to claim that it was about "1/50ᵗʰ" of the effect of morphine on the mμ-opioid receptors," and that "it tickles the mμ-opioid receptors." This is not true, however, as Nucynta's label notes that the drug contains tapentadol, an opioid agonist and Schedule II substance with abuse liability similar to other opioid agonists, legal or illicit.

77.   Nucynta has weak activity on the mμ-opioid receptor and achieves the majority of its adjuvant pain relief properties from norepinephrine and serotonin inhibition. This fact was repeated to tout the low potential for addiction to the medication. This is a claim that is not supported by the label and again is used to encourage broad adoption of the medication in patient populations where its use is not warranted and is not deemed safe and effective by the label.

78.   Janssen's sales representatives told prescribers that Nucynta's unique properties virtually eliminated the risk of addiction associated with the drug.

79.   This marketing exploitation is further supported by the compensation structure of the sales representatives. The representatives were paid by baseline growth of Nucynta prescriptions, not by the number of new prescriptions indicating that the physicians are expected to have their patients on medication above and beyond the on label ninety (90) day period. Since both compensation, and retention of employment were based on the representatives' sales numbers, this put additional pressure on representative to exploit these niches as their employment and livelihood depended on it.

80.   In discussions with prescribers, Janssen sales representatives omitted discussion of addiction risks related to many other of Janssen's drugs. Janssen's sales representatives left REMS packages ["REMS" or Risk Management Protocol that is released for opiates] for the physicians without additional explanation of what that necessarily meant for the patient and the physician. In fact, in a Quality Assurance training session the company asserted that this is the package that is

necessary for new compounds with no indication that there is an additional risk for addiction may be the actual reason for the REMS program. [Risk Management Protocol that is released for opiates].

81.     Beginning in or about 2008, Janssen trained, managed and instructed its sales representatives to market to prescribers that Nucynta's unique properties virtually eliminated the risk of addiction associated with the drug. Janssen told physicians that Nucynta's unique properties virtually eliminated the risk of addiction associated with the drug. In discussions with prescribers, Janssen sales representatives omitted discussion of addiction risks related to Janssen's drugs.

82.     Janssen sales representatives told prescribers that Nucynta and Nucynta ER were "weak opioids" in a class of their own, implying that the risks of addiction and other adverse outcomes associated with opioids were not applicable to Janssen's drugs. In truth, however, as set out in Nucynta's FDA-mandated label, Nucynta "contains Tapentadol, an opioid agonist and Schedule II substance with abuse liability similar to other opioid agonists, legal or illicit."

83.     For example, a February, 2009 Janssen coaching sheet for training its sales representatives indicates that the low incidence of nausea and vomiting and the low the incidence of constipation, CNS, dizziness, somnolence and pruritus are important sales messages. Additionally, sales representatives were coached to push the "low discontinuation rates due to" adverse events, and a "low incidence of opiate withdrawal symptoms." (See Exhibit 4).

84.     For example, a document called the "Nucynta Launch Vis Aid – An Annotated Guide" from 2009 was also used to coach sales representatives on their Nucynta messages. This document also promoted the "low composite incidence of nausea and vomiting," low discontinuation rates, and "low incidence of withdrawal symptoms." These statements did not accurately reflect the studies they referenced, which did not address patients on the drug for more than ninety (90) days or with

FIRST AMENDED COMPLAINT                         2:16-cv-06997-RGK-RAO

chronic pain – a large target for the Nucynta sales team (See Exhibit 5).

85.    For example, another 2009 sales training booklet, called "Opioid Efficacy Meets Unexpected Tolerability" made the same claims of low rates of discontinuation, adverse events, and withdrawal symptoms in the same flawed manner based on the same studies (See Exhibit 6).

86.    Janssen sales representatives told prescribers that patients on Defendants' drugs were less susceptible to withdrawal than those on other opioids. Janssen sales representatives told prescribers that Nucynta was not an opioid, making it a good choice for chronic pain patients who previously were unable to continue opioid therapy due to excessive side effects. This statement was misleading because Nucynta is an opioid and has the same effects as other opioids.

87.    Nucynta IR and ER were combined for commissions – Janssen expected patients to be on Nucynta IR long-term, and they were compensating sales representatives based on long-term Nucynta IR prescriptions (Exhibit 7).

88.    For example, in or around 2012, on a field ride with the Nucynta Product Director, Haya Teitel, Dr. Avrom Gart asserted that he had a patient that had experienced temporary blindness while on Nucynta. The Marketing Director requested that the representative not report the incident as it would "jeopardize the launch" of the medication. Regardless the representative reported the incident under "visual disturbance." This is parallel to company's overall culture to further expand the indication of the medications while simultaneously reducing the perceived rate of occurrence of side effects to encourage physician's comfort in prescribing medications broadly despite the off-label use and the clinical appropriateness for the patients.

### ii. Defendants' off-label marketing of Olysio

89.    Olysio's FDA New Drug Application ("NDA") number is NDA 205123. The FDA's approved use of Olysio is limited to the treatment of patients with

hepatitis C, in combination with Peginterferon alfa and Ribavirin (not alone), not in patients with moderate or severe hepatic impairment or who have previously failed on Olysio or other HCV protease inhibitors.

90.    In 2014, Olysio was widely prescribed off-label, nearly twenty percent (20%) of the treated genotype 1 patients were receiving a regimen containing Janssen's Olysio, with the majority of these patients being prescribed the off-label combination of Olysio plus Sovaldi with or without Ribavirin. Trending analysis from the previous sampling period shows that off-label prescribing of this combination had more than doubled, with thirty percent (30%) of specialists in one study reporting having patients currently prescribed the regimen (See Exhibit 8).

91.    According to marketing data presented at corporate training meetings between the months of November 2013 – November 2014, ninety-eight percent (98%) of Olysio prescriptions were written in an off label manner, for dual therapy based on the COSMOS trial which included only thirteen (13) patients per each arm of the treatment Q80K polymorphism. Those that were suffering from HIV infection would need to take a drug holiday from their current HIV treatment in order to be treated. This was dual therapy instead of the proven and less expensive triple therapy regimen, and also included kidney compromised patients. At least one of these patients has reportedly died as a result of this experimentation (See Exhibit 9).

92.    Janssen devised a marketing plan to promote off-label uses of Olysio through promotion of the COSMOS study, and Janssen management disseminated the instructions directly to sales representatives at national sales meetings and through weekly or monthly local sales meetings. Sales representatives were pushed to promote Olysio use as part of an off-label dual-therapy regimen in accord with the COSMOS study, when only a triple-regimen therapy was approved by the FDA. The COSMOS study was therefore distributed and left behind with the

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

physician customers to push the dual-therapy regimen model. Sales representatives were instructed to tell physician customers, "your colleagues are using dual-therapy as described in the COSMOS study" and left the study with the physician. Sales representatives were instructed to tell physicians that patient sustained viral response ("SVR") would be better under a COSMOS model of dual-therapy, and would result in fewer hospitalizations and complications.

93.     However, the FDA's approved use of Olysio was limited to the treatment of patients with hepatitis C, in combination with Peginterferon alfa and Ribavirin (not alone), not in patients with moderate or severe hepatic impairment or who have previously failed on Olysio or other HCV protease inhibitors.

94.     Meanwhile, the company enjoyed a $2.3 billion windfall as a result of this strategic off label promotion. Defendant JNJ CEO Alex Gorsky addressed the investors that this surplus is a windfall and knowing that the drug simply didn't have the efficacy or the opportunity to compete in the market (See Exhibit 10).

95.     The Olysio niches that were to be exploited versus the competition by Janssen sales representatives included combination use with cholesterol lowering medication such as Lipitor (atorvastatin); and renally compromised patients as presented by sales marketing materials that consisted of speaker slide decks that the company prepared for their paid physician speakers, and district business plans from 2013 to 2015 (See Exhibits 11, 12, and 13).

96.     Speakers were encouraged to talk about their success with pre and post liver transplant patients, again a population in which the medication has not been proven to be safe or effective. The FDA indicated that this usage with patients on concomitant cholesterol lowering medication is not deemed safe or effective and in fact seven (7) patients were reported injured as a result. Despite this, Defendants' sales representatives were pushed to actively promote this use (See Exhibit 14).

97.     Speakers were expected to set up a friend in the audience at Olysio dinners

to ask about off-label use, giving the speaker the opportunity to answer in a way that promoted the off-label, dual-therapy regimen with Olysio that was in accord with the COSMOS study. If no one in the audience remembered to ask about off-label use, then the Janssen sales representative was expected to ask a question about off-label use to give the speaker the opportunity to promote Olysio off-label.

98.     These experimental regimens not only endangered the patient, they also caused an unhealthy cost burden to the healthcare system.

99.     For example, Defendants had Dr. Tram Tran moderate a Newport Liver society meeting (See Exhibit 15). Dr. Tran was overheard by Relator asserting that the cost of re-treating Hepatitis-C patient failures on this experimental system is nearly $1 million dollars.

100.   It is important to note that the Olysio sales team was using the term "spontaneous" as a euphemism for "off-label sales." Sales representatives were following the "spontaneous users" (off-label prescribing physicians) very closely, as were sales managers and National Sales Director Bill Whyte.

101.   For example, in a document regarding a "field ride" with Janssen sales manager Mo Issa, a sales representative noted that he was taking Issa to visit three (3) of the top Olysio prescribers in his territory, all of whom were using Olysio in the "spontaneous" manner. This showed the focus of Ron Lloyd and his manager on increasing the business with these "spontaneous" off-label prescribers (See Exhibit 16).

102.   For example, in a September 16, 2014 document, Janssen National Sales Director Bill Whyte instructed a sales representative to take him to see Dr. Tong and Dr. Mena at their liver transplant center. Dr. Tong and Dr. Mena were using Olysio off-label for their liver transplant patients, and the document made note of their high prescribing volume of Olysio and Sovaldi, and their status within the company as "KOL & National Speakers." The document noted that Dr. Tong and

Dr. Mena are "using spontaneous use of Olysio" (See Exhibit 17).

103.   Dr. Myron Tong is a liver center doctor at Pasadena Liver Center who works with Dr. Edward Mena. In 2015, Relator was reprimanded by her Janssen sales manager Tyana Grant for not helping Dr. Tong to pull through an insurance payment approval on a genotype-2 patient (Olysio was only indicated for hepatitis C, Genotype 1). Relator refused to participate due to her concerns about the safety of this off-label use. Dr. Tong wanted this treatment for one specific patient. Dr. Tong asked Relator to work with CVS pharmacy, and to pass information to the pharmacy and to help with the pull through on the insurance prior authorization requirement on that patient. Relator refused to do the off-label pull-through, and so was reprimanded by her manager Tyana Grant, on orders from her regional manager Mo Issa. Mo Issa claimed that Relator was not working hard enough and needed to do this pull-through. Relator defended Relator's self by saying that what Dr. Tong was intending to do was off-label and potentially dangerous, and Relator did not feel comfortable assisting him. Manager Tyana Grant told Relator that she was hearing several similar complaints from other doctors where Relator was unwilling to do the prior authorization work they required on their off-label prescriptions.

104.   From 2014-2015, Dr. Myron Tong wanted Relator to invite every possible doctor to his speaker programs, but no more than ten (10) doctors would show up. Dr. Tong specifically requested the Asian community physician attendees, but they were outside Relator's territory. Dr. Tong wanted these doctors to attend his speaker programs because they were potential referral partners for him. Dr. Tong would sometimes shout at the Relator that Relator was not getting enough people to his speaker programs.

105.   Defendants continue to promote Olysio for use in off-label patient populations, even in the face of evidence that such use led to an increased risk of

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1  adverse events and even death. In fact, upon information and belief, Janssen
2  continues to promote Olysio for off-label use in off-label patient populations in the
3  same manner as set forth in this Complaint today.
4  106.   Given these risks, it is difficult to see how the benefits of using Olysio for
5  patients with HIV and renal failure or other off-label indications for Defendants'
6  drugs outweigh the risks.

7              *iii. Defendants' off-label marketing of Xarelto*

8  107.   Xarelto (rivaroxaban) is advertised as a wonder drug — a "next generation"
9  blood thinner to replace warfarin for prevention of blood clots and stroke.
10  Unfortunately, Xarelto's makers chose not to warn that the drug also causes
11  uncontrollable internal bleeding that may lead to death. That calculated decision
12  has led to hundreds of deaths and many more injuries.
13  108.   Janssen minimized the need for an antidote indicating that Coumadin is an
14  old paradigm that needed to be changed. True to its core business strategy, Janssen
15  has positioned Xarelto as the #1 NOA [Novel Oral Anti-coagulent] in the market,
16  expanding the label and minimizing the potential side effects of this dangerous
17  drug. Since the launch of Xarelto, hundreds of patients have died as a result of
18  irreversible internal bleeds.
19  109.   The U.S. Food and Drug Administration (FDA) has approved Xarelto for a
20  number of specified uses, including: For hip and knee replacement patients, to
21  avoid and treat deep vein thrombosis (DVT) and pulmonary embolism (PE); and
22  for nonvalvular atrial fibrillation (NVAF) patients, to minimize the risk for stroke.
23  110.   However, Defendants promoted Xarelto off-label in that it was not indicated
24  for medically ill patients. Defendant had employees calling on hospitals and
25  hematologists, whereas cardiologists and general practitioners and internists would
26  have been the appropriate, on-label targets. Defendants minimized the bleeding
27  deaths in the trials, and told doctors that there was no problem with reversal of the
28

FIRST AMENDED COMPLAINT                           2:16-cv-06997-RGK-RAO

1    bleeding problem, "because we aren't seeing a bleeding problem."

2    111.    There were twenty-two (22) deaths at the end of one Xarelto trial that

3    Defendants claimed were due to inaccuracy of the trial design. Additionally,

4    Janssen chose to aggressively market to patients on dialysis and medically ill

5    patients despite the fact that the FDA did not grant this label exception. Janssen

6    extensively targets oncologists and nephrologists although the safety and efficacy

7    has not borne out Xarelto's use in these patients.

8    112.    Before Xarelto and other blood thinners like it came on the market, doctors

9    prescribed Warfarin (Coumadin) or heparin. The problem with Warfarin is that

10    users must take the drug at mealtime, eat a limited diet and have their blood

11    monitored frequently. These restrictions are unnecessary with Xarelto, as Janssen

12    claims. But Xarelto can cause bleeding, and once bleeding starts, Xarelto does not

13    have a simple method of stopping it. In this way, Xarelto is more dangerous than

14    Warfarin, where internal bleeding can be quickly stopped with vitamin K or

15    plasma.

16    113.    Janssen also directed that Xarelto be actively promoted to oncologists,

17    nephrologists and hematologists, although there is no indication for medically ill

18    patients (See Exhibit 18).

19                    *iv. Defendants' off-label promotion of Levaquin*

20    114.    Levaquin (levofloxacin) is an antibiotic in the fluoroquinolone class,

21    indicated in adults (≥18 years of age) with infections caused by designated,

22    susceptible bacteria. It is indicated for: Pneumonia: nosocomial and community

23    acquired; Acute bacterial sinusitis; Acute bacterial exacerbation of chronic

24    bronchitis; Skin and skin structure infections, both complicated and

25    uncomplicated; Chronic bacterial prostatitis; Urinary tract infections, both

26    complicated and uncomplicated; and for Acute pyelonephritis Inhalational anthrax,

27    post-exposure. It is also indicated for plague.

28

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

115.   However, the FDA issued a drug safety alert that the agency is requiring the manufacturer of the antibiotic Levaquin (levofloxacin), Ortho-McNeil-Janssen Pharmaceuticals, and of other fluoroquinolone drugs revise the labeling to warn patients of the risk of serious side effects including nerve damage. Previously, these drugs were implicated in tendon tears and ruptures in the arms and legs, also serious injuries and heart damage including aortic dissection.

116.   Defendants misrepresented the risk of tendon tears to physicians, telling them only 1 in 10,000 patients had tendon ruptures (Achilles tendon tears were the more common). Sales representatives were told and directed to make it sound as safe as drinking coffee.

117.   Defendants required representatives to sell Levaquin for all anti-biotic purposes, as a much stronger anti-biotic than Cipro. At the Defendant's urging, physicians were using to it off-label for all sorts of antibiotic purposes, and quite commonly for upper respiratory infections.

118.   Levaquin is used for mild upper respiratory infections such as acute bronchitis, which is usually a self-limiting disease. Defendants touted Levaquin as the work-horse quinolone antibiotic; safe and effective for use in both upper respiratory and genitourinary infections. While many doctors and thousands of patients have complained about the many adverse events associated with this strong medication, Janssen decided to push the envelope with this medication and encouraged doctors to use it as their go-to broad spectrum antibiotics from minor urinary tract infections to upper respiratory infections despite the danger of developing antibiotic resistance strains of bacteria, and despite the many reported side effects reported by the patients that the company has treated dismissively.

119.   Levaquin targets DNA gyrase and Topoisomerase 4 and as a very strong antibiotic, Janssen used this platform to falsely indicate that the development of resistance to this antibiotic is extremely low. This has not borne out in any clinical

FIRST AMENDED COMPLAINT                               2:16-cv-06997-RGK-RAO

study, local antibiograms nor has it been substantiated by the CDC as a means to lower the incidence of MRSA. The indiscriminate use of this strong antibiotic in fact may have contributed to the rise of MRSA in the local and national community.

120.   Additional, undisclosed adverse effects of Levaquin included patients who were "floxed" – since Levaquin is a chemotherapy agent, it deactivates two points in cell replication, targeting the DNA. Physicians were told that it targets the bacterial DNA not the human DNA, and that widespread off-label use would therefore be safe.

121.   Patients who have been "floxed" have routinely reported suffering adverse effects such as widespread bodily pain, fatigue, muscle weakness, muscle twitching, muscle wasting, gait disturbances, severe balance issues, stiffness, spasms, joint pain, tendon issues, seizures, tremors, numbness, burning, tingling, fasciculation, spasticity, nerve damage, autonomic issues, voice issues, exercise intolerance, difficulty swallowing, slow digestive motility, abdominal pain, acid reflux, gastritis, nausea, constipation, diarrhea, colitis, cognitive impairment, memory impairment, cardiac issues, urinary issues, kidney damage, liver damage, pancreatic damage, thyroid abnormalities, hair loss, glucose issues, respiratory issues, emotional issues, depression, psychosis, depersonalization, dissociation, anxiety, insomnia, abnormal dreams, suicidal thoughts, thought alterations, agitation, fatigue, dizziness, inability to concentrate, panic attacks, difficulty communicating, forgetfulness, bruising, vision issues, hearing issues, tinnitus, dental issues, gum issues, skin issues, rashes, multiple chemical sensitivity, sexual dysfunction, reproductive issues, and DNA damage.

122.   Defendants warned the FDA that the drug's adverse reactions also included abnormal heart rhythms known as arrhythmias in addition to existing concerns about heart problems and the potentially deadly Stevens Johnson Syndrome that

has dogged Zithromax for some time. However, the Defendants have not adequately addressed the adverse events of the "floxed" patients in the drug's labeling, or adequately begun warning doctors against its continued off-label use.

123.   In fact, the Defendants minimized the potential for tendon rupture and did not disclose the thousands of permanent or otherwise persistent neurological side effects that have been reported by many patients since launch. The company marketing team asserted that the risk for developing a tendon injury is less than one in 10,000 patients, that this is a class effect, and that in fact the large majority the cases are because of competing antibiotic drug Cipro. Thereby Defendants minimized the true side effects of this powerful agent that also has acted as a chemotherapy agent and a DNA disruptor.

124.   Relator is aware of one physician named Dr. James Jung who reported to Relator and a sales manager that he personally suffered paralysis as a side effect of Levaquin, and another physician named Dr. Spira who reported that he personally suffered a ruptured tendon as a side effect of Levaquin. In each case, Defendants' sales managers told Relator that the side effects would not be reported to the FDA, as the managers felt they were unrelated to the drug.

### v. Defendants' off-label promotion of Invokana

125.   Invokana (canaglifozin) is indicated for treatment of type 2 diabetes. Defendants downplayed the risk of foot and leg infections. Diabetes patients are already at risk of developing foot and leg infects. In 2016, the FDA updates the Boxed Warning to warn that Invokana doubled the risk of foot and leg infections.

126.   Defendants also downplayed the side-effect risk of yeast infections with Invokana, which was a significant risk because diabetes patients are already more susceptible to yeast infection.

127.   Defendants also promoted Invokana off-label as a weight loss drug, without scientific support.

FIRST AMENDED COMPLAINT                      2:16-cv-06997-RGK-RAO

*vi. Defendants' off-label promotion of Simponi*

128.   Defendant drug Simponi was indicated for a number of conditions, including ulcerative colitis. Janssen promoted it off-label to treat all other inflammatory bowel diseases (which are autoimmune diseases), rather than just ulcerative colitis. Other inflammatory bowel diseases Simponi was promoted for off-label include: Crohn's, Behcet's, diversion colitis, microscopic colitis.

*vii. Defendants' scheme to get off-label drug uses covered by insurance.*

129.   Defendants trained sales representatives on off-label and kickback-based sales in "best practices meetings" which occurred at every national sales meeting. Sales representatives were put through intensive training called "grinders," "round robin," and "role playing" at these sales meetings, and Defendants paid doctor customers to do the role playing during the sales training. Physicians were offered free travel and one day of pay to participate in the role playing.

130.   Defendants' sales representatives and Medical Science Liaisons ("MSL") were trained to use knowingly off-label information to persuade physicians to use Defendants' drugs. Defendants trained and directed sales staff to tell doctors that Defendants' drugs are effective for a variety of off-label claims; none of which were indications which the FDA had approved for Defendants' drugs. These efforts were successful to promote the drug off-label. Collaboration with MSLs was utilized as a means to expand and extend the label and make the physicians comfortable with extensive off label use (98% in 2014 in combination with Sovaldi).

131.   Collaboration also occurred between Janssen sales representatives and pharmacists at various specialty pharmacies in order to pull-through off-label prescriptions. "Pull-through" is the process by which a drug company sales representative induces the physician, the physician's staff, the pharmacists, and the

pharmacists staff to submit paperwork to overcome prior authorization or other roadblocks to getting a prescription filled.

132.   Janssen sales representatives were given lists of pharmacies and specialty pharmacies in their area to induce with lunches, meals and gifts in order to get their agreement to work collaboratively on the pull-through efforts. Janssen sales managers tracked the efforts of sales representatives to call on the pharmacies with inducements in order to establish the relationships, and to follow up with them to get them to follow up on prior authorization paperwork from insurance companies to get drug prescriptions approved.

133.   At Olysio dinner speaker presentations in 2014-2015, Janssen employees were instructed by Defendants' sales managers to invite sales representatives from the specialty pharmacy that helped fill the Olysio prescriptions. These specialty pharmacy sales representatives were also encouraging off-label discussions about Olysio and the COSMOS study. The specialty pharmacy sales representatives were much more aggressive in pushing off-label uses for Olysio to the doctors. Accordingly, Janssen sales managers preferred to have specialty pharmacy sales representatives attend their Olysio meetings.

134.   For example, in October, 2014 a presentation was given at a Janssen meeting for physicians at a Newport, California meeting by Rafael Marfil (See Exhibit 19). Mr. Marfil was the Sendera pharmacy founder, and he expressed the critical nature of the leverage between the representative and the pharmacy in order to pull through the medication. In this presentation, the representative demonstrated that when he has a difficult prescription (off-label prescription) to pull-through past the insurance company prior-authorization obstacles, he calls the pharmacy where the prescription is supposed to be fulfilled. The pharmacy then reached out to the insurance company and had a variety of template studies that are attached to each in order to obtain the prior authorization for each off-label prescription. This

relationship and collaboration is essential in procuring such a large percentage of medications that are cost prohibitive and not on the drug formularies. This scheme is similar to the off-label promotion scheme that was promoted for use by Defendants' Olysio sales representative in February, 2015 as a "Success Story" with Dr. Victor Machicao at the University of Texas for his liver transplant patients with acid reflux problems (See Exhibit 20).

135.     For example, in December, 2014, Janssen sales representatives were given information from Defendants to provide to doctors promoting the use of Olysio off-label for HIV, post-liver transplantation and renal failure patients. The information was included in a Janssen letter to physicians which was supposed to be used only for unsolicited requests for off-label information from physicians. However, Defendants' District Managers routinely ordered sales representatives to make available off-label information to hospitals and physicians in order to realize a boost in sales, and in order to get Defendants' MSLs invited to give additional off-label information to doctors promoting the use of Olysio for HIV and renal failure patients (See Exhibit 21).

136.   Janssen had established a "closed network" of specialty pharmacies for the sale of the drug Simponi, and the Olysio sales force was instructed to use this closed network for Olysio. Furthermore, the Olysio sales force was instructed to nominate local specialty pharmacies for inclusion in the closed network.

137.   For example, one Janssen sales and marketing document notes that the sales representative worked closely with Janssen's Rich Appiah to get two local specialty pharmacies approved for the Simponi closed network "which enables full portfolio coverage with both Olysio & Simponi and expanded relationship and opportunity for local area pharmacies" (See Exhibit 22).

138.   For example, a Janssen sales and marketing email stated that Janssen had speakers from Sendera Specialty Pharmacy come to a Janssen sales meeting to

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

train sales reps on collaborating more closely on pulling-through the Olysio prescriptions (See Exhibit 23).

139.   Janssen Senior Training Manager for Sales and Development, Policia Perez instructed all sales representatives to collaborate with Medical Science Liaisons ("MSLs") to work on pull-through of the off-label Olysio prescriptions. MSLs were Janssen employees who were supposed to respond to physician requests for off-label information, but Janssen developed a scheme to use them as a more aggressive part of the sales force and instructed sales representatives to set meetings for them to promote off-label uses to pharmacy staff and physicians (See Exhibit 24).

140.   Janssen incentivized sales representatives to induce pharmacies and specialty pharmacies to help with prescription pull-through. Nearly all Olysio sales that were reported by specialty pharmacies were being "allocated" to the responsible Janssen rep for commission credit.

141.   For example, a November 2014 email among Olysio sales staff discussed the allocation of Premier Specialty Pharmacy sales among local sales reps (See Exhibit 25).

> *viii. Defendants sponsored seminars, symposia, and other continuing medical education programs that promoted the off-label use of their drugs*

142.   Specifically, as part of its scheme to promote its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs widely for use to treat off-label patient populations, Janssen sought out influential physicians and proffered kickbacks to them in return for conducting research and implementing policies promoting the use of Defendants' drugs in those off-label cases. As set forth below, most of this

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

"research" consisted of paying a physician to prescribe Defendants' opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs and report some simple findings. The Janssen marketing department made the decisions on which doctors to pay to do case studies and be involved in research protocols based on their drug prescribe volume, showing that Janssen was not paying those doctors for a legitimate research purpose. In effect, Janssen paid these influential physicians to prescribe their patients with Janssen drugs in order to expand its market share. Janssen also paid these "Key Opinion Leaders" and "Champions" to promote the use of opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica at seminars and other events for referring cardiologists, clinic staff, and prescribing drugs in patients.

> *ix. Defendants provided financing and other support for questionable research to support and promote the use of their drugs in off-label patient populations.*

143.    Defendants engaged in a researching and publishing campaign under which it paid physicians to engage in off-label studies of Olysio in HIV and renal failure patients, and other uses, along with off-label uses of Levaquin, Xarelto, Nucynta, and other Defendants' drugs. These studies were heavily influenced by bias, since the physicians were paid by Defendants; the research was often coordinated by Defendants; and in many cases, Defendants' employees were included as researchers on the projects. In sum, Defendants deliberately pursued a scheme under which they paid for biased research and studies to support the use of Olysio off-label in HIV and renal failure patients, and other off-label uses for Levaquin, Xarelto, Nucynta, and other Defendants' drugs.

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

144.   Defendants used a speaker program to promote the drug Elmiron. Notably, Defendants paid the developer of the drug, Dr. Lowell Parsons from San Diego, to appear as a promotional speaker. Dr. Parsons is not in-house at Janssen, so when he spoke at these paid events, he had the appearance of being a credible or neutral third party, when in fact he was making a speaker fee, and probably royalties from the sale of the drug.

145.   Defendants also ran a number of nationwide studies which engaged a large number of investigators, each of whom enrolled a few patients each, and for which doctors were remunerated up to several thousand dollars per enrolled patient, in order to create brand loyalty with the physicians, often for off-label uses.

146.   Defendants' research and publication campaign had a clear purpose: to support and promote the off-label use of Olysio for HIV and renal failure patients, and other off-label uses for Nucynta, Nucynta ER, Xarelto, Ultram ER, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, Imbruvica, and other Defendants' drugs.

**B.**     **Defendants Illegally Promoted Use of Their Drugs by Providing Kickbacks to Physicians and Researchers.**

147.   Defendants used illegal kickbacks and quid pro quo arrangements to ensure that physicians would continue to prescribe Defendants' drugs. None of these incentives have anything to do with true scientific or medical research or with the safety of patients. These incentives include cash payments to "consultants" and "preceptors," cash payments for a "speaker's bureau" and to national and regional "advisory boards" and for participation in teleconferences, post-market research, "case studies," as well as the other activities described herein.

148.   Advisory boards were completely overseen by Defendants' marketing department. Marketing would invite the speakers and nominate the members of the advisory boards. With Olysio for example, they met at least three (3) times a year,

1   normally in Chicago and Los Angeles. Physician's travel was paid, and they were

2   paid for participating, at least $1500.

3   149.   Defendants rewarded doctors with many of these kickbacks for prescribing

4   large quantities of its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its

5   other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex,

6   Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs. Some

7   doctors, who prescribed a large number of Defendants' drugs, were given gifts

8   including expensive meals. Defendants also expected sales representatives to

9   supply some doctors with wine and alcohol at dinner. Relator has personal

10  knowledge of alcohol provided at dinners.

11  150.   Relator also has personal knowledge of at least one of the Defendants'

12  speaker program dinners at which some attendees used cocaine, as well as an

13  illegal sales and marketing scheme whereby physicians in the Korea Town area of

14  Los Angeles were frequently taken to a "spa" for prostitution services that were

15  paid for by Defendants' sales representatives using corporate credit cards and/or

16  other corporate entertainment funds. Relator was also aware of a physician in

17  Korea Town who was paid over $100,000 by Defendants in 2009 for an office

18  remodeling project.

19  151.   Defendants established formal internal guidelines for the award of these

20  benefits to physicians, in effect pushing "prescribe to play," quid pro quo-focused

21  sales strategies which are based entirely on the amount of prescriptions written by

22  the physicians and the ability of the physician to influence other physicians to

23  begin prescribing Defendants' drugs. The recipients of these awards and benefits

24  were selected by Defendant marketers based on the recipients' ability to prescribe

25  its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio,

26  Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi,

27  Elmiron, and Imbruvica, and other Defendants' drugs, and to influence other

28

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1 doctors to do so.

2 152. Some doctors demanded payment from Defendants as a speaker, a

3 researcher in order to use Defendants' drugs, or demanded Defendants pay for

4 lunch or dinner for the physicians' entire office or the physicians' friends.

5 Defendants' managers generally agreed to pay, and instructed sales representatives

6 to arrange the paid activity for the doctor. Defendants' sales representatives were

7 then responsible for following through to ensure that Defendants generated its

8 opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio,

9 Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi,

10 Elmiron, and Imbruvica, and other defendant drug sales based on the provision of

11 the quid pro quo payment.

12 153. Paid speakers received increasing amounts of money over time with Janssen,

13 starting from $1,000 per talk in relator's early years with the company to $3,000

14 per talk near the end. As long as the money was in the budget, Janssen pushed its

15 sales representatives to pay for speakers in order to entice them to prescribe more

16 drug.

17 154. As a result of this pressure and despite continual objections by Janssen sales

18 representatives that there were no additional **educational** needs in the market for

19 Olysio, the Janssen Regional Business Director and District Manager kept

20 continual tabs of speaker programs and measured how many speaker programs

21 each district or sales representative conducted. The sales representatives

22 continually echoed that, since the medication is no longer in the launch mode and

23 the majority of physicians are well trained, "there is no longer an educational need

24 for the dinners." Due to increasing management pressure and the deleterious

25 effects on employment, these dinners were conducted on nearly a weekly basis, in

26 an expensive restaurant to allure and entertain physicians.

27 155. Often the physicians attending were friends, colleagues or referral partners

28

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1    and this was no more than a social event, an opportunity to have a referral dinner

2    and enjoy some entertainment provided to them by the Defendant.

3    156.    For example, a speaker dinner with Dr. Edward Mena was held on

4    approximately Jan. 18th or 19th, 2015 at Hakafan restaurant in Beverly Hills, at a

5    program being run by Janssen sales rep Manisha Jaishangani. Relator was present,

6    and noted that Dr. Edward Mena had brought his manicurist girlfriend, and she was

7    eating and expensing it to Janssen. This was a violation of the Janssen policy on

8    not paying for girlfriends, wives and families of doctors. However, no one at

9    Janssen was allowed to tell a doctor that their family members had to leave a

10   meeting, so Dr. Mena's girlfriend was allowed to stay and eat and expense it to

11   Janssen.

12   157.    To make matters worse, the Janssen Regional Business Director requested a

13   roster of favorability of speakers. This scoring system highlighted the physicians

14   who wrote a higher volume of prescriptions, and who spoke favorably about

15   various niches where they used the product. The sales representatives were

16   expected to use these physicians as speakers most frequently, and this speaker

17   program thereby provided a reward for their increased utilization. Those that were

18   strictly using Janssen drugs on-label were considered "neutral" or "unfavorable"

19   and the sales representatives were instructed to use them less often (See Exhibit 26,

20   27).

21   158.    For example, a February 22, 2008 Janssen business plan said that Janssen

22   sales representatives were to "Target speaker programs for aciphex and levaquin

23   for highest opportunity physicians" (See Exhibit 28).

24   159.    For example, an April 5, 2015 email promotes two physicians who are

25   Olysio speakers who show "Extensive experience with our regimen, and actively

26   prescribing to date" and are "passionate" advocates (See Exhibit 29).

27   160.    Around December, 2014, Defendants' business conduct worsened when a

28

Janssen District Manager wrote a scathing internal Janssen email about a speaker's presentation. The District Manager wrote about Dr. Sammy Saab, who was asked at one Janssen sponsored dinner what his "go-to prescription" was. Dr. Saab asserted that he uses competing drug Harvoni, and uses the combination as a secondary agent (See Exhibit 30). The Janssen Regional Business Director then requested that the Relator approach and shakedown the physician and confront him by saying, "for someone that we have spent so much marketing money, why is he writing so few scripts?"  He further continued "if we are to continue using him he would need to use our product extensively."

161.   On the other hand, Defendants gave handsome rewards to doctors who prescribed a high volume, and the sales representatives who worked with those doctors.

162.   Defendants' drug Aciphex was abused by sales representatives as part of a sales scheme to get prescriptions paid for by insurance without even having actual patients taking the drug. Doctors wrote prescriptions for patients who did not need the drug. Janssen issued "7 day savings cards" to the sales representatives. The reps took these cards, along with the patient prescriptions, to the pharmacy, got the prescriptions filled, then delivered the filled prescriptions back to the doctors' office. This was a way for reps to get huge sales numbers, and for the doctors to get credit with Janssen, without patients ever having to pick up the drug. No patients consented for this.

163.   For example, Dr. Simon Chan had prescriptions for four thousand (4000) Aciphex patients, a completely disproportional number to the size of his practice. Many or most of these prescriptions were paid for by Medi-Cal. Sales representative Amy Chun won a "President's Circle" award from Janssen because her sales numbers were so high as a result of this scheme.

164.   To build and maintain sales relationships, Defendants bought meals for

doctors and their staff. Dinners were about once per week; lunches were every day. Most of the time, the restaurant would bring in the food, but sometimes the reps had to bring in the food. A lot of the offices needed two different foods – kosher for the doctors, and non-kosher for the staff. Offices were also brought ice cream, pizza, breakfast, and other treats on a consistent basis (See Exhibit 31).

165.   For example, from May 19, 2005 through October 13, 2005, Janssen provided fifty-four (54) lunches and fifteen (15) dinners to doctors in the Cedars territory, and paid three doctors as speakers to promote Aciphex and Levaquin (See Exhibit 32).

166.   For example, on March 25, 2013, Janssen paid $134.82 for lunch for Dr. James Jung's office from Chosun Galbee Restaurant in Los Angeles (See Exhibit 33).

167.   For example, on April 2, 2013, Janssen paid $69.26 for lunch for Dr. Sharim's office from Shah Abbas Restaurant in Beverly Hills (See Exhibit 34).

168.   For example, on March 29, 2013, Janssen paid $79.97 for lunch for Dr. Sharim's office from Beach House Restaurant in Hermosa Beach (See Exhibit 35).

169.   For example, on March 26, 2013, Janssen paid $66.63 for lunch for Dr. Nassir's office from Real Food Daily Restaurant in Los Angeles (See Exhibit 36).

170.   For example, on March 20, 2013, Janssen paid $130.80 for lunch for Dr. Nusinovich's office from Fresh Corn Grill Restaurant in West Hollywood (See Exhibit 37).

171.   For example, on March 12, 2013, Janssen paid $260.38 for lunch for a doctor's office from a restaurant in Los Angeles (See Exhibit 38).

172.   For example, on November 2, 2011, Janssen paid $138.59 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 39).

173.   For example, on January 12, 2012, Janssen paid $210.00 for lunch for a doctor's office from Armai restaurant in Los Angeles (See Exhibit 39).

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

174.   For example, on January 12, 2012, Janssen paid $168.10 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 39).

175.   For example, on December 20, 2011, Janssen paid $229.00 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 39).

176.   For example, on January 25, 2012, Janssen paid $207.21 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 39).

177.   For example, on February 2, 2012, Janssen paid $194.00 for lunch for a doctor's office from Shah Abba's Restaurant in Los Angeles (See Exhibit 39).

178.   For example, on February 7, 2012, Janssen paid $142.00 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 39).

179.   For example, on February 10, 2012, Janssen paid $114.90 for lunch for a doctor's office from Chicken Dijon restaurant in El Segundo (See Exhibit 39).

180.   For example, on April 6, 2012, Janssen paid $210.00 for lunch for a doctor's office from Armai restaurant in Los Angeles (See Exhibit 39).

181.   For example, on April 11, 2012, Janssen paid $170.89 for lunch for a doctor's office from Sharky's restaurant in Beverly Hills (See Exhibit 39).

182.   For example, on April 27, 2012, Janssen paid $150.95 for lunch for a doctor's office from California Pizza Kitchen in Los Angeles (See Exhibit 39).

183.   For example, on May 9, 2012, Janssen paid $1,866.40 for dinner for a doctor's office from Siene Bar and Grill restaurant in Beverly Hills (See Exhibit 39).

184.   For example, on December 8, 2011, Janssen paid $1,346.47 for dinner for a doctor's office from Wolfgang's Steakhouse restaurant in Beverly Hills (See Exhibit 39).

185.   For example, on April 18, 2012, Janssen paid $1,161.14 for dinner for a doctor's office from Il Covo restaurant in Los Angeles (See Exhibit 39).

186.   For example, and particularly, attached as an exhibit are photographs

illustrating some of the Defendants' speaker programs, the high usage of alcohol at some of the Defendants' funded events, birthday parties for doctors and their medical staff paid for by the Defendants, and catered lunches that Defendants' employed for its high prescribing physicians and their medical staff, pharmacy, hospital and other healthcare customers and Defendants' sales representatives to induce them to prescribe its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica (See Exhibit 40):

a.   A photograph Defendants' funded speaker program and birthday cake for Dr. Sammy Saab on or about November 18, 2014 to promote Defendants' opioid drugs Nucynta, Nucynta ER and Ultram and its other drugs;

b.   A photograph from a typical Defendants' funded physician's dinner, with sashimi bowl with caviar on or about July 25, 2013 to promote Defendants' opioid drugs Nucynta, Nucynta ER and Ultram and its other drugs;

c.   A photograph of deceased celebrity singer Michael Jackson's former physician Dr. Allan Metzger with two Defendants' sales representatives on or about November 16, 2011 to promote Defendants' opioid drugs Nucynta, Nucynta ER and Ultram and its other drugs;

d.   A photograph of Dr. Ed Kim with alcohol at a Defendants funded Dr. Lawrence Miller speaker program on or about June 10, 2010 to promote Defendants' opioid drugs Nucynta, Nucynta ER and Ultram and its other drugs;

e.   A photograph of one of Defendants' targeted physician and his medical staff with alcohol at the same Defendant's funded Dr.

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

Lawrence Miller's speaker program on or about June 10, 2010 to promote Defendants' opioid drugs Nucynta, Nucynta ER and Ultram and its other drugs;

f.     A photograph of a doctor with a Xarelto package on or about December 6, 2012 during a Defendants' funded meeting to illegally promote and market Xarelto and its other drugs. More specifically, here, the physician is Dr. Mark Barats is a nephrologist at this Janssen funded meeting where its drug Xarelto was not indicated for kidney compromised patients;

g.     A photograph of Dr. Peter Rosenberg's birthday cake on or about November 17, 2014 to promote Defendants' opioid drugs Nucynta, Nycunta ER, and Ultram, and its other drugs;

h.     A photograph of a birthday party for a nurse at South Bay Gastroenterology group on or about June 25· 2014, to promote Defendants' opioid drugs Nucynta, Nycunta ER, and Ultram, and its other drugs;

i.     A photograph of a birthday party for a nurse at South Bay Gastroenterology Medical Group on or about June 3, 2014, to promote Defendants' drugs Olysio, Simponi, Remicade, and its other drugs;

j.     A photograph of a birthday party for office staff at South Bay Gastroenterology Medical group on or about May 24, 2011 to promote Defendants' drugs Olysio, Simponi, Remicade, and its other drugs;

k.     A photograph of deceased celebrity singer Michael Jackson's former physician Dr. Allan Metzger's assistant's birthday party at his office on or about May 24, 2011 to promote Defendants' opioid drugs Nucynta, Nycunta ER, and Ultram, and its other drugs;

FIRST AMENDED COMPLAINT                        2:16-cv-06997-RGK-RAO

187.   Defendants knew that its provision of kickbacks to these physicians and researchers was illegal and made efforts to conceal its illegal, fraudulent scheme by funneling some payments through third-party consulting organizations. Defendants also understood that its provision of these kickbacks actually caused its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica to be used for off-label purposes. Many of these drugs were paid for by Medicaid, Medicare, and the TRICARE health care system for military members and their families. Had the United States and the several States known that these drugs were used due to a fraudulent kickback scheme, they would not have provided reimbursement for these drugs.

> *i. Defendants Paid Physicians Honoraria, and Lavish Meals to Attend or Speak at Events Promoting the Use of Opioid Drugs Nucynta, Nucynta ER, and Ultram ER, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' Drugs.*

188.   In their efforts to promote the use of its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs in off-label patient populations, Defendants provided honoraria, and lavish meals to key opinion leaders and other physicians to attend or speak at dinners, lunches, conferences, symposia, and other events where Defendants' drugs were being promoted.

189.   The meals directly took into account the volume and value of the business generated and were given to physicians who had used or would agree to use or promote the use of its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex,

1  Invokana, Simponi, Elmiron, and Imbruvica.

2  190.   Many dinner meetings consisted of lavish dinners at local restaurants. The

3  emphasis at some of these meetings was also on off-label uses of its opioid drugs

4  Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto,

5  Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron,

6  and Imbruvica, and other Defendants' drugs, and thousands of dollars' worth of

7  honoraria were paid to physicians who spoke about off-label uses at these

8  meetings. High volume prescribing doctors and local opinion leaders were targeted

9  for invitation. High volume prescribing Medicaid and Medicare doctors were often

10 specifically targeted for invitation. At all of the events physicians were encouraged

11 to increase their use of Defendants' drugs.

12 191.   For example, a February 12, 2015, dinner was held at the expensive

13 Cecconi's restaurant in West Hollywood, California for high prescriber Dr.

14 Edward Mena and for some other physicians who were targeted for sales (See

15 Exhibit 41).

16 192.   Defendants ensured that cash and meals were often targeted specifically at

17 high Medicare and Medicaid prescribing doctors, to increase market share within

18 the Medicaid and Medicare programs, and to influence the market share status of

19 Defendants' drugs within the Medicaid and Medicare programs. In addition, cash

20 and meals were often targeted at high Medicaid and Medicare volume facilities in

21 order to increase Defendants' reimbursements through State and Federal health

22 care systems. Also, formulary committee members at high volume Medicaid

23 facilities were specifically targeted for cash and meals to place Defendants' drugs

24 on their approved drug formularies and hospital protocols, and to purchase

25 Defendants' drugs for their inventories and increase Janssen's reimbursements.

26 193.   Defendants' sales representatives were encouraged to be involved with prior

27 authorization process with Ultram ER, Nucynta, Nucynta ER, Aciphex and

28

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

Simponi in order to pass insurance, hospital and Medicare drug formularies, and prior authorization manipulation was part of their business plans (See Exhibit 42). Not only does this violate HIPAA, it also violates prohibitions on illegal kickbacks.

194.   During 2009 and from 2012-2015, Relator was on Defendants' sales force for selling the drug Remicade. Janssen managers required Relator to induce staff at RxBiotech specialty pharmacy located in the Beverly Sinai Medical Pharmacy with lunches and dinners and other inducements to get them to give access to lists of patient names, and to pull-through Remicade prescriptions, using Janssen-created language to present to insurance payers in order to get Remicade prescriptions approved through prior authorization.

195.   Defendants' District Managers touted that the number one sales representative in the country in 2012 got prescriptions by going to physician offices and simply flagging the charts with Ultram ER stickers and doing prior authorizations for each patient. This practice was encouraged by the Regional Business Director and other District Managers. Examples of prior authorization pull through effort requirements for sales staff by District Manager Mo Issa are added as an Exhibit. (See Exhibit 43).

196.   Defendants' sales representative involvement in the prior authorization process endangered the patients' HIPAA rights and was designed to bypass the existing formulary process to gain the prescription.

197.   Janssen's territory business plans often included tracking of doctors by their volume of Medicare and Medicaid patients, average duration of treatment, and the average revenue from Janssen drugs. Janssen management utilized this Medicaid and Medicare volume information in order to determine which doctors to target for expensive meals and cash payments.

198.   For example, a February 27, 2015, Janssen business email updated Olysio

sales representatives about various State Medicaid agreements to pay for the drug. Medicaid programs in California and a large number of other states were covering Olysio as of Feb. 25, 2015, and Janssen tracked twenty-three (23) states where Medicaid payment was possible. Janssen sales representatives were sent the information by email, and were told to report on their experience in "pulling through" any of the California Medicaid prescriptions through the California prior authorization process (See Exhibit 44).

199.   For example, a 2009 sales planning spreadsheet called for offering paid speaker programs and paid lunches as part of the "Plan of Action" to get Medicare and private insurance reimbursed physicians to write more prescriptions for Nucynta (See Exhibit 45).

200.   For example, an August 3, 2014, Janssen business plan document called for offering paid speaker programs and paid lunches as part of a campaign to promote Olysio to Medicare physicians. The document noted that Dr. John Hoefs had 10% Medicare patients; the office of Dr. Tarek Hassanein had 32% Medicaid and 10% Medicare; Dr. Richard Quist had 9% Medicare; Dr. Michael Demicco had 16% Medicare; Dr. Ke-Qin Hu had 67% Medicare; the office of Dr. Alaa Abousaif had 6% Medicare; Dr. Syam Gaddam had 13% Medicare; and Dr. Lawrence Hurwitz had 10% Medicare (See Exhibit 42).

201.   For example, a June 9, 2013 Janssen sales tracking document for Ultram ER noted that 21% of sales were to Medicare patients, and 4% were to Medicaid fee-for-service patients (See Exhibit 46).

202.   Defendants' sales representatives were instructed to coordinate checks for payment for up to $3,000 to speakers for each dinner speaking program, and invitations to lavish meals exclusively to targeted high volume prescribers or referral sources in order to meet the sales representatives' required sales levels for bonus payouts each quarter. Defendants' sales representatives were instructed to

target cardiologists, catheterization lab physicians, and internal medicine physicians for prescriptions, and buy them expensive meals, and sign them up for paid speaking engagements.

203.   For example, on January 27, 2012, Dr. Gerald Sacks was paid $1,500 to speak at Boa Steakhouse in West Hollywood, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 47).

204.   For example, on February 6, 2012, Dr. Lawrence Miller was paid $1,000 to speak at Sotto Restaurant in Los Angeles, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 48).

205.   For example, on March 18, 2008, Dr. Ellie Goldstein was paid $1,500 to speak at Valentino's Restaurant in Los Angeles, California on the topic of community-acquired pneumonia to promote the Janssen antibiotic Levaquin (See Exhibit 49).

206.   For example, on May 9, 2012, Dr. Jonathan Nissanoff was paid $2,500 to speak at La Seine Restaurant in Beverly Hills, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 50).

207.   For example, on March 7, 2012, Dr. William French was paid $2,000 to speak at Fig and Olive Restaurant in Los Angeles, California on the topic of stroke and systemic embolism to promote the Janssen blood thinner Xarelto (See Exhibit 51).

208.   For example, on June 27, 2012, Dr. Matthew Budoff was paid $2,000 to speak at Tanino Restaurant in Los Angeles, California on the topic of stroke and systemic embolism to promote the Janssen blood thinner Xarelto (See Exhibit 52).

209.   For example, on December 8, 2011, Dr. Lawrence Miller was paid $1,000 to speak at Boa Steakhouse in West Hollywood, California on the topic of

management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 53).

210.   For example, on September 18, 2008, Dr. Allan Metzger was paid $1,000 to speak at Geisha House in Los Angeles, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 54).

211.   For example, on October 21, 2008, Dr. Gerald Sacks was paid $1,500 to speak at Katana Restaurant in West Hollywood, California on the topic of "New Directions in Pain" to promote the Janssen opioid Nucynta (See Exhibit 55).

212.   For example, on April 18, 2012, Dr. Lawrence Miller was paid $1,000 to speak at IL Covo Restaurant in Los Angeles, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 56).

213.   For example, on December 8, 2011, Dr. Lawrence Miller was paid $1,000 to speak at Wolfgang's Steakhouse in Beverly Hills, California on the topic of management of chronic pain to promote the Janssen opioid Nucynta (See Exhibit 57).

214.   Payment for dinner and other incentives to increase referrals to a physician for the use of opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs is inappropriate and illegal. According to the federal Health and Human Services Office of the Inspector General (HHS OIG), paid meals would be inappropriate if they are tied directly or indirectly to the generation of federal health care program business for the manufacturer, or for the purposeful inducement of business. See, e.g., 68 F.R. 23738. ("these arrangements [entertainment, recreation, travel, meals, etc.] potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business.")

1
2
3

> *ii. Defendants Concealed Some Illegal and Fraudulent Payments to Physicians by Funneling Them through Third Party Consultant Companies.*

4   215.   In order to hide illegal payments to physicians, Defendants made many

5   payments to doctors through the MedForce marketing company, among other

6   similar vendors. MedForce arranged for expensive meals and sent payments to

7   sales representatives to be given to speakers for promoting Defendants' drugs off-

8   label.

9   216.   For example, Janssen contracted with MedForce to pay a speaker fee and set

10   up invitations and dinner reservations for Dr. Edward Mena to speak at Cecconi's

11   restaurant in West Hollywood, California on February 12, 2015 on Olysio.

12   MedForce provided sign-in sheets for guests, reviewed unauthorized charges on

13   the food and beverage bill, collected meeting evaluations, and provided a credit

14   card authorization for expenses (See Exhibit 58).

15
16
17

> *iii. Defendants Knew Their Payments to Physicians Were Illegal Because They Were Intended for the Purposeful Inducement of Business.*

18   217.   Defendants knew their payments to physicians were illegal kickbacks. In

19   fact, Defendants provided personnel with guidelines that indicated that field

20   employees could occasionally provide modest meals or snacks to health care

21   professionals where the primary purpose is an informational presentation (See

22   Exhibit 59). In contrast, Defendants' dinner events with paid speakers were often a

23   sham, with the speaker getting paid up to $3,000 per speaking event, but having no

24   real responsibility. Doctors received prepared slides from Defendants to speak

25   from, so that the doctors did not have to put forth any effort to prepare a

26   presentation, but gave the impression to attendees that the slides reflected their

27   own opinions and conclusions. Doctors sometimes simply opened a laptop on the

28

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

table at dinner with some slides on it, and then only spoke for five to ten minutes, or did not speak at all and simply enjoyed the lavish dinner with the other attendees.

> *iv. Defendants' Payment of Illegal Kickbacks to Physicians Actually Affected the Use of Opioid Drugs Nucynta, Nucynta ER, and Ultram ER, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' Drugs among Doctors*

218.   Defendants' scheme to pay physicians resulted in specific sales. Defendants, like most branded drug companies, monitor the relationship of its sales to its promotional efforts over a very short timeframe; Defendants would be concerned about a drop in sales within a certain therapeutic regime not after a year look-back, or even a quarterly look-back, but over a period of just weeks.

219.   Defendants' marketing and sales strategy documents show that at least on a weekly basis Defendants were tracking prescription volume by doctor, and tracking the percentage change in prescribing habits of physicians for Defendants' drugs. In addition, Defendants tracked the return on investment ("ROI") of paid travel and expensive meals for physicians. Defendants' sales representatives were instructed to ask physicians for additional prescriptions when the physicians were paid to speak at a lavish meal event, and told to track follow-up prescriptions by the physician, and to hold the physicians accountable if the physicians did not increase prescriptions of Defendants' drugs.

220.   Physicians were made aware by sales representatives that the physicians would not continue to be invited to lavish meals if the physicians did not remain in the high volume prescriber range, and if the physicians did not prescribe Defendants' drugs. Physicians who did not continue to prescribe Defendants' drugs were tracked on a quarterly basis by Defendants' marketing and sales personnel,

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

and were sometimes penalized by being taken off target lists for invitations to future lavish meals and offers of speaking engagements, paid research opportunities, and other perks. Defendants' pushed "prescribe to play," quid pro quo-focused sales strategies, which are based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing Defendants' drugs. The recipients of these awards and benefits were selected by Defendants' marketers based on the recipients' ability to prescribe its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs and to influence other doctors to do so.

221.   Defendants' sales representatives provided meals and other favors for physician members of formulary committees and of hospital guideline committees and their staffs, including committees which affected large Medicaid and Medicare patient populations, such as hospitals with large Medicaid and Medicare populations. Defendants' management directed sales staff to invite formulary committee members and guideline committee members to lavish meals and offer paid speaking opportunities, paid research, and other perks. Defendants' management arranged inducements for influential formulary and guideline committee members in order to put its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, or other Defendants' drugs on their formulary or guidelines or standing orders, or to purchase Janssen drugs into inventory.

222.   Defendants also instructed physicians' office staff and clinic personnel to maximize Medicaid and Medicare billing. Defendants' field sales representatives gave billing seminars, and paid billing maximization speakers to give

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

presentations, in which the Defendants' sales representatives suggested how to bill Medicare in order to receive maximum revenues. The field sales representatives also reviewed prior billings for some facilities, and suggested additional billings that Medicaid or Medicare were known to pay for without question (See Exhibit 60).

223.    Defendants also instructed its sales representatives to review patient records at doctor's offices and to help them select high risk patients to receive opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Defendants' drugs instead of competitor drugs.

224.    For example, in 2014, the Janssen Specialty Hepatology and Immunology ("JSHI") organization was brought together by Defendants for one purpose and one purpose only: to exploit the short off-label niche in which the Olysio product could be effectively marketed. To the tune of $2.5 billion dollars in revenue ($600 average price per pill) and the expense of Medicaid, Medicare, TriCare, and private insurance companies this strategy was extremely successful. Soon after this off-label opportunity closed, the company disbanded the JSHI franchise, as the commercial opportunity for on-label sales of Olysio was considered minimal.

225.    The evidence points to willful and premeditated schemes of off-label promotion, kickbacks, and violations of patients' HIPAA protections. The Relator, who was vocal about these tactics, was prevented from promotions and from applying to other sales opportunities within the company, and was many times verbally and publicly reprimanded for not toeing the company line, and generally not being "positive."

226.    The company was so aggressive about exploiting this Olysio off-label opportunity that many times the reps were worked one hundred (100) hours per week just to meet the extensive demands. Often times sales representatives were

required to work nights and weekends and to take very minimal vacations to meet the increased demand of this short window of Olysio's off-label sales "opportunity."

227.  For example, in December 2014, Janssen Regional Business Director requested Defendants' sales representatives to participate in non-educational events such as a liver foundation "Healthy Flavors of Coronado Culinary Gala" in San Diego's prestigious Coronado Hotel, where high prescribing physicians were presented with an honorary plaque and award and Janssen paid $4,000 to participate as a "Table Sponsor." The Coronado Hotel event violated company policy since it was only for the entertainment of Janssen's physician customers, and had no educational component. The decision to fund the event was based on Janssen Regional Business Director Mo Issa wanting to support a local San Diego customer, high-Olysio prescriber Dr. Tarek Hassanein, and the purpose was a quid pro quo arrangement with him for more prescribing (See Exhibits 61, 62).

**C.**   **Defendants Illegally Promoted Use of Opioid Drugs Nucynta, Nucynta ER, and Ultram ER, along with Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and other Drugs by Illegally Promoting a Spread between Published Pricing and the Prices Offered to Customers.**

228.  Defendants defrauded the Medicaid program by reporting excessively high and false prices for some of their prescription drugs with knowledge that Medicaid used these reported prices for establishing reimbursement to its Medicaid providers for these drugs. As a result, Medicaid sustained significant losses to its program by making reimbursement payments to Defendants' Customers/Medicaid providers for the drugs at illegally excessive prices compared to the prices at which the Defendants' Customers/Medicaid providers actually acquired the same drugs. This is a practice known in the industry as "creating a Spread." The Spread is utilized

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

by pharmaceutical companies to seize market share and thereby to fraudulently increase their profits.

229.   Via this scheme, commencing sometime by at least 2005 and continuing through the present, Defendants defrauded States and the United States by knowingly causing the Medicaid Programs to pay false or fraudulent claims. Examples of the Defendants' specific drug products at issue include its opioid drugs Nucynta, Nucynta ER, and Ultram ER, and its other drugs Olysio, Xarelto, Aciphex, Levaquin, Remicade, Elmiron, Aciphex, Invokana, Simponi, Elmiron, and Imbruvica, and are identified by "NDC" numbers in Relator's extensive documentary evidence. The drugs at issue are referred to jointly as the "Spread Drugs."

230.   The Defendants marketed and sold their Spread Drugs to their Customers. The Customers purchased the Spread Drug products either directly from Defendants, through a GPO contract, or through wholesalers or specialty distributors. When Defendants sold their Spread Drugs to wholesalers, they invoiced wholesalers at gross prices which Defendants referred to as wholesale acquisition cost prices, however Defendants reported misleading, inflated AWPs and, in some cases, WACs to the pricing compendia for the Spread Drugs which had no relation to the prices Defendants knew were generally and currently available in the marketplace.

231.   The amount paid by a Customer was typically based on a price negotiated with Defendants, a price negotiated with a GPO, or an often equally competitive price set by a specialty wholesaler or distributor. Defendants offered "contract pricing" to many of their Customers that was less than "Non-Contract" or "Regular Cost" prices generally offered by wholesalers and distributors to any customer. Defendants created inflated Spreads on the Spread Drugs for Customers that purchased the Spread Drugs at regular cost, available to virtually any industry

customer, and an even greater Spread for those purchasing the Spread Drugs "under contract".

232.   Regardless of the method of purchase, Defendants' Customers submitted claims for payment to Medicaid when a drug product was dispensed to a program beneficiary. The claims submitted by Defendants' Customers were paid at amounts directly influenced by Defendants' false and fraudulent prices. Defendants disseminated false pricing information for their drug products to the Pricing Publications. Defendants knew the prices they reported to the pricing compendia controlled the pricing compendia's published reports of AWP and WAC.

233.   The manufacturers control the prices that are reported by the compendia, including First DataBank (FDB) a Division of the Hearst Corporation. Some state Medicaid programs use FDB. For example, FDB asserts that all pricing information is supplied and verified only by the products' manufacturers, and that there is no independent review of those prices for accuracy.

234.   Accordingly, the manufacturers functionally control what price information that payors, including the Medicaid program, can obtain. Defendants have taken undue advantage of the resulting disparity in status, power and knowledge by knowingly reporting prices for Medicaid reimbursement purposes that bear no relationship whatsoever to prices generally or currently available in the marketplace. The Defendants knew that the state Medicaid programs, which employ small numbers of pharmacy staff, would not have the manufacturers' insider knowledge, resources, or opportunity necessary to discover and remedy the Defendants' drug pricing fraud.

235.   Defendants first reported false prices for the Spread Drugs sometime by at least 2005. The reported prices did not represent prices actually being charged in the marketplace. Thereafter, Defendants' employees typically reported and/or confirmed the false and fraudulent prices to the Pricing Publications periodically.

During the relevant time period, Defendants generally reported falsely inflated AWPs and WACs on the Spread Drugs while simultaneously offering dramatically lower prices to their Customers in the marketplace. Defendants routinely failed to update, adjust, decrease or correct their initial price reports for the Spread Drugs to reflect prices being charged in the marketplace. Consequently, Defendants caused the price reporting compendia to publish false inflated WACs and/or AWPs from sometime by at least 2005 and continuing through the present.

236.    Defendants knew that the prices they reported to the Price Publications directly affected reimbursement amounts paid by the Medicaid Programs. The false prices Defendants reported to the Pricing Publications caused inflated government reimbursement amounts to be paid on claims submitted by Defendants' payors for the drug products at issue. Additionally, Defendants knew that withholding reports of WAC to the pricing compendia during the relevant time period would ensure the pricing compendia's failure to report WAC. Relator's extensive documentary evidence includes a pricing chart illustrating multiple examples of the NDCs at issue showing: reported prices (AWP and, if applicable, WAC), the Relator's Cost and the corresponding Spreads (difference between the prices at which Defendants actually sold their Spread Drugs and the false prices reported by Defendants). The prices listed as those available to the Relator, as an independent pharmacy, are some of the highest prices offered by Defendants in the marketplace. Therefore, the inflated Spreads available to the Relator were some of the lowest Spreads in the marketplace.

237.    Defendants manipulated AWPs and WACs to induce their Customers to purchase Defendants' Spread Drugs by marketing to their Customers the huge profits that would result to them from excessive reimbursement payments. Defendants actively used the inflated Spreads and huge profits as a marketing tool directed at providers to promote increased sales of the Spread Drugs. Moreover,

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

the Spreads, in effect, marketed themselves. Any purchaser could easily calculate the potential profit by using the reported prices and the actual sales price. For example, the inflated Spreads were readily apparent from information on the drug purchasing software programs available to Customers from drug wholesalers.

238.   The Defendants reported or caused to be reported false or misleading prices to Medicaid by providing false or misleading price information including but not necessarily limited to AWP, Suggested Wholesale Price ("SWP"), CDP, WAC, DP, List Price and direct wholesale price to the compendia with knowledge that they in turn would utilize such false and misleading price information in determining the AWPs and DPs that were reported to Medicaid.

239.   For example, Defendants published AWPs that were many times greatly in excess of 30% above acquisition price for the drugs, creating a large spread that was promoted to customers as a way of illegally profiting off of Medicaid (Exhibit 63):

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 2/7/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $145.42 | $3.92 | $141.50 | 3609.69 39% |
| 3/8/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $219.12 | $5.91 | $213.21 | 3607.61 42% |
| 5/21/2010 | LEVAQUIN 500MG/D5 W 100ML | 50458-0168-01 | $273.90 | $7.39 | $266.51 | 3606.35 99% |

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 10/25/2010 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $109.56 | $2.96 | $106.60 | 3601.3514% |
| 5/12/2010 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $136.95 | $4.43 | $132.52 | 2991.4221% |
| 2/5/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $242.36 | $7.84 | $234.52 | 2991.3265% |
| 6/21/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $242.36 | $7.84 | $234.52 | 2991.3265% |
| 9/7/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $242.36 | $7.84 | $234.52 | 2991.3265% |
| 11/2/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $60.59 | $1.96 | $58.63 | 2991.3265% |
| 1/31/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $60.59 | $1.96 | $58.63 | 2991.3265% |
| 2/28/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $363.54 | $11.76 | $351.78 | 2991.3265% |

-71-

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 3/5/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $363.54 | $11.76 | $351.78 | 2991.3265% |
| 8/27/2010 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $302.95 | $9.80 | $293.15 | 2991.3265% |
| 2/8/2010 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $182.60 | $5.91 | $176.69 | 2989.6785% |
| 3/1/2010 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $182.60 | $5.91 | $176.69 | 2989.6785% |
| 1/15/2011 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $182.60 | $5.91 | $176.69 | 2989.6785% |
| 9/27/2010 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $273.90 | $8.87 | $265.03 | 2987.9369% |
| 10/1/2010 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $273.90 | $8.87 | $265.03 | 2987.9369% |
| 10/11/2010 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $273.90 | $8.87 | $265.03 | 2987.9369% |

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 10/14/2010 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $45.65 | $1.48 | $44.17 | 2984.4595% |
| 1/25/2011 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.4595% |
| 2/25/2011 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.4595% |
| 2/28/2011 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.4595% |
| 3/7/2011 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.4595% |
| 3/15/2011 | LEVAQUIN 500MG/D5W 100ML | 50458-0168-01 | $91.30 | $2.96 | $88.34 | 2984.4595% |
| 6/13/2011 | LEVAQUIN 750MG (PREMIX) | 50458-0166-01 | $174.48 | $5.88 | $168.60 | 2867.3469% |
| 11/23/2010 | LEVAQUIN /D5W 500/100 INJ | 50458-0168-01 | $482.02 | $75.37 | $406.65 | 539.5383% |

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

| Fill Date | Drug Name | NDC | AWP | Acquisition Cost | AWP $ Spread | AWP % Spread |
|---|---|---|---|---|---|---|
| 11/26/2010 | LEVAQUIN /D5W 500/100 INJ | 50458-0168-01 | $482.02 | $75.37 | $406.65 | 539.5383% |
| 11/29/2010 | LEVAQUIN /D5W 500/100 INJ | 50458-0168-01 | $482.02 | $75.37 | $406.65 | 539.5383% |

240.   Defendants were well aware of how Medicaid used Defendants' reported pricing information to set reimbursement levels to providers for the Spread Drugs. At all relevant times, Defendants were aware that Medicaid used published AWPs and/or WACs to estimate acquisition costs, defined as the best estimate of the price generally and currently paid by providers in the marketplace.

241.   Defendants were also aware that the extraordinarily high volume of prescriptions processed by Medicaid requires the type of electronic data interchange that the Defendants have taken advantage of in order to defraud the Medicaid program. For example, from 2003 through 2011 Medicaid paid for an average of 35.8 million prescriptions per week nationwide. During this time, Medicaid processed prescriptions for over 35,000 NDC drug codes each year, reaching a peak of 39,212 NDC drug codes in 2011.

242.   Defendants pay the Medicaid rebates and have reports that indicate the amount of their Spread Drugs, and the number of prescriptions for their Spread Drugs paid for by State by quarter. Defendants know that the Medicaid States are processing so many claims that it cannot be handled manually. Defendants know that Medicaid used complicated electronic payment databanks, and Defendants provided the databanks with false information.

243.   After creating price Spreads for their Spread Drugs, Defendants enlarged those Spreads by reducing acquisition costs to providers without disclosing the reductions to compendia such as First DataBank or to the Medicaid Program. Defendants also gave Customers incentives that decreased the price of prescription drugs, such as discounts, rebates, off-invoice pricing, free goods, charge backs, volume discounts, credit memos, "consulting" fees, debt forgiveness, educational and promotional grants, and other financial incentives. Price reductions were granted to some retail pharmacy chains, wholesalers, buying groups, pharmacy benefit managers at the request of those chains, wholesalers, buying groups or pharmacy benefit managers. These price reductions financially benefitted providers, but were not reflected in the AWPs and other price quotes the Defendants reported to the compendia, which formed the basis for reimbursements by Medicaid.

## DEFENDANTS' ACTS OF RETALIATION

241.   In early 2013, Relator was a celebrated company employee who had won numerous sales awards from Defendants such as the "President's Circle" for highest national sales. Relator celebrated with Defendants' employees on stage with sales managers Russ Stough (Regional Business Director, Southern California), Karen Martin, Molly Laughlin, Danielle Felter (District Manager, Southern California), and Jason Hammond (District Manager, Southern California) (please see photograph attached as Exhibit 64).

242.   In or about November 2013, Relator became aware that there were company-wide problems with off-label promotion and kickbacks.

244.   The manner in which Defendants market the use of their drugs is governed by the Food, Drug and Cosmetic Act ("FDCA") (Title 21, U.S.C. § 355) and inducements to physicians are covered by the Medicare and Medicaid anti-kickback laws, 42 U.S.C. 1320a-7b(b), *et seq.*

245.   In order to comply with the relevant laws and regulations, pharmaceutical companies like Janssen must be able to account for all off-label marketing materials and inducements given to physicians. In or about November 2013, Relator found out that there were company-wide irregularities with respect to tracking these payments and marketing materials. In particular, Relator spoke up at the Newport meeting in December, 2014 with other Janssen sales representatives, saying that with respect to the specialist pharmacies, that there was a question of how was it legal for the company to work with the specialist pharmacies at such an intimate level on prior authorization pull-through in order to forward the off-label Olysio marketing scheme. At that time the Regional Director Mohammed Issa said, in front of the other sales representatives, that "this was the biggest bunch of BS that I've ever heard," and then castigated Relator on multiple occasions for "not being positive." and "not being a team player," and not "being flexible." Subsequently, the Regional Director warned Relator not to make the same statements again.

246.   Thereafter, Relator complained and reported to Janssen human resources and management, both orally and in writing, of these alleged illegal business practices, which violated the FDCA and Medicare and Medicaid anti-kickback laws and other relevant statutes and regulations.

247.   In retaliation for these actions, Relator's supervisor at Janssen and Janssen HR personnel began a campaign to harass and intimidate Relator. In particular, the Regional Director would tell Relator that "you are not a team player," and that "you should not point this stuff out in front of the team." This in spite of the fact that in addition to driving five (5) to six (6) hours per day in Relator's own territory to manage the Los Angeles territory, which was the eleventh (11th) highest volume territory in the nation, and managing a district including five (5) Western States, Relator was accused of "not being flexible or a team player." During this

FIRST AMENDED COMPLAINT                           2:16-cv-06997-RGK-RAO

1   time period, the relator worked in excess of one hundred (100) hours a week, and

2   consequently started to suffer many job-related physical and health complications

3   [with long-term consequences], and did not do so for other sales representatives in

4   Relator's region. Under company policy, and in Relator's experience, no other

5   sales rep was terminated without a performance improvement plan ("PIP"), unlike

6   the Relator.

7   248.   In or about November 2013, Janssen made it clear to its sales representatives

8   that they were to begin to market Olysio for use off-label to treat HIV and renal

9   failure patients, and other uses that are not approved by the FDA. In November

10  2013, the FDA sent Janssen an approval letter for Olysio's labeling. More

11  specifically, this FDA letter did not allow the Defendants to market Olysio for use

12  in HIV and renal failure patients. However, Janssen continued to market Olysio for

13  use in HIV and renal failure patients, as set forth above.

14  249.   In or about November, 2013, Relator complained about Janssen's off-label

15  marketing strategy to Relator's manager. Relator also voiced concern about

16  Janssen's use of kickbacks. For example, when District Manager Alan Williams

17  wrote about Dr. Sammy Saab getting paid for speaking on Olysio even though it

18  wasn't his "go-to drug" and asked Regional Business Director ("RBD") Mo Issa to

19  intervene on this issue. The RBD asked in turn for the representative to confront

20  the physician and ask "why with so many resources [speaker programs and

21  advisory board kickbacks] does Dr. Saab write such minimal number of patients on

22  Olysio?" The RBD proceeded to state that the Defendants would not be using

23  physicians that are not advocates of the products. And the RBD requested a

24  favorability matrix to be developed to measure ROI of retaining physicians as

25  speakers for products and their perceived value to the company. In this way, the

26  RBD was clearly requiring sales representatives to make certain that their speaker

27  arrangements with physicians were quid pro quo arrangements (See Exhibit 65).

28

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

250.   Dr. Sammy Saab spoke at multiple dinners on Olysio during 2014-15. Doctors arrived, signed-in, and got seated right away because they did not like to come early. Dr. Saab would arrive early. As part of the scheme, the laptop and projector were already set up by the restaurant staff, and Dr. Saab brought a flash drive with his presentation slides. The average size of a dinner meeting was 12-22 people. Dr. Saab greeted the other doctors as they began to arrive. Dr. Saab nearly always spoke to people that he worked with at the UCLA transplant program, and he arranged with members of the audience prior to arriving at the dinner to ask questions about the COSMOS study. Janssen personnel advisedDr. Saab in advance of each dinner that he would not be able to talk off-label about using an Olysio dual-therapy regimen like in the COSMOS study without a question from the audience. Dr. Saab would arrange for a friend in the audience to ask him the off-label question. Sometimes an attendee would forget to ask the off-label question in the audience, so Dr. Saab would say, "did someone have a question about the COSMOS study?", or the Janssen sales representative would step forward and ask the off-label question, since that was the most important part of the talk.

251.   Again, in retaliation for these complaints, Relator was subjected to further harassment and intimidation. Relator continued to be treated differently from other sales representatives in the region. Relator had long been a graduate of the management development program. Despite having elevated into the last stage of the program, the management had asked Relator to repeat a series of classes that were already completed. Despite the fact that Relator attempted to apply for another position as the most qualified candidate, citing that Relator had ethical issues selling the product, the management team intervened and reached the hiring manager and told the hiring manager that Relator was job hopping. Relator had been with the same company for nine (9) years at that point, and was not "job

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

hopping." The same manager supported another member of the team that had none of the qualifications to be successful in the new role.

252.   For example, other sales representatives in Relator's region were allowed to take vacations or miss meetings in order to accommodate family obligations or to run businesses on the side. Relator was pressured not to take vacation, and to keep working over one hundred hours a week, while noted previously, running the eleventh highest volume territory in the country while managing five other states. Shortly after complaining about Janssen's off-label promotions, Relator was routinely required to attend promotional dinners with doctors, while colleagues in the region were given the night off in order to plan activities with their families or their own side businesses. In fact, the Regional Director himself had a side business that he was spending time on while at the same time demanding a very high amount of work hours from Relator. Relator was asked to work all the local area drug expositions (over 14 additional days with no over time or respite). Despite the intense emotional and social pressure, Relator worked nights for dinners and for completing district management duties, and worked days for sales calls and territory management. Relator was never compensated for these additional hours despite CA regulations.

253.   In addition, Relator was subjected to racial and religious discrimination by Relator's manager. For example, on June 26, 2014 while in a meeting in Denver, Colorado, Relator's manager Tyana Grant had her birthday celebrated at a meeting. Ms. Grant had just come back from a church-related trip from Israel. Relator asked her how her trip was, and Ms. Grant said Israel was beautiful, but the Palestinians are like animals. Relator was shocked and asked her what she meant by that. Ms. Grant said that the Muslim kids surrounded her bus and were begging for money. Ms. Grant said that they weren't acting like humans, they were surrounding the bus like animals, and shaking people down for money. Relator's own family's religious

FIRST AMENDED COMPLAINT                         2:16-cv-06997-RGK-RAO

background and ethnic heritage were viciously attacked in this manner, and as a result Relator suffered extreme emotional and physical distress.

254.   In April, 2015, Relator won a sales award for being the District Representative of the Year, because Relator not only ran a sales territory successfully, but Relator also ran an entire five state district and brought that district to the number one position in sales. But even then, Relator was being retaliated against by not being allowed by Defendant to be promoted to the next level of employment as a permanent District Manager. Despite the success Relator experienced in the field and in the district the RBD stated that Relator is not flexible and does not appear to have a positive disposition and such a role would be highly at risk.

255.   On or about August 10, 2015, Defendants' employee Carrie Palmer from Janssen's HR Office illegally disclosed the details of Relator's disability and medical treatment to an outside party in violation of Relator's rights under HIPAA.

256.   On August 11, 2015, an HR representative for Janssen terminated Relator by mail, without paying Relator's accrued vacation time as per California law. Relator was not given a severance package, as the other sales representatives who had been laid off previously had been. There was no PIP (Performance Improvement Plan) to warn Relator and ask for corrective action.

257.   Janssen's stated reason for terminating Relator was for Relator's making of additional ("side") income. However, most of the Defendants' sales representatives and managers followed the same customary practice as Relator in creating a side income. This conduct had occurred for many years in front of Defendant's managers without any other sales reps receiving any criticism or complaints. For example, the Regional Business Director Mo Issa was simultaneously the CEO of another company, Noor Vitamins. This was information that was highly public and understood as completely compliant as the RBD discussed going to Dubai for this

business and talked about his multiple business successes.

258.   After the Relator reported the alleged fraud to Defendants' management, and despite Relator's long history of employment and the fact that the Relator was an exemplary employee, having won multiple sales awards nationally and regionally, the Relator was discharged without notice. The discharge included Defendants' employee Carrie Palmer from Defendants' human resources department contacting an outside organization and illegally violating Relator's rights under Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Here, Defendants revealed the details of Relator's personal and private medical records, and temporary disability, without Relator's knowledge and consent. Subsequently, the Relator was discharged from that new employer without cause.

259.   Furthermore, on or about August 10th, 2015, Defendants' human resources department employee Carrie Palmer contacted Relators' new employer and disclosed details of Relator's health issues to this new employer. Multiple employees from the new employer including but not limited to employee A and employee B informed the Relator of Defendant's egregious conduct. Relator was subsequently terminated by the new employer on or about August 18th, 2015, only days after the Defendants contacted.

260.   Relator alleges other infractions including but not limited to violating HIPPA and encroachment on Relator's privacy, COBRA violations, and interference with the active medical treatment of an employee under distress and during a period of active disability. Defendants retaliated against Relator by terminating Relator's medical insurance, terminating Relator's disability insurance, interfering with Relator's rights to continue insurance under Cobra, and by refusing to pay for treatments for Relator's severe disabling condition which was brought about by Defendants' hostile work environment described herein.

261.   For example, despite medical evidence of Relator's inability to drive an

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1   automobile, Defendants refused to make accommodation for the

2   Relator.  Defendants' referring physician Dr. Orfus stated in Relator's Qualified

3   Medical Examiner ("QME") report that if Relator was unable to drive an

4   automobile, then Relator was unable to work. While Relator was qualified for

5   Long Term disability based on the QME and Relator's employee contract with

6   Defendants, and the long-term disability insurance that Relator personally paid for,

7   Defendants proceeded to rescind relator's disability claim.  Relator contacted the

8   claims administrator Regina Carter for Prudential that is the long-term Disability

9   Plans administrator.  Prudential's Regina Carter stated that Relator's claim was

10  being processed for payment and intact there was a case number

11  assigned.  According to the claims administrator Regina Carter, the Defendants

12  interference with an application at this stage was extremely uncommon, and

13  Defendants requested Prudential to terminate the application in violation of state

14  law.

15  262.   Defendants further blacklisted the Relator from gainful employment. Relator

16  is informed of verbal communications from August 2015 through June, 2016,

17  where several of the Defendants employees in human resources and executive

18  management, such as Regional Business Director Mo Issa, Helen Hutchins, Jason

19  Hammon, were overheard making false statements about the Relator. This includes

20  Defendants' sales representatives including Ron Lloyd and Julie Ewers, and several

21  managers, including Sunny Lee and Jennifer Brown.   This conduct black-listed the

22  Relator and made Relator unemployable. And, to further undermine Relator's

23  credibility, Defendants' employees retaliated and maliciously accused the relator

24  of fraud. Defendants roguishly continued these malicious attacks through June

25  2016, almost one year after Relator's termination, and Defendants failed to curtail

26  these highly defamatory communications.

27  263.   Another tactic that Defendants employed to further intimidate and harass the

28

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

Relator was the interference with Relator's disability application.
Consequently, Relator suffered a multitude of injuries such as physical and
debilitating illnesses and was still under treatment at the time of discharge.

264.   Relator was a stellar, nationally-ranked sales representative of Defendants,
illustrated by Relator's record, multiple awards and written and verbal management
accolades.  As a result of working over one hundred hours a week, verbal abuse
and a hostile work environment, Defendants terminated Relator under extreme
medical duress. At the time of termination, the Relator needed to see multiple
specialists to treat chronic refractory hemiplegic migraines, and Relator was placed
on a heavy daily prescription regimen to control excruciating pain, nausea and
disorientation.  Relator was barely able to drive an automobile, keep food down,
and had to take multiple medications and see multiple specialists to for basic
activities such as walking and talking.  Relator's health continued to decline and
deteriorate further caused by Defenadnts' hostile and illegal work environment
which was further aggravated by Defendants' retaliation, illegal termination,
violation of HIPPA, and defamation of Relator.

265.   For example, prior to Relator's period of total disability, Relator's territory
produced nearly $100 million in Olysio sales, yet relator was publicly reprimanded
for not producing more Simponi prescriptions and other prescription manufactured
and distributed by the Defendants. When Relator, an interim District Manager,
brought the Defendants' team performance to the number one sales position in the
United States of America, instead of encouragement, gratitude and positive
reinforcement, relator was told that the success was just a result of natural market
forces.  When Relator contended several illegally business practices to the
Defendants, Relator was singled out as not being "positive" and not having "team
spirit" by the Defendants.  Consequently, Relator was reprimanded both publicly
and privately, and was denied company benefits such as vacation and other

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1  compensation.

2  266.   Defendants continued to intimidate Relator by interfering with Relator's

3  right to privacy, ability to receive adequate medical care, resolve disability, and

4  interfering with the Relator's ability to maintain gainful employment and preserve

5  a 10-year career in pharmaceutical sales. The Defendants' actions continued

6  unabated and given the fact that the Defendant has been under a Corporate

7  Integrity Agreement for two separate counts of fraud and off-label promotion,

8  61.   As a direct and proximate result of Defendants' unlawful actions as

9  detailed herein, Relator has suffered loss of employment opportunities, lost a

10  potential career, loss of dignity, suffered great humiliation, and emotional injuries

11  manifesting physical illness and severe emotional distress.

12  62.   As a result of the conduct by Defendants of which Relator complains,

13  Plaintiff suffered and continues to suffer substantial losses in earnings and other

14  employee benefits.  Relator will seek leave to amend this Complaint to state the

15  amount or will proceed according to proof at trial.

16  63.   Relator suffered emotional distress as a result of the conduct by

17  Defendants of which Relator complains.

18  64.   At all material times, Defendants, and each of them, knew that Relator

19  depended on Relator's wages and other employee benefits as a source of earned

20  income.  At all material times, Defendants were in a position of power over

21  Relator, with the potential to abuse that power.

22  65.   Relator was in a vulnerable position because of Relator's status as a

23  whistleblower, with a relative lack of power, because Relator had placed Relator's

24  trust in Defendants, because Relator depended on Relator's employment for

25  Relator's self-esteem and sense of belonging, because Relator relied upon

26  Relator's employment as a source of income. Defendants were aware of Relator's

27  vulnerability and the reasons for it.

28

FIRST AMENDED COMPLAINT                     2:16-cv-06997-RGK-RAO

## DEFENDANTS' SCHEMES RESULTED IN FALSE CLAIMS TO MEDICAID AND MEDICARE

267.   Defendants' business plans often included tracking of physicians by their volume of Medicare and Medicaid patients, average duration of treatment, and the average revenue from Defendants' drugs. Defendant management utilized this Medicaid and Medicare volume information in order to determine which physicians to target for expensive meals and cash payments and off-label sales promotions.

268.   Payments of consulting fees and expensive dinners and other incentives to increase referrals to a physician for the use of Defendants' drugs is inappropriate and illegal. According to the federal Health and Human Services Office of the Inspector General (HHS OIG), paid meals would be inappropriate if they are tied directly or indirectly to the generation of federal health care program business for the manufacturer, or for the purposeful inducement of business. See, e.g., 68 F.R. 23738. ("these arrangements [entertainment, recreation, travel, meals, etc.] potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business.")

269.   Defendants' scheme to pay physicians and promote off-label sales resulted in specific sales. Defendants, like most branded drug companies, monitor the relationship of its sales to its promotional efforts over a very short timeframe; Defendants would be concerned about a drop in sales within a certain therapeutic regime not after a year look-back, or even a quarterly look-back, but over a period of just weeks. Defendants' marketing and sales strategy documents show that at least on a weekly basis Defendants were tracking prescription volume by physician, and tracking the percentage change in prescribing habits of physicians for Defendants drugs.

270.   Additionally, Defendants tracked the return on investment ("ROI") of paid

travel and expensive meals for physicians. Defendants' sales representatives were instructed to ask physicians for additional prescriptions when the physicians were paid to speak at a lavish meal event, and told to track follow-up prescriptions by the physician, and to hold the physicians accountable if the physicians did not increase prescriptions of Defendants' drugs. Physicians were made aware by Defendants' sales representatives that the physicians would not continue to be invited to lavish meals if the physicians did not remain in the high volume prescriber range, and if the physicians did not prescribe Defendants' drugs. Physicians who did not continue to prescribe Defendants' drugs were tracked on a quarterly basis by Defendants' marketing and sales personnel, and were sometimes penalized by being taken off target lists for invitations to future lavish meals and offers of speaking engagements, paid research opportunities, and other perks.

271.   Defendants pushed "prescribe to play," quid pro quo-focused sales strategies, which are based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing Defendants' drugs. The recipients of these awards and benefits were selected by Defendants' home office marketing department. Some ROI factors that Defendants' home office used to funnel kickbacks to physicians included but were not limited to the physician recipients' ability to prescribe Defendants' drugs and to influence other physicians to do so.

272.   Defendants also instructed its sales representatives to review patient records at physician's offices and instruct them to switch their patients to receive Defendants' drugs instead of competitor drugs.

273.   The evidence points to willful and premeditated schemes of off-label promotion, kickbacks, and violations of patients' HIPPA protections. The Relator, who was vocal about these tactics, was retaliated against with unreasonable plans of corrective action and ultimately wrongfully terminated.

## CONCLUSION

274.   Defendants' fraudulent activities, as set forth in this Complaint have resulted in significant fraud on the government's health care systems. These concerted, national schemes for fraudulent promotion of Defendants' drugs have resulted in billions of dollars in unnecessary and fraudulent claims for reimbursement increasing the cost of healthcare and wasting the American taxpayer dollar.

### COUNT I; FALSE CLAIMS ACT

### CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS

275.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

276.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

277.   The DEFENDANTS, from at least January 1, 2005 to the present date knowingly [as defined in 31 USC, §3729(b)] caused to be presented to officers or employees of the UNITED STATES GOVERNMENT and STATES GOVERNMENTS false or fraudulent claims for payment or approval, in that the DEFENDANTS, caused to be presented to officers or employees of the UNITED STATES GOVERNMENT AND STATES GOVERNMENTS false or fraudulent claims for the specified drugs (as the term "specified drugs" has been defined throughout this Complaint) and caused the UNITED STATES and STATE GOVERNMENTS to pay out sums of money to the healthcare providers and suppliers of the DEFENDANTS' specified drugs, grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES and STATE GOVERNMENTS.

278.   Because of the DEFENDANT PHARMACEUTICAL MANUFACTURERS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in amount to be proven at trial, all in violation of 31 U.S.C. §3729(a)(1).

## COUNT II; FALSE CLAIMS ACT

## CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT

279.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

280.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

281.   The DEFENDANTS, from At least January 1, 2005 to the present date knowingly [as defined in 31 USC, §3729(b)] caused false records or statements to be made or used to get false or fraudulent claims to be paid or approved by the GOVERNMENT, in that the DEFENDANTS, caused false information about the DEFENDANTS' drugs specified herein to be used by the GOVERNMENT to pay or approve claims presented by healthcare providers and suppliers of the DEFENDANTS' specified drugs, which claims were grossly in excess of the amounts permitted by law, resulting in great financial loss to the UNITED STATES and STATE GOVERNMENTS.

282.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).

**COUNT III; FALSE CLAIMS ACT**

**CAUSING FALSE RECORDS OR STATEMENT TO BE USED TO CONCEAL AN OBLIGATION TO PAY MONEY TO THE GOVERNMENT**

283.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

284.       Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

285.       The DEFENDANTS, from at least January 1, 2005 to the present date knowingly [as defined in 31 USC, §3729(b)] caused false records or statements to be made or used to conceal obligations to pay money to the GOVERNMENT, in that: the DEFENDANTS knowingly made, used or caused to be made or used false records or false statements, i.e., the false certifications made or caused to be made by Defendants material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

286.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).

**COUNT IV; FALSE CLAIMS ACT**

**CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS; ILLEGAL RENUMERATION**

287.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP,

JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

288.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

289.   The DEFENDANTS, from at least 2010 to the present date knew that the prices charged to their customers for the specified drugs were significantly reduced in the amount from the prices and costs represented by the DEFENDANTS and upon which the DEFENDANTS knew the Medicaid claims would be approved and paid. Accordingly, the DEFENDANTS have each knowingly offered or paid, or caused to be offered or paid, directly or indirectly, overtly or covertly, in cash or in kind, remuneration to their customers on the form of price reductions and/or in the form of illegal remuneration from the States' Medicaid Programs to induce them to purchase, order or arrange or to recommend purchasing, arranging or ordering the specified drugs for which the DEFENDANTS knew that payment would be made, in whole or in part, by the States' Medicaid Programs. Such financial inducement is specifically prohibited by 42 U.S.C. §1320a-7b(b) and 18 U.S.C.§2

290.   The DEFENDANTS' knowing and willful actions in arranging for their customers to receive remuneration prohibited by 42 U.S.C. §1320a-7b(b), in causing the omission of material information from the claims, and in causing the failure to properly disclose and appropriately reflect the remuneration in the claims, caused the claims for the specified drugs to be false and fraudulent claims and caused the claims to be presented to the States' Medicaid Programs for payment and approval in violation of 31 U.S.C. §3729(a)(1).

291.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(1).

/ / /

## COUNT V; FALSE CLAIMS ACT

**CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT; PROHIBITED REFERRALS, CLAIMS AND COMPENSATION ARRANGEMENTS**

292.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

293.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

294.   The DEFENDANTS, from at least 2010 to the present date knowingly presented or caused to be presented, prohibited claims or bills to individuals and other entities for designated health services [outpatient prescription drugs] furnished pursuant to prohibited referrals from physicians, physician groups and/or outpatient clinics with which the DEFENDANTS has financial relationships, for which the DEFENDANTS knew that payment would be made, in whole or in part, by the States' Medicaid Programs. Such prohibited referrals, claims bills and compensation arrangements are specifically prohibited by 42 U.S.C. §1395nn(a)(1)(B) and 18 U.S.C. §2.

295.   The DEFENDANTS' knowingly made or used or caused referring physicians, physician groups or outpatient clinics to make or use records or statements to get false or fraudulent claims and bills for the DEFENDANTS' outpatient prescription drugs to be paid or approved by the States' Medicaid Programs.

296.   The DEFENDANTS' knowing presentment or causing others to present,

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

claims or bills to the States' Medicaid programs in violation of 42 U.S.C. §1395nn(a)(1)(B) without disclosing facts revealing said violations constituted the making or using, or the causing others to make or use, false records or statements to get a false or fraudulent claims paid or approved by the GOVERNMENT in violation of 31 U.S.C. §3729(a)(2).

297.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(2).

## COUNT VI; FALSE CLAIMS ACT

## CONSPIRING TO DEFRAUD THE GOVERNMENT BY GETTING A FALSE OR FRAUDULENT CLAIM ALLOWED OR PAID

298.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

299.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

300.   With respect to State Medicaid Programs, this Count also applies to all DEFENDANTS manufacturing specified drugs which: 1) were multiple-source drugs and/or single-source drugs, 2) were subject to State Medicaid reimbursement methodology similar to the Medicare "J Code" methodology, and 3) had a falsely inflated reported AWP and/or WAC or another falsely inflated reported price or cost if such price or cost was utilized in creating an array or prices or costs from which one was selected or reimbursement of all versions of a given drug.

301.   Each DEFENDANTS' liability as to this Count extends from the time it first reported a falsely inflated AWP and/or WAC, or in the case of Medicaid, a falsely

inflated AWP and/or WAC or such other price cost used to create the array of drug prices or costs, until such time, if any, each DEFENDANT stopped reporting said inflated AWP and/or WAC or, in the case of Medicaid, stopped reporting said inflated AWP and/or WAC or such other reported price or cost used to create the array of drug prices or costs from which one was selected for reimbursement purposes.

302.   Because of the DEFENDANTS' conduct as set forth in this Count, the UNITED STATES suffered actual damages in excess of One Billion Dollars ($1,000,000,000.00), all in violation of 31 U.S.C. §3729(a)(3).

## COUNT VII; FALSE CLAIMS ACT

## RETALIATION/WRONGFUL TERMINATION

## VIOLATION OF THE RETALIATION STATUTE, 42 U.S.C. § 3730(h)

303.   This is a civil action by the Plaintiff, UNITED STATES, and the Relator, JANE DOE, on behalf of the UNITED STATES and on behalf of the Relator, against the Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, under the False Claims Act, 31 U.S.C. §§3729-32.

304.   Relator realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

305.   Janssen retaliated by harassing Relator and taking actions to prevent Relator from properly carrying out job responsibilities as a result of lawful acts done in furtherance of this action, including reporting violations of the FDCA and anti-kickback statutes to the UNITED STATES and JANSSEN management and refusing to engage in Janssen's scheme to promote off-label prescriptions and provide kickbacks to physicians. On August 11, 2015, the Relator was discharged from Defendant's employment through a letter mailed by Carrie Palmer from JOHNSON & JOHNSON human resources, also as a result of Relator's lawful acts

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

done in furtherance of this action, as set forth above. This discharge was in violation of 31 U.S.C. § 3730(h).

306.   As a direct and proximate result of this unlawful and discriminatory discharge and Defendants' various acts of retaliation described herein, Relator has suffered emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator's efforts to obtain alternative employment, injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

## COUNT VIII

**(Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 *et seq*.)**

307.   Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

308.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Arkansas. Upon information and belief, Defendants' actions described herein occurred in the State of Arkansas as well. This is a qui tam action brought by Relator and the State of Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.

309.   The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides liability for any person who-

310.   Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

311.   At any time knowingly makes or causes to be made any false     statement or representation of a material fact for use in determining rights to a benefit or payment;

312.   In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the Arkansas Medicaid program.

313.   Defendants violated the Arkansas Medicaid Fraud False Claims Act §20-77-902(1) (2) & (7)(A) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

314.   Defendants furthermore violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and presented to the State of Arkansas from at least 2005 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti-Kickback Act and Stark Act Requirements, as described     herein.

315.   The State of Arkansas, by and through the Arkansas Medicaid program and other State health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

316.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Arkansas is connection with Defendants' fraudulent and illegal practices.

317.   Had the State of Arkansas known that Defendants was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

318.   As a result of Defendants' violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

319.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, and brought this action pursuant to A.C.A. § 20-77-911(a) on behalf of themselves and the State of Arkansas.

320.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid program.

321.   Pursuant to the Arkansas Medicaid Fraud False Claims Act, the State  of Arkansas and Relator are entitled to the following damages as against  Defendants:

322.   To the STATE OF ARKANSAS:

323.   Three times the amount of actual damages which the State of Arkansas has sustained as a result of Defendants' fraudulent and illegal practices;

324.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Arkansas;

325.   Prejudgment interest; and

326.   All costs incurred in bringing this action.

327.   To RELATOR:

328.   The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and /or any other applicable provision of law;

329.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

330.   An award of reasonable attorneys' fees and costs; and

331.   Such further relief as this court deems equitable and just.

/ / /

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1

2

## COUNT XIX

**(California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)**

3    332.   Relator re-allege and incorporate the allegations above as if fully set for

4    herein and further alleges as follows.

5    333.   Additionally, Relator state that the course of conduct described in this

6    Complaint was a nationwide practice of Defendants. Defendants conduct business

7    in the State of California. Upon information and belief, Defendants' actions

8    described herein occurred in the State of California as well.

9    334.   This is a qui tam action brought by Relator and the State of California to

10   recover treble damages and civil penalties under the California False Claims Act,

11   Cal. Gov't. Code § 12650 *et seq.*

12   335.   Cal. Gov't Code § 12651(a) provides liability for any person who—

13   336.   Knowingly presents, or causes to be presented, to an officer or employee of

14   the state of any political division thereof, a false claim for payment or approval;

15   337.   Knowingly makes, uses, or causes to be made or used a false record of

16   statement to get a false claim paid or approved by the state or by any political

17   subdivision;

18   338.   Conspires to defraud the state or any political subdivision by getting a false

19   claim allowed or paid by the state of by any political subdivision.

20   339.   Is a beneficiary of an inadvertent submission of a false claim to the state or a

21   political subdivision, subsequently discovers the falsity of the claim, and fails to

22   disclose the false claim to the state or the political subdivision within a reasonable

23   time after discovery of the false claim.

24   340.   In addition, the payment or receipt of bribes or kickbacks is prohibited under

25   Cal. Bus. & Prof. Code §§ 650 and 650.1, and is also specifically prohibited in

26   treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

27   341.   Defendants violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf.

28

FIRST AMENDED COMPLAINT                         2:16-cv-06997-RGK-RAO

& Inst. Code § 14107.2 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

342.   Defendants furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 2005 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act and Stark Act Requirements, as described herein.

343.   The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

344.   Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' fraudulent and illegal practices.

345.   Had the State of California known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

346.   As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

347.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

348.   This Court is requested to accept supplemental jurisdiction over this related

state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

349.    Pursuant to the California False Claims Act, the State of California and Relator are entitled to the following damages as against Defendants:

350.    To the STATE OF CALIFORNIA:

351.    Three times the amount of actual damages which the State of California has sustained as a result of Defendants' fraudulent and illegal practices;

352.    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants presented or caused to be presented to the State of California;

353.    Prejudgment interest; and

354.    All costs incurred in bringing this action.

355.    To RELATOR:

356.    The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law;

357.    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

358.    An award of reasonable attorneys' fees and costs; and

359.    Such further relief as this Court deems equitable and just.

## COUNT X

**(California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 *et seq.*)**

360.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

361.    This is a claim for treble damages and penalties under the California Insurance Fraud Prevention Act.

362.    By virtue of the acts described above, Defendants knowingly utilized a

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

scheme by which they improperly procured "runners, cappers, steerers, and other persons" to procure patients who held private insurance contracts and against whom Defendants could cause the filing of claims for payment. *See* Cal. Ins. Code § I871.7(a).

363.   Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the private insurers in California, or for patients in California those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

364.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

365.   By virtue of the acts described above, the Defendants conspired to violate the California Insurance Fraud Prevention Act and each patient's private health insurance contract.

366.   The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

367.   Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

368.   By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

369.   Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim

FIRST AMENDED COMPLAINT                2:16-cv-06997-RGK-RAO

for payment.

370.   The State of California is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

371.   WHEREFORE, Relators request the following relief:

372.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that the private insurance companies have sustained because of Defendants' actions, plus a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation of Cal. Ins. Code § 1871.7(a) and (b);

373.   At least thirty percent (30%) and up to forty percent (40%) of the proceeds of this action to the Relators if the State of California elects to intervene, and forty percent (40%) to fifty percent (50%) if it does not;

374.   Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

375.   Such other relief as the Court deems just and appropriate.

## COUNT XI

**(Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 *et seq.*)**

376.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

377.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Colorado. Upon information and belief, Defendants' actions described herein occurred in the State of Colorado as well.

378.   This is a qui tam action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colorado Revised Statutes § 25.5-4-303.5. *et seq*.

379.   Colorado Revised Statutes § 25.5-4-305 provides liability for any person who-

380.   Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

381.   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

382.   Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

383.   Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

384.   Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

385.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act;"

386.   Conspires to commit a violation of paragraphs (a) to (f) of this subsection.

387.   Defendants violated Colorado Revised Statutes § 25.5-4-305 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

388.   Defendants furthermore violated Colorado Revised Statutes § 25.5-4-305 and knowingly caused thousands of false claims to be made, used and presented to the State of Colorado from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

389.   The State of Colorado, by and through the State of Colorado Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

390.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' fraudulent and illegal practices.

391.   Had the State of Colorado known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

392.   As a result of Defendants' violations of Colorado Revised Statutes § 25.5-4-305 the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

393.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Colorado Revised Statutes § 25.5-4-306(2) on behalf of itself and the State of Colorado.

394.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

395.   Pursuant to the Colorado Medicaid False Claims Act, the State of Colorado and Relator are entitled to the following damages as against Defendants:

396.   To the STATE OF COLORADO:

397.   Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' fraudulent and illegal practices;

398.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Colorado;

399.   Prejudgment interest; and

400.   All costs incurred in bringing this action.

401.   To RELATOR:

402.   The maximum amount allowed pursuant to Colorado Revised Statutes § 25.5-4-306(4) and /or any other applicable provision of law;

403.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

404.   An award of reasonable attorneys' fees and costs; and

405.   Such further relief as this court deems equitable and just.

## COUNT XII

### (Connecticut False Claims Act for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. *et seq.*)

406.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

407.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Connecticut. Upon information and belief, Defendants' actions described herein occurred in the State of Connecticut as well.

408.   This is a qui tam action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. *et seq*.

409.   Connecticut General Statutes § 17b-301b. provides liability for any person who-

410.   Knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

411.   Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

412.   Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

413.   Defendants violated Connecticut General Statutes § 17b-301b from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

414.   Defendants furthermore violated Connecticut General Statutes § 17b-301b and knowingly caused thousands of false claims to be made, used and presented to the State of Connecticut from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

415.   The State of Connecticut, by and through the State of Connecticut Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

416.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and

belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' fraudulent and illegal practices.

417.   Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

418.   As a result of Defendants' violations of Connecticut General Statutes § 17b-301b the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

419.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Connecticut General Statutes § 17b-301d on behalf of itself and the State of Connecticut.

420.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

421.   Pursuant to the Connecticut False Claims Act for Medical Assistance Programs, the State of Connecticut and Relator are entitled to the following damages as against Defendants:

422.   To the STATE OF CONNECTICUT:

423.   Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' fraudulent and illegal practices;

424.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Connecticut;

425.   Prejudgment interest; and

426.   All costs incurred in bringing this action.

427.   To RELATOR:

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

428.   The maximum amount allowed pursuant to Connecticut General Statutes § 17b-301 and /or any other applicable provision of law;

429.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

430.   An award of reasonable attorneys' fees and costs; and

431.   Such further relief as this court deems equitable and just.

## COUNT XIII

### (Delaware Medicaid False Claims Act, 6 Del. C. § 1201 *et seq.*)

432.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

433.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Delaware. Upon information and belief, Defendants' actions described herein occurred in Delaware as well.

434.   This is a qui tam action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. § 1201 *et seq.*

435.   6 Del. C. § 1201 *et seq.* provides liability for any person who—

436.   Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

437.   Knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved;

438.   Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

439.   Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

money or property to or from the Government.

440.   Further, 31 Del. C. § 1005 provides that— It shall be unlawful for any person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person . . . [t]o purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

441.   Defendants violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware from 2005 to the present by its violation of federal and state laws, including 31 Del. C. §1005, and Anti-Kickback Act and the Stark Act Requirements, as described herein.

442.   The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

443.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' fraudulent and illegal practices.

444.   Had the State of Delaware known that Defendants were violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

445.   As a result of Defendants' violations of 6 Del C. § 1201(a), the State of Delaware has been damage in an amount far in excess of millions of dollars

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

exclusive of interest.

446. Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

447. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

448. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

449. Pursuant to the Delaware Medicaid False Claims Act, the State of Delaware and Relator are entitled to the following damages as against Defendants:

450. To the STATE OF DELAWARE:

451. Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' fraudulent and illegal practices;

452. A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

453. Prejudgment interest; and

454. All costs incurred in bringing this action.

455. To RELATOR:

456. The maximum amount allowed pursuant to 6 Del C. § 1205, and /or any other applicable provision of law;

457. Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

458.  An award of reasonable attorneys' fees and costs; and

459.  Such further relief as this court deems equitable and just.

## COUNT XIV

### (District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 *et seq.*)

460.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

461.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the District of Columbia. Upon information and belief, Defendants' actions described herein occurred in the District of Columbia as well.

462.   This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 *et seq.*

463.   D.C. Code § 2-30814(a) provides liability for any person who-

464.   Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

465.   Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

466.   Conspires to defraud the District by getting a false claim allowed or paid by the District;

467.   Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

468.   In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

469.   Referring a recipient to a particular provider of any item or service or for

which payment may be made under the District of Columbia Medicaid program; or

470.   Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

471.   Defendants violated D. C. Code § 4-802(c) from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

472.   Defendants furthermore violated D. C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia from at least 2005 to the present by its violation of federal and state laws, including D. C. Code § 4-802(c), the Anti-Kickback Act and the Stark Act, as described herein.

473.   The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

474.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendants' fraudulent and illegal practices.

475.   Had the District of Columbia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

476.   As a result of Defendants' violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

477.   Relator are private persons with direct and independent knowledge of the

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

478.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

479.   Pursuant to the District of Columbia Procurement Reform Amendment Act, the District of Columbia and Relator are entitled to the following damages as against Defendants:

480.   To the DISTRICT OF COLUMBIA:

481.   Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' fraudulent and illegal practices;

482.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the District of Columbia;

483.   Prejudgment interest; and

484.   All costs incurred in bringing this action.

485.   To RELATOR:

486.   The maximum amount allowed pursuant to D. C. Code § 2-308.15(f) and /or any other applicable provision of law;

487.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

488.   An award of reasonable attorneys' fees and costs; and

489.   Such further relief as this court deems equitable and just.

## **COUNT XV**

### **(Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq*.)**

490.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

491.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Florida. Upon information and belief, Defendants' actions described herein occurred in the State of Florida as well.

492.   This is a qui tam action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. § 68.081 *et seq.*

493.   West's F.S.A. § 68.082 provides liability for any person who-

494.   Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval

495.   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency

496.   Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid

497.   Defendants violated West's F.S.A. § 68.082 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

498.   Defendants furthermore violated West's F.S.A. § 68.082 and knowingly caused thousands of false claims to be made, used and presented to the State of Florida from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

499.   The State of Florida, by and through the State of Florida Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

500.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of

Florida in connection with Defendants' fraudulent and illegal practices.

501.    Had the State of Florida known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

502.    As a result of Defendants' violations of West's F.S.A. § 68.082 the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

503.    Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to West's F.S.A. § 68.083(2) on behalf of themselves and the State of Florida.

504.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

505.    Pursuant to the Florida False Claims Act, the State of Florida and Relator are entitled to the following damages as against Defendants:

506.    To the STATE OF FLORIDA:

507.    Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' fraudulent and illegal practices;

508.    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Florida;

509.    Prejudgment interest; and

510.    All costs incurred in bringing this action.

511.    To RELATOR:

512.    The maximum amount allowed pursuant to West's F.S.A. § 68.085 and /or any other applicable provision of law;

513.    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

514.    An award of reasonable attorneys' fees and costs; and

515.    Such further relief as this court deems equitable and just.

## COUNT XVI

**(Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.)**

516.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

517.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Georgia. Upon information and belief, Defendants' actions described herein occurred in Georgia as well.

518.    This is a qui tam action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.

519.    Ga. Code Ann. § 49-4-168.1 *et seq*. provides liability for any person who—

520.    Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

521.    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

522.    Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

523.    Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

524.    Defendants violated Ga. Code Ann. § 49-4-168.1 and knowingly caused

hundreds of thousands of false claims to be made, used and presented to the State of Georgia from 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

525.   The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

526.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' fraudulent and illegal practices.

527.   Had the State of Georgia known that Defendants were violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

528.   As a result of Defendants' violations of Ga. Code Ann. § 49-4-168.1, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

529.   Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

530.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Ga. Code Ann., § 49-4-168.2(b) on behalf of themselves and the State of Georgia.

531.   This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

532.  Pursuant to the Georgia State False Medicaid Claims Act, the State of Georgia and Relator are entitled to the following damages as against Defendants:

533.  To the STATE OF GEORGIA:

534.  Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' fraudulent and illegal practices;

535.  A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

536.  Prejudgment interest; and

537.  All costs incurred in bringing this action.

538.  To RELATOR:

539.  The maximum amount allowed pursuant to Ga. Code Ann., § 49-4-168.2(i), and/ or any other applicable provision of law;

540.  Reimbursement for reasonable expenses which Relator incurred in connection with this action;

541.  An award of reasonable attorneys' fees and costs; and

542.  Such further relief as this Court deems equitable and just.

## COUNT XVII

### (Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 *et seq.*)

543.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

544.  Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Hawaii. Upon information and belief, Defendants' actions described herein occurred in Hawaii as well.

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

545.   This is a qui tam action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 *et seq.*

546.   Haw. Rev. Stat. § 661-21(a) provides liability for any person who—

547.   Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

548.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

549.   Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

550.   Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

551.   Defendants violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

552.   The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

553.   Compliance with applicable Medicare, Medicaid and the various other federal state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' fraudulent and illegal practices.

554.   Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health

care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

555.   As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

556.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

557.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

558.   Pursuant to the Hawaii False Claims Act, the State of Hawaii and Relator are entitled to the following damages as against Defendants:

559.   To the STATE OF HAWAII:

560.   Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' fraudulent and illegal practices;

561.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

562.   Prejudgment interest; and

563.   All costs incurred in bringing this action.

564.   To RELATOR:

565.   The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and /or any other applicable provision of law;

566.   Reimbursement for reasonable expenses which Relator incurred in connection with this action; and

567.   Such further relief as this Court deems equitable and just.

FIRST AMENDED COMPLAINT                2:16-cv-06997-RGK-RAO

## COUNT XVIII

**(Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq*.)**

568.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

569.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Illinois. Upon information and belief, Defendants' actions described herein occurred in Illinois as well.

570.    This is a qui tam action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq*.

571.    740 ILCS 175/3(a) provides liability for any person who—

572.    knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

573.    knowingly makes, uses, of causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

574.    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

575.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item of service for which payment may be made in whole or in part under the Illinois Medicaid program.

576.    Defendants violated 305 ILCS 5/8A-3(b) from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

577.    Defendants furthermore violated 740 ILCS 175/3(a) and knowingly caused

hundreds of thousands of false claims to be made, used and presented to the State of Illinois from at least 2005 to the present by its violation of federal and state laws, including 305 ILCS 5/8A-3(b), the Anti-Kickback Act and the Stark Act, as described herein.

578.   The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

579.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' fraudulent and illegal practices.

580.   Had the State of Illinois known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

581.   As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

582.   Relator are private persons with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

583.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

584.   Pursuant to the Illinois Whistleblower Reward and Protection Act, the State

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

of Illinois and Relator are entitled to the following damages as against Defendants:

585.   To the STATE OF ILLINOIS:

586.   Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' fraudulent and illegal practices;

587.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Illinois;

588.   Prejudgment interest; and

589.   All costs incurred in bringing this action.

590.   To RELATOR:

591.   The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other applicable provision of law;

592.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

593.   An award of reasonable attorneys' fees and costs; and

594.   Such further relief as this Court deems equitable and just.

## COUNT XIX

**(Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq*.)**

595.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

596.   This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act.

597.   By virtue of the acts described above, Defendants knowingly offered and/or paid remuneration to physicians to induce the procurement of patients for Defendants' drugs for which Defendants could cause the filing of claims for payment from the patients' insurers. *See* 740 Ill. Comp. Stat. § 92/5(a).

598.   Defendants knowingly presented or caused to he presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those

insurers covered, for payment or approval in violation of each patient's private health insurance contract.

599.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

600.   By virtue of the acts described above, the Defendants conspired to violate the Illinois Insurance Claims Fraud Prevention Act and each patient's private health insurance contract.

601.   The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

602.   Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

603.   By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

604.   Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

605.   The State of Illinois is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, 'used, presented, or caused to be made, used, or presented by Defendants.

606.   WHEREFORE, Relators request the following relief:

607.   That this Court enter judgment against Defendants in an amount equal to

FIRST AMENDED COMPLAINT                          2:16-cv-06997-RGK-RAO

three times the amount of damages that the private insurance companies have sustained because of Defendants' actions, plus a civil penalty of not less tl1an $5,000,00 and not more than $10,000.00 for each violation of 740 Ill. Comp. Stat. §§ 92/5(a) and (b);

608.   No less than thirty percent (30%) of the proceeds of this action to the Relators if the State of Illinois elects to intervene, and no less than forty percent (40%) if it does not;

609.   Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

610.   Such other relief as the Court deems just and appropriate.

## COUNT XX

**(Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq*.)**

611.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

612.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Indiana. Upon information and belief, Defendants' actions described herein occurred in Indiana as well.

613.   This is a qui tam action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*

614.   IC 5-11-5.5-2 provides liability for any person who—

615.   presents a false claim to the state for payment or approval;

616.   makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

617.   with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the

state;

618. with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

619. receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

620. makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

621. conspires with another person to perform an act described in subdivisions (a) through (f); or

622. causes or induces another person to perform an act described in subdivisions (a) through (f).

623. In addition, IC 12-15-24-1 & IC 12-15-24-2 prohibits the provision of a kickback or bribe in connection with the furnishing of items or services or the making or receipt of the payment under the Indiana Medicaid program.

624. Defendants violated IC 12-15-24-1 & IC 12-15-24-2 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

625. Defendants furthermore violated IC 5-11-5.5-2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Indiana from at least 2005 to the present by its violation of federal and state laws, including IC 12-15-24-1 & IC 12-15-24-2, the Anti-Kickback Act and the Stark Act, as described herein.

626. The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

627. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and

belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' fraudulent and illegal practices.

628.    Had the State of Indiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

629.    As a result of Defendants' violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

630.    Relator are private persons with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to IC 5-11-5.5-4 on behalf of themselves and the State of Indiana.

631.    This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

632.    Pursuant to the Indiana False Claims and Whistleblower Protection Act, the State of Indiana and Relator are entitled to the following damages as against Defendants:

633.    To the STATE OF INDIANA:

634.    Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' fraudulent and illegal practices;

635.    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

636.    Prejudgment interest; and

637.    All costs incurred in bringing this action.

638.    To RELATOR:

639.   The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other applicable provision of law;

640.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

641.   An award of reasonable attorneys' fees and costs; and

642.   Such further relief as this Court deems equitable and just.

## COUNT XXI

### (Iowa False Claims Act, Iowa Code § 685.1 *et seq.*)

643.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

644.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Iowa. Upon information and belief, Defendants' actions described herein occurred in Iowa as well.

645.   This is a qui tam action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1 *et seq.*

646.   Iowa Code § 685.2 provides liability for any person who—

647.   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

648.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

649.   Conspires to commit a violation of paragraphs (a), (b), (d)-(g);

650.   Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less than all of that money or property;

651.   Is authorized to make or deliver a document certifying receipt of property

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

652.   Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the Iowa national guard, who lawfully may not sell or pledge property;

653.   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

654.   Defendants violated Iowa Code § 685.2 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

655.   Defendants furthermore violated Iowa Code § 685.2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Iowa from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

656.   The State of Iowa, by and through the Iowa Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

657.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Iowa in connection with Defendants' fraudulent and illegal practices.

658.   Had the State of Iowa known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and

1   illegal practices.

2   659.   As a result of Defendants' violations of Iowa Code § 685.2, the State of

3   Iowa has been damaged in an amount far in excess of millions of dollars exclusive

4   of interest.

5   660.   Relator are private persons with direct and independent knowledge of the

6   allegation of this Complaint, who have brought this action pursuant to Iowa Code §

7   685.3(2)(a) on behalf of themselves and the State of Iowa.

8   661.   This court is requested to accept supplemental jurisdiction of this related

9   state claim as it is predicated upon the exact same facts as the federal claim, and

10  merely asserts separate damage to the State of Iowa in the operation of its

11  Medicaid program.

12  662.   Pursuant to the Iowa False Claims Act, the State of Iowa and Relator are

13  entitled to the following damages as against Defendants:

14  663.   To the STATE OF IOWA:

15  664.   Three times the amount of actual damages which the State of Iowa has

16  sustained as a result of Defendants' fraudulent and illegal practices;

17  665.   A civil penalty for each false claim which Defendants caused to be presented

18  to the State of Iowa;

19  666.   Prejudgment interest; and

20  667.   All costs incurred in bringing this action.

21  668.   To RELATOR:

22  669.   The maximum amount allowed pursuant to Iowa Code § 685.3(4)(a)(1)

23  and/or any other applicable provision of law;

24  670.   Reimbursement for reasonable expenses which Relator incurred in

25  connection with this action;

26  671.   An award of reasonable attorneys' fees and costs; and

27  672.   Such further relief as this Court deems equitable and just.

28

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

## COUNT XXII

### (Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 *et seq*.)

673.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

674.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Louisiana. Upon information and belief, Defendants' actions described herein occurred in Louisiana as well.

675.    This is a qui tam action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 *et seq*.

676.    La. Rev. Stat. Ann. § 438.3 provides –

677.    No person shall knowingly present or cause to be presented a false or fraudulent claim;

678.    No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds;

679.    No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

680.    In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebated, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

681.    Defendants violated La. Rev. Stat. Ann § 438.2(A) from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

682. Defendants furthermore violated La. Rev. Stat. Ann. § 438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana from at least 2005 to the present by its violation of federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback Act and Stark Act, as described herein.

683. The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

684. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' fraudulent and illegal practices.

685. Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

686. As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

687. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev. Stat. Ann. § 439.1(A) on behalf of themselves and the State of Louisiana.

688. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

689.   Pursuant to the Louisiana Medical Assistance Programs Integrity Law, the State of Louisiana and Relator are entitled to the following damages as against Defendants:

690.   To the STATE OF LOUISIANA:

691.   Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' fraudulent and illegal practices;

692.   A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

693.   Prejudgment interest; and

694.   All costs incurred in bringing this action.

695.   To RELATOR:

696.   The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

697.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

698.   An award or reasonable attorneys' fees and costs; and

699.   Such further relief as this Court deems equitable and just.

## COUNT XXIII

**(Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 *et seq*.)**

700.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

701.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the Commonwealth of Maryland. Upon information and belief, Defendants' actions described herein occurred in Maryland as well.

702.   This is a qui tam action brought by Relator and the State of Maryland to

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

recover treble damages and civil penalties under the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 *et seq*.

703.   Annotated Code of Maryland § 2-602 provides liability for any person who-

704.   Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

705.   Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

706.   Conspires to commit a violation under this subtitle;

707.   Has possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly delivers or causes to be delivered to the State less than all of that money or other property;

708.   Knowingly makes any other false or fraudulent claim against a State health plan or a State health program.

709.   Defendants violated the Annotated Code of Maryland § 2-602 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

710.   Defendants furthermore violated the Annotated Code of Maryland § 2-602 and knowingly caused thousands of false claims to be made, used and presented to the State of Maryland from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

711.   The State of Maryland, by and through the State of Maryland Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

712.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' fraudulent and illegal practices.

713.   Had the State of Maryland known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

714.   As a result of Defendants' violations of the Annotated Code of Maryland § 2-602 the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

715.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Annotated Code of Maryland § 2-604 on behalf of themselves and the State of Maryland.

716.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

717.   Pursuant to the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, the State of Maryland and Relator are entitled to the following damages as against Defendants:

718.   To the STATE OF MARYLAND:

719.   Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' fraudulent and illegal practices;

720.   A civil penalty of not less than the amount of the actual damages the State health plan or State health program incurs as a result of the violation, and not more than $10,000 for each false claim which Defendants caused to be presented to the

1    State of Maryland;

2    721.    Prejudgment interest; and

3    722.    All costs incurred in bringing this action.

4    723.    To RELATOR:

5    724.    The maximum amount allowed pursuant to the Annotated Code of Maryland

6    § 2-605 and /or any other applicable provision of law;

7    725.    Reimbursement for reasonable expenses which Relator incurred in

8    connection with this action;

9    726.    An award of reasonable attorneys' fees and costs; and

10   727.    Such further relief as this court deems equitable and just.

11                              <u>**COUNT XXIV**</u>

12   **(Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A)** *et*

13                                  *seq.***)**

14   728.     Relator re-allege and incorporate the allegations above as if fully set for

15   herein and further alleges as follows.

16   729.    Additionally, Relator state that the course of conduct described in this

17   Complaint was a nationwide practice of Defendants. Defendants conduct business

18   in the Commonwealth of Massachusetts. Upon information and belief, Defendants'

19   actions described herein occurred in Massachusetts as well.

20   730.    This is a qui tam action brought by Relator and State of Massachusetts for

21   treble damages and penalties under Massachusetts False Claims Act, Mass. Gen.

22   Laws Ann. Chap 12 § 5(A) *et seq.*

23   731.    Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person

24   who—

25   732.    Knowingly presents, or causes to be presented, a false or fraudulent claim

26   for payment or approval;

27   733.    Knowingly makes, uses, or causes to be made or used, a false record or

28

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

734.   Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

735.   Is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reason able time after discovery of the false claim.

736.   In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe ore rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

737.   Defendants violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

738.   Defendants furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Massachusetts from at least 2005 to the present by its violation of federal and state laws, including Mass. Gen. Laws Ann. Chap. 118E § 41, the Anti-Kickback Act and the Stark Act, as described herein.

739.   The State of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

740.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

belief, also an express condition of payment of claims submitted to the State of Massachusetts in connection with Defendants' fraudulent and illegal practices.

741.   Had the State of Massachusetts known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

742.   As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B the State of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

743.   Relator are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to Mass. Gen. Laws Ann Chap. 12 § 5(c)(2) on behalf of themselves and the State of Massachusetts.

744.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Massachusetts in the operation of its Medicaid program.

745.   Pursuant to the Massachusetts False Claims Act, the State of Massachusetts and Relator are entitled to the following damages as against Defendants:

746.   To the STATE OF MASSACHUSETTS:

747.   Three times the amount of actual damages which that State of Massachusetts has sustained as a result of Defendants' fraudulent and illegal practices;

748.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Massachusetts;

749.   Prejudgment interest; and

750.   All costs incurred in bringing this action.

751.   To RELATOR:

752.   The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5F and/or any other applicable provision of law;

753.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

754.   An award of reasonable attorneys' fees and costs; and

755.   Such further relief as this court deems equitable and just.

## COUNT XXV

**(Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq.*)**

756.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

757.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in Michigan. Upon information and belief, Defendants' actions described herein occurred in Michigan as well.

758.   This is a qui tam action brought by Relator and State of Michigan for treble damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq*.

759.   M.C.L.A. 400.607 provides liability for any person who, among other things—

760.   Causes to be made or presented to an employee or officer of this state a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the state, knowing the claim to be false.

761.   Presents or causes to be made or presented a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards.

762.   In addition, M.C.L.A. 400.604 prohibits the solicitation, receipt or offering of a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program.

763.   Defendants violated M.C.L.A. 400.604 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

764.   Defendants furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan from at least 2005 to the present by its violation of federal and state laws, including M.C.L.A. 400.604, the Anti-Kickback Act and the Stark Act, as described herein.

765.   The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

766.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' fraudulent and illegal practices.

767.   Had the State of Michigan known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

768.   As a result of Defendants' violations of M.C.L.A. 400.607 the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

769.   Relator are private persons with direct and independent knowledge of the

allegations of the Compliant, who have brought this action pursuant to M.C.L.A. 400.610a on behalf of themselves and the State of Michigan.

770.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

771.   Pursuant to the Michigan Medicaid False Claim Act, the State of Michigan and Relator are entitled to the following damages as against Defendants:

772.   To the STATE OF MICHIGAN:

773.   Three times the amount of actual damages which that State of Michigan has sustained as a result of Defendants' fraudulent and illegal practices;

774.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

775.    Prejudgment interest; and

776.   All costs incurred in bringing this action.

777.   To RELATOR:

778.   The maximum amount allowed pursuant to M.C.L.A. 400.610a(9) and/or any other applicable provision of law;

779.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

780.   An award of reasonable attorneys' fees and costs; and

781.   Such further relief as this court deems equitable and just.

## COUNT XXVI

### (Minnesota False Claims Act, (Minnesota Statutes § 15C.01 *et seq.*)

782.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

783.   Additionally, Relator state that the course of conduct described in this

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

Complaint was a nationwide practice of Defendants. Defendants conduct business in Minnesota. Upon information and belief, Defendants' actions described herein occurred in Minnesota as well.

784. This is a qui tam action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, Minnesota Statutes § 15C.01 *et seq.*

785. Minnesota Statutes § 15C.02 provides liability for any person who-

786. Knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

787. Knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

788. Knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

789. Defendants violated Minnesota Statutes § 15C.02 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

790. Defendants furthermore violated Minnesota Statutes § 15C.02 and knowingly caused thousands of false claims to be made, used and presented to the State of Minnesota from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

791. The State of Minnesota, by and through the State of Minnesota Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers

FIRST AMENDED COMPLAINT                                    2:16-cv-06997-RGK-RAO

and third payers in connection therewith.

792.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendants' fraudulent and illegal practices.

793.   Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

794.   As a result of Defendants' violations of Minnesota Statutes § 15C.02 the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

795.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Minnesota Statutes § 15C.05 on behalf of themselves and the State of Minnesota.

796.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

797.   Pursuant to the Minnesota False Claims Act, the State of Minnesota and Relator are entitled to the following damages as against Defendants:

798.   To the STATE OF MINNESOTA:

799.   Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' fraudulent and illegal practices;

800.   A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

801.   Prejudgment interest; and

802.   All costs incurred in bringing this action.

803.   To RELATOR:

804.   The maximum amount allowed pursuant to Minnesota Statutes § 15C.12 and § 15C.13 and /or any other applicable provision of law;

805.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

806.   An award of reasonable attorneys' fees and costs; and

807.   Such further relief as this court deems equitable and just.

## <u>COUNT XXVII</u>

### (Missouri Health Care Payment Fraud and Abuse Act, Missouri Revised Statutes § 191.900 *et seq*.)

808.    Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

809.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Missouri. Upon information and belief, Defendants' actions described herein occurred in the State of Missouri as well.

810.   This is a qui tam action brought by Relator and the State of Missouri to recover treble damages and civil penalties under the Missouri Health Care Payment Fraud And Abuse Act, Missouri Revised Statutes § 191.900 et seq.

811.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(1) provides liability for any person –

812.   Knowingly presenting to a health care payer a claim for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not;

813.   Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

made by a health care payer for providing health care;

814.   Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled.

815.   Knowingly presenting a claim to a health care payer that falsely indicates that any particular health care was provided to a person or persons, if in fact health care of lesser value than that described in the claim was provided.

816.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(2) provides liability if any person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for -

817.   Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

818.   Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

819.   The Missouri Health Care Payment Fraud And Abuse Act § 191-905(3) provides liability if any person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

820.   Defendants violated the Missouri Health Care Payment Fraud and Abuse Act § 191-905(1) & (2) & (3) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

821.   Defendants furthermore violated Missouri Health Care Payment Fraud And

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

Abuse Act § 191-905(1) & (2) & (3) and knowingly caused thousands of false claims to be made, used and presented to Missouri from at least 2005 to the present by its violation of federal and state laws, including Missouri Revised Statutes §191-905(3), the Anti-Kickback Act and Stark Act Requirements, as described herein.

822.   Missouri, by and through the Missouri Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

823.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Missouri in connection with Defendants' fraudulent and illegal practices.

824.   Had the State of Missouri known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

825.   As a result of Defendants' violations of § 191-905(1) & (2) & (3), the State of Missouri has been damaged in an amount far in excess of millions of dollars exclusive of interest.

826.   Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Missouri Revised Statutes § 191.907 on behalf of themselves and the State of Missouri.

827.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Missouri in the operation of its Medicaid program.

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

828.    Pursuant to the Missouri Health Care Payment Fraud And Abuse Act, the State of Missouri and Relator is entitled to the following damages as against Defendants:

829.    To the STATE OF MISSOURI:

830.    Three times the amount of actual damages which the State of Missouri has sustained as a result of Defendants' fraudulent and illegal practices;

831.    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Missouri;

832.    Prejudgment interest; and

833.    All costs incurred in bringing this action.

834.    To RELATOR:

835.    The maximum amount allowed pursuant to Missouri Revised Statutes § 191.907 and /or any other applicable provision of law;

836.    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

837.    An award of reasonable attorneys' fees and costs; and

838.    Such further relief as this court deems equitable and just.

## COUNT XXVIII

### (Montana False Claims Act, MT ST 17-8-401 *et seq.*)

839.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

840.    Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in Montana. Upon information and belief, Defendants' actions described herein occurred in Montana as well.

841.    This is a qui tam action brought by Relator and State of Montana for treble damages and penalties under Montana False Claims Act, MT ST 17-8-401 *et seq*.

FIRST AMENDED COMPLAINT                                    2:16-cv-06997-RGK-RAO

842.   MT ST 17-8-403 provides liability for any person who—

843.   knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval;

844.   knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity;

845.   conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity.

846.   In addition, MT ST 45-6-313 prohibits the solicitation, receipt or offering any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the Montana Medicaid program.

847.   Defendants violated MT ST 45-6-313 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

848.   Defendants furthermore violated MT ST 17-8-403 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Montana from at least 2005 to the present by its violation of federal and state laws, including MT ST 45-6-313, the Anti-Kickback Act and the Stark Act, as described herein.

849.   The State of Montana, by and through the Montana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

850.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Defendants' fraudulent and illegal practices.

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

851.   Had the State of Montana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

852.   As a result of Defendants' violations of MT ST 17-8-403 the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

853.   Relator are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to MT ST 17-8-406 on behalf of themselves and the State of Montana.

854.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

855.   Pursuant to the Montana False Claims Act, the State of Montana and Relator are entitled to the following damages as against Defendants:

856.   To the STATE OF MONTANA:

857.   Three times the amount of actual damages which that State of Montana has sustained as a result of Defendants' fraudulent and illegal practices;

858.   A civil penalty of between $5,500 and $11,000 (adjusted for inflation) for each false claim which Defendants caused to be presented to the State of Montana;

859.   Prejudgment interest; and

860.   All costs incurred in bringing this action.

861.   To RELATOR:

862.   The maximum amount allowed pursuant to MT ST 17-8-410 and/or any other applicable provision of law;

863.   Reimbursement for reasonable expenses which Relator incurred in

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

connection with this action;

864.  An award of reasonable attorneys' fees and costs; and

865.  Such further relief as this Court deems equitable and just.

## COUNT XXIX

### (Nevada False Claims Act, N.R.S. § 357.010 *et seq*.)

866.   Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

867.  Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Nevada. Upon information and belief, Defendants' actions described herein occurred in Nevada as well.

868.  This is a qui tam action brought by Relator and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010 et. seq.

869.  N.R.S. § 357.040(1) provides liability for any person who—

870.  Knowingly presents or causes to be presented a false claim for payment or approval;

871.  Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

872.  Conspires to defraud by obtaining allowance or payment of a false claim;

873.  Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

874.  In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

875.   Defendants violated N.R.S. § 422.560 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

876.   Defendants furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2005 to the present by its violation of federal and state laws, including N.R.S. § 422.560, the Anti-Kickback Act and the Stark Act, as described herein.

877.   The State of Nevada, by and through the Nevada Medicaid program and other health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

878.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendants' fraudulent and illegal practices.

879.   Had the State of Nevada known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

880.   As a result of Defendants' violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount far in excess or millions of dollars exclusive of interest.

881.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the State of Nevada.

882.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and

merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

883.   Pursuant to the Nevada False Claims Act, the State of Nevada and Relator are entitled to the following damages as against Defendants:

884.   To the STATE OF NEVADA:

885.   Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' fraudulent and illegal practices;

886.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Nevada;

887.   Prejudgment interest; and

888.   All costs incurred in bringing this action.

889.   To RELATOR:

890.   The maximum amount allowed pursuant to N.R.S § 357.210 and/or any other applicable provision of law;

891.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

892.   An award of reasonable attorneys' fees and costs; and

893.   Such further relief as this Court deems equitable and just.

## COUNT XXX

### (New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.*)

894.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

895.   Additionally, Defendants conduct business in the New Jersey. Upon information and belief, Defendants' actions described herein occurred in New Jersey as well.

896.   This is a qui tam action brought by Relator and State of New Jersey for treble damages and penalties under New Jersey False Claims Act, N.J.S.A.

2A:32C-1 *et seq.*

897.   N.J.S.A. 2A:32C-3 provides liability for any person who—

898.   Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

899.   Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

900.   Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

901.   In addition, N.J.S.A. 30:4D-17 prohibits solicitation, offers, or receipt of any kickback, rebate or bribe in connection with the furnishing of items or services for which payment is or may be made in whole or in part under the New Jersey Medicaid program, or the furnishing of items or services whose cost is or may be reported in whole or in part in order to obtain benefits or payments under New Jersey Medicaid.

902.   Defendants violated N.J.S.A. 30:4D-17 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

903.   Defendants furthermore violated N.J.S.A. 2A:32C-3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2005 to the present by its violation of federal and state laws, including N.J.S.A. 30:4D-17, the Anti-Kickback Act and the Stark Act, as described herein.

904.   The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

905.   Compliance with applicable Medicare, Medicaid and the various other

FIRST AMENDED COMPLAINT                           2:16-cv-06997-RGK-RAO

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' fraudulent and illegal practices.

906.   Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

907.   As a result of Defendants' violations of N.J.S.A. 2A:32C-3 the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

908.   Relator are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to N.J.S.A. 2A:32C-5 on behalf of themselves and the State of New Jersey.

909.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

910.   Pursuant to the New Jersey False Claims Act, the State of New Jersey and Relator are entitled to the following damages as against Defendants:

911.   To the STATE OF NEW JERSEY:

912.   Three times the amount of actual damages which that State of New Jersey has sustained as a result of Defendants' fraudulent and illegal practices;

913.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

914.   Prejudgment interest; and

915.   All costs incurred in bringing this action.

916.   To RELATOR:

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

917.   The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7and/or any other applicable provision of law;

918.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

919.   An award of reasonable attorneys' fees and costs; and

920.   Such further relief as this Court deems equitable and just.

## COUNT XXXI

**(New Mexico Medicaid False Claims Act, and New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 27-14-1 *et seq.*, and N. M. S. A. 1978, § 44-9-1 *et seq.*)**

921.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

922.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of New Mexico. Upon information and belief, Defendants' actions described herein occurred in the State of New Mexico as well.

923.   This is a qui tam action brought by Relator and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, § 27-14-1 *et seq.* and the New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 44-9-1 *et seq.*

924.   N. M. S. A. 1978, § 27-14-4 provides liability for any person who-

925.   Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program;

926.   Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

state knowing such record or statement is false;

927.   Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

928.   N.M.S.A. 1978 § 44-9-3 provides liability for any person who-

929.   knowingly presents, or causes to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval;

930.   knowingly makes or uses, or causes to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

931.   conspires to defraud the state by obtaining approval or payment on a false or fraudulent claim;

932.   conspires to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

933.   Defendants violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

934.   Defendants furthermore violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 and knowingly caused thousands of false claims to be made, used and presented to the State of New Mexico from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

935.   The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

936.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' fraudulent and illegal practices.

937.   Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

938.   As a result of Defendants' violations of N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

939.   Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N. M. S. A. 1978, § 27-14-7 and N. M. S. A. 1978, § 44-9-5 on behalf of themselves and the State of New Mexico.

940.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

941.   Pursuant to the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act, the State of New Mexico and Relator are entitled to the following damages as against Defendants:

942.   To the STATE OF NEW MEXICO:

943.   Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' fraudulent and illegal practices;

944.   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

945.   Prejudgment interest; and

946.   All costs incurred in bringing this action.

947.   To RELATOR:

948.   The maximum amount allowed pursuant to N. M. S. A. 1978, § 27-14-9 and N. M. S. A. 1978, § 44-9-7 and /or any other applicable provision of law;

949.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

950.   An award of reasonable attorneys' fees and costs; and

951.   Such further relief as this court deems equitable and just.

## COUNT XXXII

### (New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*)

952.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

953.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the New York. Upon information and belief, Defendants' actions described herein occurred in New York as well.

954.   This is a qui tam action brought by Relator and State of New York for treble damages and penalties under New York False Claims Act, N.Y. State Finance Law § 187 *et seq*.

955.   N.Y. State Finance Law § 189 provides liability for any person who—

956.   Knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval;

957.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government;

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

958.   Conspires to defraud the state or a local government by getting a false or fraudulent claim allowed or paid.

959.   Defendants violated § 189 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

960.   Defendants furthermore violated § 189 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

961.   The State of New York, by and through the New York Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

962.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Defendants' fraudulent and illegal practices.

963.   Had the State of New York known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

964.   As a result of Defendants' violations of § 189 the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

965.   Relator are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to N.Y. State Finance Law § 190(2) on behalf of themselves and the State of New York.

966.   This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

967.   Pursuant to the New York False Claims Act, the State of New York and Relator are entitled to the following damages as against Defendants:

968.   To the STATE OF NEW YORK:

969.   Three times the amount of actual damages which that State of New York has sustained as a result of Defendants' fraudulent and illegal practices;

970.   A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendants caused to be presented to the State of New York;

971.   Prejudgment interest; and

972.   All costs incurred in bringing this action.

973.   To RELATOR:

974.   The maximum amount allowed pursuant to N.Y. State Finance Law § 190(6) and/or any other applicable provision of law;

975.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

976.   An award of reasonable attorneys' fees and costs; and

977.   Such further relief as this Court deems equitable and just.

## COUNT XXXIII

### (North Carolina False Claims Act, North Carolina General Statutes § 51-1-605 *et seq.*)

978.    Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

979.   Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of North Carolina. Upon information and belief, Defendants' actions

described herein occurred in the State of North Carolina as well.

980.  This is a qui tam action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, North Carolina General Statutes § 51-1-605 *et seq.*

981.  North Carolina General Statutes § 51-1-607 provides liability for any person who-

982.  Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval

983.  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

984.  Conspires to commit a violation of subdivisions of this section.

985.  Defendants violated North Carolina General Statutes § 51-1-607 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

986.  Defendants furthermore violated North Carolina General Statutes § 51-1-607 and knowingly caused thousands of false claims to be made, used and presented to the State of North Carolina from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

987.  The State of North Carolina, by and through the State of North Carolina Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

988.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendants' fraudulent and illegal practices.

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

989.   Had the State of North Carolina known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

990.   As a result of Defendants' violations of North Carolina General Statutes § 51-1-607 the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

991.   Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to North Carolina General Statutes § 51-1-608 on behalf of themselves and the State of North Carolina.

992.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

993.   Pursuant to the North Carolina False Claims Act, the State of North Carolina and Relator are entitled to the following damages as against Defendants:

994.   To the STATE OF NORTH CAROLINA:

995.   Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' fraudulent and illegal practices;

996.   A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina;

997.   Prejudgment interest; and

998.   All costs incurred in bringing this action.

999.   To RELATOR:

1000. The maximum amount allowed pursuant to North Carolina General Statutes § 51-1-610 and /or any other applicable provision of law;

1001. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

1002. An award of reasonable attorneys' fees and costs; and

1003. Such further relief as this court deems equitable and just.

## COUNT XXXIV

**(Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 *et seq*.)**

1004.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1005. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Oklahoma. Upon information and belief, Defendants' actions described herein occurred in the State of Oklahoma as well.

1006. This is a qui tam action brought by Relator and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 *et seq*.

1007. 63 Okl. St. Ann. § 5053.1 provides liability for any person who-

1008. Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

1009. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

1010. Conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

1011. In addition, 56 Okl. St. Ann. § 1005 prohibits solicitation or acceptance of a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

1012. Defendants violated 56 Okl. St. Ann. § 1005 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

1013. Defendants furthermore violated 63 Okl. St. Ann. § 5053.1 and knowingly caused thousands of false claims to be made, used and presented to the State of Oklahoma from at least 2005 to the present by its violation of federal and state laws, including 56 Okl. St. Ann. § 1005, the Anti-Kickback Act, and Stark Act, as described herein.

1014. The State of Oklahoma, by and through the State of Oklahoma Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1015. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' fraudulent and illegal practices.

1016. Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1017. As a result of Defendants' violations of 63 Okl. St. Ann. § 5053.1 the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1018. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 63 Okl. St. Ann. § 5053.2(B) on behalf of themselves and the State of Oklahoma.

1019. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

1020. Pursuant to the Oklahoma Medicaid False Claims Act, the State of Oklahoma and Relator are entitled to the following damages as against Defendants:

1021. To the STATE OF OKLAHOMA:

1022. Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' fraudulent and illegal practices;

1023. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Oklahoma;

1024. Prejudgment interest; and

1025. All costs incurred in bringing this action.

1026. To RELATOR:

1027. The maximum amount allowed pursuant 63 Okl. St. Ann. § 5053.4 and /or any other applicable provision of law;

1028. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

1029. An award of reasonable attorneys' fees and costs; and

1030. Such further relief as this court deems equitable and just.

## COUNT XXXV

### (Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1 *et seq.*)

1031.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1032. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Rhode Island. Upon information and belief, Defendants' actions described herein occurred in the State of Rhode Island as well.

1033. This is a qui tam action brought by Relator and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1 *et seq.*

1034. Gen. Laws 1956, § 9-1.1-3 provides liability for any person who-

1035. knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the guard a false or fraudulent claim for payment or approval;

1036. knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

1037. conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

1038. In addition, Gen. Laws 1956, § 40-8.2-3 prohibits the solicitation, receipt, offer, or payment of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, in cash or in kind, to induce referrals from or to any person in return for furnishing of services or merchandise or in return for referring an individual to a person for the furnishing of any services or merchandise for which payment may be made, in whole or in part, under the Rhode Island Medicaid program.

1039. Defendants violated Gen. Laws 1956, § 40-8.2-3 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

1040. Defendants furthermore violated Gen. Laws 1956, § 9-1.1-3 and knowingly caused thousands of false claims to be made, used and presented to the State of Rhode Island from at least 2005 to the present by its violation of federal and state laws, including Gen. Laws 1956, § 40-8.2-3, the Anti-Kickback Act, and Stark Act, as described herein.

1041. The State of Rhode Island, by and through the State of Rhode Island Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1042. Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' fraudulent and illegal practices.

1043. Had the State of Rhode Island known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1044. As a result of Defendants' violations of Gen. Laws 1956, § 9-1.1-3 the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1045. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Gen. Laws 1956, § 9-1.1-4(b) on behalf of themselves and the State of Rhode Island.

1046. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

1047. Pursuant to the Rhode Island False Claims Act, the State of Rhode Island and Relator are entitled to the following damages as against Defendants:

1048. To the STATE OF RHODE ISLAND:

1049. Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' fraudulent and illegal practices;

1050. A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Rhode Island;

1051. Prejudgment interest; and

1052. All costs incurred in bringing this action.

1053. To RELATOR:

1054. The maximum amount allowed pursuant Gen. Laws 1956, § 9-1.1-4(d) and /or any other applicable provision of law;

1055. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

1056. An award of reasonable attorneys' fees and costs; and

1057. Such further relief as this court deems equitable and just.

## <u>COUNT XXXVI</u>

**(Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)**

1058.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1059. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Tennessee. Upon information and belief, Defendants' actions described herein occurred in Tennessee as well.

1060. This is a qui tam action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

1061. Section 71-5-182(a)(1) provides liability for any person who—

1062. Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

1063. Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for and approved by the state knowing such record or statement is false;

1064. Conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

1065. Defendants violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the

State of Tennessee from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

1066. The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

1067. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' fraudulent and illegal practices.

1068. Had the State of Tennessee known that Defendants violated the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1069. As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1070. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

1071. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

1072. Pursuant to the Tennessee Medicaid False Claims Act, the State of Tennessee and Relator are entitled to the following damages as against Defendants:

1073. To the STATE OF TENNESSEE:

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

1074. Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' fraudulent and illegal practices;

1075. A civil penalty of not less than $5,000 and not more than $25,000 for each false claim which Defendants caused to be presented to the State of Tennessee;

1076. Prejudgment interest; and

1077. All costs incurred in bringing this action.

1078. To RELATOR:

1079. The maximum amount allowed to Tenn. Code Ann. §71-5-183(d) and/or any other applicable provision of law;

1080. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

1081. An award of reasonable attorneys' fees and costs; and

1082. Such further relief as this Court deems equitable and just.

## COUNT XXXVII

### (Vermont False Claims Act, 32 V.S.A. 630 *et seq.*)

1083.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1084. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Vermont. Upon information and belief, Defendants' actions described herein occurred in the State of Vermont as well.

1085. This is a qui tam action brought by Relator and the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, 32 V.S.A. 630 *et seq.*

1086. 32 V.S.A. 631 provides liability for any person who shall-

1087. Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.

1088. Knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

1089. Conspires to commit a violation of this subsection.

1090. Defendants violated 32 V.S.A. 630 *et seq.* from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

1091. Defendants furthermore violated 32 V.S.A. 630 *et seq.* and knowingly caused thousands of false claims to be made, used and presented to the State of Vermont from at least 2005 to the present by its violation of federal and state laws, including 32 V.S.A. 630 *et seq.*, the Anti-Kickback Act, and Stark Act, as described herein.

1092. The State of Vermont, by and through the State of Vermont Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1093. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Vermont in connection with Defendants' fraudulent and illegal practices.

1094. Had the State of Vermont known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1095. As a result of Defendants' violations of 32 V.S.A. 630 *et seq.* the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1096. Relator are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 32 V.S.A.

632(b)(1) on behalf of themselves and the State of Vermont.

1097. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

1098. Pursuant to the Vermont False Claims Act, the State of Vermont and Relator are entitled to the following damages as against Defendants:

1099. To the STATE OF VERMONT:

1100. Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' fraudulent and illegal practices;

1101. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Vermont;

1102. Prejudgment interest; and

1103. All costs incurred in bringing this action.

1104. To RELATOR:

1105. The maximum amount allowed pursuant 32 V.S.A. 635(b) and /or any other applicable provision of law;

1106. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

1107. An award of reasonable attorneys' fees and costs; and

1108. Such further relief as this court deems equitable and just.

## COUNT XXXVIII

### (Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1*et seq.*)

1109.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1110. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business

in the Commonwealth of Virginia. Upon information and belief, Defendants' actions described herein occurred in the Commonwealth of Virginia as well.

1111. This is a qui tam action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.

1112. Va. Code Ann. § 8.01-216.3 provides liability for any person who-

1113. Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

1114. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth

1115. Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

1116. Defendants violated Va. Code Ann. § 8.01-216.3 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

1117. Defendants furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused thousands of false claims to be made, used and presented to the Commonwealth of Virginia from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act and Stark Act, as described herein.

1118. The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1119. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the

Commonwealth of Virginia in connection with Defendants' fraudulent and illegal practices.

1120. Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1121. As a result of Defendants' violations of Va. Code Ann. § 8.01-216.3 the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1122. Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of himself and the Commonwealth of Virginia

1123. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

1124. Pursuant to the Virginia Fraud Against Taxpayers Act, the Commonwealth of Virginia and Relator are entitled to the following damages as against Defendants:

1125. To the COMMONWEALTH OF VIRGINIA:

1126. Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' fraudulent and illegal practices;

1127. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

1128. Prejudgment interest; and

1129. All costs incurred in bringing this action.

1130. To RELATOR:

1131. The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and /or any other applicable provision of law;

1132. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

1133. An award of reasonable attorneys' fees and costs; and

1134. Such further relief as this court deems equitable and just.

## COUNT XXXIX

**(Washington False Claims Act, Washington Revised Code § 74 66-005 *et seq*.)**

1135.  Relator re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1136. Additionally, Relator state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Washington. Upon information and belief, Defendants' actions described herein occurred in the State of Washington as well.

1137. This is a qui tam action brought by Relator and the State of Washington to recover treble damages and civil penalties under the Washington False Claims Act, Washington Revised Code § 74 66-005 *et seq*.

1138. Washington Revised Code § 74 66-020 provides liability for any person who-

1139. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

1140. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

1141. Conspires to commit one or more of the violations in this subsection.

1142. Defendants violated Washington Revised Code § 74 66-020 from at least 2005 to the present by engaging in the fraudulent and illegal practices described

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

herein.

1143. Defendants furthermore violated Washington Revised Code § 74 66-020 and knowingly caused thousands of false claims to be made, used and presented to the State of Washington from at least 2005 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

1144. The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1145. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' fraudulent and illegal practices.

1146. Had the State of Washington known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Defendants' fraudulent and illegal practices.

1147. As a result of Defendants' violations of Washington Revised Code § 74 66-020 the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1148. Relator have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Washington Revised Code § 74 66-050 on behalf of themselves and the State of Washington.

1149. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

Medicaid program.

1150. Pursuant to the Washington False Claims Act, the State of Washington and Relator are entitled to the following damages as against Defendants:

1151. To the STATE OF WASHINGTON:

1152. Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' fraudulent and illegal practices;

1153. A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

1154. Prejudgment interest; and

1155. All costs incurred in bringing this action.

1156. To RELATOR:

1157. The maximum amount allowed pursuant to Washington Revised Code § 74 66-070 and /or any other applicable provision of law;

1158. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

1159. An award of reasonable attorneys' fees and costs; and

1160. Such further relief as this court deems equitable and just.

## **REQUESTS FOR RELIEF**

WHEREFORE, the Relator, on behalf of the UNITED STATES, demands that judgment be entered in its favor and against Defendants: JANSSEN PHARMACEUTICA PRODUCTS LP, JOHNSON & JOHNSON, and ORTHO-MCNEIL, with judgment to be entered against each DEFENDANT for the amount of damages to the States' Medicaid Programs arising (a) from claims for each DEFENDANTS' respective specified drugs and (b) jointly and severally with such other Defendants for damages as set forth in each paragraph above and herein, as follows:

1.     On Count I (False Claims Act; Causing Presentation of False Claims) for

triple the amount of the UNITED STATES' damages, plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

2.       On Count II (False Claims Act; Causing False Statements to Be Used to Get False Claims Paid or Approved by The GOVERNMENT) for triple the amount of UNITED STATES' damages plus civil penalties of plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

3.       On Count III (False Claims Act; Causing False Statements to Be Used to Conceal an Obligation to Pay Money to The GOVERNMENT) for triple amount of the UNITES STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

4.       On Count IV (False Claims Act; Causing Presentation of False and Fraudulent Claims; Illegal Remuneration) for triple amount of the UNITES STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

5.       On Count V (False Claims Act; Causing A False Record or Statement to Be Made or Used to Get a False or Fraudulent Claim Paid or Approved by The Government; Prohibited Referrals, Claims, and Compensation Arrangements) for triple amount of the UNITES STATES' damages plus civil penalties of the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the UNITED STATES;

6.       On Count VI (False Claims Act; Conspiring to Defraud the Government by Getting a False or Fraudulent Claim Allowed or Paid) for triple amount of the UNITES STATES' damages plus civil penalties of the maximum amount allowed

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO

by law be imposed for each and every false claim that Defendants presented to the UNITED STATES.

7.     Further, the Relator, on its behalf, requests that it receive the maximum amount as permitted by the law, of the proceeds of this action or settlement of this action collected by the UNITED STATES, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relator requests that its award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## **DEMAND FOR JURY TRIAL**

Relator hereby demands a jury trial.

Dated: February 16, 2018          Respectfully submitted,


                                  **UNITED STATES OF AMERICA, ex rel. Relator**


                              By: __/s/_____
                                  C. Brooks Cutter
                                  John R. Parker, Jr.
                                  CUTTER LAW PC
                                  401 Watt Avenue
                                  Sacramento, California 95864
                                  Telephone:    (916) 448-9800
                                  Facsimile:    (916) 669-4499

                                  Mychal Wilson SBN 236189
                                  The Law Offices of Mychal Wilson
                                  401 Wilshire Blvd., 12th Floor
                                  Santa Monica, CA 90401
                                  Telephone: (424) 252-4232
                                  Facsimile: (310) 424-7116


                                  *Attorneys for Relator Jane Doe*

FIRST AMENDED COMPLAINT                         2:16-cv-06997-RGK-RAO

## **CERTIFICATION THAT VENUE IS PROPER**

Below-signed counsel hereby endorses and certify that this case is properly

assigned to the Central District of California.

Dated:  February 16, 2018

By:  \_\_/s/_____
C. Brooks Cutter
John R. Parker, Jr.
CUTTER LAW PC
401 Watt Avenue
Sacramento, California 95864
Telephone:  (916) 448-9800
Facsimile:   (916) 669-4499

Mychal Wilson SBN 236189
The Law Offices of Mychal Wilson
401 Wilshire Blvd., 12th Floor
Santa Monica, CA 90401
Telephone: (424) 252-4232
Facsimile: (310) 424-7116

*Attorneys for Relator Jane Doe*

FIRST AMENDED COMPLAINT                    2:16-cv-06997-RGK-RAO